THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT MAY BE REVISED BEFORE BANKRUPTCY COURT APPROVAL.

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
| AMELIA ISLAND COMPANY,<br>a Delaware corporation, | ) | Case No. 3:09-bk-09601 |
| Debtor. | )<br>)<br>) |  |

# DISCLOSURE STATEMENT

Gardner F. Davis, Esq.
Emerson M. Lotzia, Esq.
**Foley & Lardner LLP**
One Independent Drive, Suite 1300
Jacksonville, Florida 32202
(904) 359-2000
(904) 359-8700 (Facsimile)

Special Counsel for Amelia Island Company

Richard R. Thames, Esq.
Eric N. McKay, Esq.
**Stutsman Thames & Markey, P.A.**
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)

Attorneys for Amelia Island Company

Dated May 21, 2010

DISCLAIMER ........................................................................................- 1 -
INTRODUCTION ...................................................................................- 2 -
ANSWERS TO CERTAIN QUESTIONS ABOUT THE PLAN AND DISCLOSURE
STATEMENT .........................................................................................- 4 -
OVERVIEW OF THE PLAN ...................................................................- 8 -
    General Structure of the Plan .............................................................- 8 -
    Sale and Bid Procedures ....................................................................- 8 -
    Summary of Treatment of Claims and Interests Under the Plan ...............- 9 -
CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILING..........- 16 -
    Historical Business Strategy and Operations.........................................- 16 -
    Events Leading to the Debtor's Chapter 11 Filing .................................- 18 -
    Revenues at the resort are cyclical, with March through May being the "peak season,"
    with October through November traditionally being the "slower revenue" months.- 20 -
    Room Utilization..............................................................................- 20 -
    Capital Structure as of the Petition Date ..............................................- 21 -
OPERATIONS DURING THE REORGANIZATION CASE.........................- 25 -
    First Day Relief................................................................................- 25 -
    Rejection of Certain Executory Contracts and Unexpired Leases............- 29 -
    Ad Valorem Taxes ...........................................................................- 30 -
    Claims Process and Bar Dates ...........................................................- 30 -
    Period of Exclusivity to file a Plan of Reorganization ...........................- 30 -
    Recovery Actions.............................................................................- 30 -
GENERAL INFORMATION CONCERNING THE PLAN .........................- 31 -
    Class 4 (Secured Claims of PRIAC) ..................................................- 31 -
    Class 5 (PRIAC Subordinated Claims):...............................................- 32 -
    Class 6 (Secured Claims of Compass): ...............................................- 33 -
    Class 7 (Club Member Claims): .........................................................- 33 -
    Class 8 (Resigned Member Claims): ...................................................- 34 -
    Class 9 (Secured Claim of NBSC):.....................................................- 35 -
    Class 10 (General Unsecured Claims):.................................................- 35 -
    Payment of Administrative Claims .....................................................- 36 -
    Payment of Priority Tax Claims .........................................................- 38 -
    Discharge of Claims and Termination of Interests .................................- 38 -
    Injunctions......................................................................................- 39 -
    Preservation of Rights of Action Held by the Debtor and the Liquidating Trustee .- 39 -
    Limitation of Liability.......................................................................- 40 -
    Releases..........................................................................................- 40 -
    Executory Contracts and Unexpired Leases .........................................- 41 -
    Insurance Policies and Agreements .....................................................- 42 -
    Dissolution of Committee ..................................................................- 43 -
    Modification or Revocation of the Plan................................................- 43 -
DISTRIBUTIONS UNDER THE PLAN ...................................................- 43 -
    Distributions for Claims Allowed as of the Effective Date ......................- 43 -
    Distributions on the Effective Date in Respect of Class 10 General Unsecured Claims -
    43 -
    Method of Distributions to Holders of Claims .......................................- 44 -

General Unsecured Claims Reserve.................................................................- 44 -
Distribution Record Date ..............................................................................- 44 -
Means of Cash Payments ..............................................................................- 44 -
Timing and Calculation of Amounts to Be Distributed .............................- 44 -
Compliance with Tax Requirements.............................................................- 45 -
Setoffs ............................................................................................................- 45 -
Prosecution of Objections to Claims............................................................- 45 -
Liquidation and Payment of Tort Claims.....................................................- 46 -
Treatment of Disputed Claims ......................................................................- 46 -
Distributions on Account of Disputed Claims Once They Are Allowed.................- 46 -
VOTING AND CONFIRMATION OF THE PLAN.....................................- 47 -
General.............................................................................................................- 47 -
Voting Procedures and Requirements.............................................................- 47 -
Confirmation Hearing .....................................................................................- 48 -
Confirmation ...................................................................................................- 49 -
Acceptance or Cramdown...............................................................................- 49 -
Best Interests Test; Liquidation Analysis ......................................................- 50 -
Feasibility........................................................................................................- 51 -
Compliance with Applicable Provisions of the Bankruptcy Code ...............- 52 -
Alternatives to Confirmation and Consummation of the Plan......................- 52 -
RISK FACTORS ......................................................................................................- 52 -
CERTAIN TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN..........- 53 -
Cancellation of Debt Income ..........................................................................- 54 -
U.S. Federal Income Tax Consequences to Claim Holders...........................- 54 -
Information Reporting and Backup Withholding ..........................................- 55 -
RECOMMENDATION AND CONCLUSION...........................................................- 56 -

# DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE CHAPTER 11 PLAN DATED MAY 19, 2010, FILED BY AMELIA ISLAND COMPANY (AS MAY BE AMENDED IN ACCORDANCE WITH THE TERMS THEREOF AND APPLICABLE LAW, THE "PLAN"). THE INFORMATION CONTAINED HEREIN MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN. NO PERSON MAY GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS, OTHER THAN THE INFORMATION AND REPRESENTATIONS CONTAINED IN THIS DISCLOSURE STATEMENT, REGARDING THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN AND THE PLAN SUPPLEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF AND THERE CAN BE NO ASSURANCE THAT STATEMENTS CONTAINED HEREIN SHALL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH § 1125 OF THE UNITED STATES BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAW.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS. THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

# INTRODUCTION

On November 13, 2009 (the "Petition Date"),[1] Amelia Island Company ("AIC" or the "Debtor") filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its properties and is managing its business as debtor in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

The Debtor submits this disclosure statement (as may be amended, the "Disclosure Statement") pursuant to § 1125 of the Bankruptcy Code for use in the solicitation of votes on the Plan. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection under Chapter 11 and significant events that have occurred during the Chapter 11 Case. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote on the Plan must follow for their votes to be counted.

The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of claims against and interests in a debtor, is the overriding purpose of a Chapter 11 case.

In this case, the Plan is premised on a sale of substantially all of the Debtor's assets, free and clear of all liens and encumbrances, with the proceeds being used to pay Administrative Claims, Priority Claims, Secured Claims and Unsecured Claims in the manner outlined in the Plan. To ensure the Debtor sells the Assets at the highest and best price, an auction shall be held and all qualified purchasers shall have the opportunity to bid at the auction. Additionally, the Debtor's secured lenders, PRIAC Realty Investments, LLC ("PRIAC") and Compass Bank ("Compass"), may be permitted to credit bid for their respective collateral. For any successful bidder to be chosen as the highest or otherwise best bid, that bidder must provide a bid that pays the claims that must be paid to confirm a Chapter 11 plan. If any potential bidder provides a bid that will not fund a confirmable Chapter 11 plan, such bid will not be chosen as the highest or otherwise best bid.

The Debtor has received preliminary offers from several experienced and reputable potential purchasers and has signed an Asset Purchase Agreement with Noble Hospitality Fund Acquisitions, LLP, who will serve as the "stalking horse" bidder and the Noble APA as the template for the sale of the Debtor's assets at auction. A copy of the Asset Purchase Agreement is attached hereto as Exhibit I. The Debtor presently cannot inform creditors if another bidder will be chosen as the successful bidder at auction or the terms that such bidder may propose. The Asset Purchase Agreement does, however, provide a floor that any successful bidder must exceed in order to acquire the assets. Creditors must realize, however, that to receive any distributions from either auction or stalking horse sale, the Plan must be approved and confirmed.

---

[1] All capitalized terms in this Disclosure Statement not otherwise defined herein have the meanings given to them in the Plan or the Bankruptcy Code.

The sale structure provides for the purchaser of the Debtor's assets to operate the assets as a first class resort and honor all pending sale contracts for Resort use for the post-closing period. As a condition to being permitted to purchase the Resort, the Bankruptcy Court will determine that the purchaser has the financial resources and management team necessary to successfully operate the Resort after closing.

The Plan further provides for the conversion of the current members-only club to an equity club owned by the members. The conversion of the existing club to an equity club will provide for the new equity club to assume all obligations concerning any right to a refund of Membership Deposits. All current club members are entitled to vote to accept or reject the Plan. Additionally, resigned members who elect to join the equity club and have their claims treated equally with current club member claims are also entitled to vote on the Plan. If the club members (*i.e.* holders of Club Member Claims in Class 7) approve the Plan by requisite vote, the Debtor shall transfer, for the benefit of the present and future members of the New Club, the Member Facilities (defined in the Plan to include the Ocean Club House, the Long Point Club House and the Long Point Golf Course) to either AICI or a new not-for-profit corporation in accordance with the terms of the Member Facilities Lease/Purchase Agreement, a copy of which is attached to the Plan as Exhibit 1.1(71).

EXCEPT AS EXPRESSLY PROVIDED IN THE PLAN, ON THE EFFECTIVE DATE, ALL CURRENT MEMBERS', RESIGNED MEMBERS' AND AICI'S PAST, PRESENT AND FUTURE RIGHTS, CLAIMS AND PRIVILEGES, BOTH AT LAW AND IN EQUITY, WHICH ANY SUCH MEMBER OR ENTITY NOW HAS, HAS HAD OR MAY HEREAFTER HAVE ARISING FROM OR RELATING TO OR CONCERNING THE EXISTING CLUB, THE EXISTING CLUB MEMBERSHIP PLAN, THE CLUB AGREEMENT, THE CLUB FACILITIES (INCLUDING THE MEMBER FACILITIES), THE NDA, OR ANY COVENANT RUNNING WITH THE LAND RELATED TO THE CLUB FACILITIES (INCLUDING THE MEMBER FACILITIES) ARE AND WILL BE IRREVOCABLY AND UNCONDITIONALLY TERMINATED, RELEASED AND DISCHARGED. UPON THE EFFECTIVE DATE, THE EXISTING CLUB MEMBERSHIP PLAN, THE CLUB AGREEMENT AND THE NDA SHALL BE TERMINATED, NULL AND VOID AND OF NO FORCE OR EFFECT. UPON THE EFFECTIVE DATE, EXCEPT AS EXPRESSLY PROVIDED IN THE MEMBER FACILITIES TRANSFER AGREEMENT AND THE NEW CLUB PLAN, NONE OF CURRENT MEMBERS, RESIGNED MEMBERS NOR AICI SHALL HAVE ANY FURTHER RIGHTS, CLAIMS OR PRIVILEGES WITH RESPECT TO THE CLUB FACILITIES (INCLUDING THE MEMBER FACILITIES). NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE TRANSFER OF THE CLUB FACILITIES TO AICI AND THE SALE OF ASSETS TO THE PURCHASER SHALL BE FREE AND CLEAR OF ALL RIGHTS AND CLAIMS OF ALL CURRENT MEMBERS, RESIGNED MEMBERS AND AICI, INCLUDING ALL RIGHTS AND CLAIMS UNDER THE NDA, EXCEPT FOR THE TERMS OF THE MEMBER FACILITIES TRANSFER AGREEMENT OR ACCESS AND USE AGREEMENT, AS APPLICABLE

**AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTOR UNDER THE PLAN AND THE CASH,**

CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS AND DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, EACH HOLDER OF A CLAIM THAT VOTES IN FAVOR OF THE PLAN WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTOR'S OBLIGATIONS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES, AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION OR OTHER OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANYWAY RELATING TO THE DEBTOR, THE REORGANIZATION CASE OR ANY OF THE DEBTOR'S PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, ACCOUNTANTS (INCLUDING INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS), ADVISORS, ATTORNEYS, INVESTMENT BANKERS, UNDERWRITERS, CONSULTANTS OR OTHER AGENTS OR SHAREHOLDERS, ACTING IN SUCH CAPACITY (WHICH RELEASE WILL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED IN THE PLAN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), EXCEPT FOR THOSE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES BASED ON ACTS OR OMISSIONS OF ANY SUCH PERSON CONSTITUTING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.**

### ANSWERS TO CERTAIN QUESTIONS
### ABOUT THE PLAN AND DISCLOSURE STATEMENT

*The information presented in the answers to the questions set forth below is qualified in its entirety by reference to the full text of this Disclosure Statement, including the Plan.* All creditors entitled to vote on the Plan are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan, prior to submitting a Ballot to accept or reject the Plan.

#### *What is this document and why am I receiving it?*

On November 13, 2009, the Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. The Debtor continues in possession of its properties and is managing its business as debtor in possession, pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. In connection with the proposed reorganization in accordance with Chapter 11, the Debtor has prepared the Plan of Reorganization, which sets forth in detail the proposed treatment of the Claims of the Debtor's creditors and

Interests of the Debtor's equity interest holders. This Disclosure Statement describes the terms of, and certain other material information relating to, the Plan.

This Disclosure Statement is being delivered to you because you either are or may be the holder of, or have otherwise asserted, either a Claim or Claims against the Debtor. This Disclosure Statement is intended to provide you with information sufficient to make an informed decision as to whether to vote to accept or reject the Plan.

***Am I eligible to vote to accept or reject the Plan?***

You are entitled to vote to accept or reject the Plan only if you hold an Allowed Claim (or a Claim that has been temporarily allowed for voting purposes) in one or more of the following Classes:

- Class 4 (Secured Claims of PRIAC)

- Class 6 (Secured Claims of Compass)

- Class 7 (Club Member Claims)

- Class 10 (General Unsecured Claims)

In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims are not eligible to vote with respect to the Plan as a holder of such Claim. If you hold an Allowed Claim in Class 1 (Unsecured Priority Claims) you will receive Cash equal to the allowed amount of such Claim and thus are deemed to have accepted the Plan and may not vote with respect to it as a holder of such Claim.

***Why should I vote to accept the Plan?***

Simply put, from a creditor's perspective, this Plan provides the best means for achieving the maximum distribution on account of your prepetition claim. The Plan, as you see it, is the product of months of difficult negotiations, and is believed to have the support of the major constituencies who have had the financial resources to investigate and pursue alternative course for achieving a distribution on account of the prepetition claims. It is believed that a failure to achieve confirmation of the Plan will result in a piecemeal liquidation of the Assets, with little or no prospects for distributions to unsecured creditors.

From a Club Members' perspective, confirmation of the Plan will maintain continuity of your use of the Club amenities and preservation of the resort in a manner resembling the current Club structure. The failure to achieve confirmation of the Plan could result in the closure of Club facilities and your loss of access to those amenities not expressly covered by the Non-Disturbance Agreement.

***How do I vote to accept or reject the Plan?***

If you are entitled to vote on the Plan because you are the holder of a Claim in Class 4, Class 6, Class 7, Class 9, or Class 10 that is allowed or has been temporarily

allowed for voting purposes, as the case may be, you must complete, sign and return your Ballot or Ballots in accordance with the ballot instructions to be provided.

### *What if I'm entitled to vote to accept or reject the Plan and don't?*

In general, within any particular class of Claims, only those holders of Claims who actually vote to accept or to reject the Plan will affect whether the Plan is accepted by the requisite holders of Claims in such Class. The holders representing at least two-thirds in dollar amount and a majority in number of the Claims in such Class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such Claims who actually vote to accept or to reject the Plan must vote to accept the Plan.

### *What happens if the Plan is not accepted by each Class entitled to vote on the Plan?*

If the holders of each Class of Claims entitled to vote on the Plan (*i.e.* Class 4, Class 6, Class 7, Class 8, Class 9, and Class 10) vote to reject the Plan, the Plan will not be confirmed or consummated in its present form. Conversely, as long as the requisite holders of Claims in one of the above enumerated classes vote to accept the Plan, the Debtor may seek Confirmation pursuant to the "cramdown" provisions of the Bankruptcy Code (which will require a determination by the Bankruptcy Court that that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class that does not accept the Plan or is deemed to have rejected it). The Debtor believes that the Plan satisfies the "cramdown" provisions of the Bankruptcy Code and, in any case, has reserved the right to modify the Plan to the extent that Confirmation thereunder requires modification.

### *As a Current or Former Club Member, What will I receive on account of my Claim if the Plan is confirmed and becomes effective?*

If the holders of Club Member Claims vote to accept the Plan, *i.e.* if at least two-thirds in amount and more that one-half in number of holders of Club Member Claims vote in favor of the Plan, each holder of a Club Member Claim shall receive in full satisfaction of its Allowed Class 7 Claim, New Club Membership Rights in accordance with the terms of the Member Facilities Lease Agreement  Pursuant to the Member Facilities Lease Agreement, each Current Member will receive a membership in New Club in the membership category corresponding to their current membership category in Existing Club, without payment of any initiation fee.  New Club Membership Rights shall be as provided in Exhibit 1.1(77) to the Plan.

If the holders of Club Member Claims vote to reject the Plan, each holder of a Club Member Claim shall receive in full satisfaction of its Allowed Class 7 Claim, Access and Use Rights in accordance with the Access and Use Agreement.  Pursuant to the Access and Use Agreement, holders of Club Member Claims will receive the right to access and use the New Club corresponding to their current or resigned membership category in Existing Club, without payment of any initiation fee, provided such holders of Club Member Claims continue to pay dues and abide by the rules and policies of the

New Club. If any member fails to timely pay applicable dues and abide by the rules and policies of the New Club, such member's Access and Use Rights shall terminate.

Class 8 Resigned Member Claims shall have the option to elect (a) treatment under Class 7 as Club Member Claims or (b) as Class 8 Resigned Member Claims. The treatment of Resigned Club Member Claims under the Plan shall be as set forth above for Class 7 for each Resigned Member who elects treatment under Class 7. In the absence of such election, each Class 8 Claim shall have an Allowed Claim calculated to be zero for purposes of voting and distribution and holders of Class 8 Claims will be deemed to have rejected the Plan and are not entitled to vote thereon.

### What will I receive if my Claim is Disputed?

No distributions will be made on account of any Claim that is a Disputed Claim unless and until that Claim becomes an Allowed Claim in accordance with the procedures for resolving Disputed Claims set forth in the Plan.

### Is there a particular record date/or determining who will be entitled to receive distributions under the Plan on account of a Claim?

Under the distribution procedures set forth in the Plan, distributions on account of an Allowed Claim will be made only to the holder of that Claim as of the close of business on the Distribution Record Date (which is a date to be announced by the Debtor that is not more than five Business Days preceding the then-anticipated Effective Date). No purported transfer of a Claim following the Distribution Record Date will be recognized.

### If I am entitled to receive a distribution pursuant to the Plan, when will I receive it?

If you are the holder of an Administrative Claim, a Priority Tax Claim, an Unsecured Priority Claim (Class 1), the Secured Claim of PRIAC (Class 4), the Secured Claim of Compass (Class 6), the Secured Claim of NBSC (Class 9), or a General Unsecured Claims (Class 10) that is allowed on the Effective you will receive the distribution to which you are entitled under the Plan on account of such Claim on or promptly after the Effective Date. If you are the holder of an Administrative Claim, a Priority Tax Claim, or an Unsecured Priority Claim (Class 1) that is Disputed as of the Effective Date, to the extent such Claim becomes an Allowed Claim after the Effective Date, you should receive the distribution to which you are entitled under the Plan on or promptly after the Quarterly Distribution Date next following that date on which such Claim is allowed.

### When will the Plan be confirmed? When will the Plan be effective?

### Confirmation

After the Bankruptcy Court has approved the form and adequacy of information in this Disclosure Statement, the Bankruptcy Court will schedule and conduct a hearing

concerning Confirmation of the Plan. Typically, the Plan confirmation hearing is scheduled about a month after the Disclosure Statement hearing. The Plan confirmation hearing may be continued or adjourned, however, and even if it is held, there is no guaranty that the Bankruptcy Court will find that the requirements of the Bankruptcy Code with respect to Confirmation have been met. In addition, the additional conditions to Confirmation set forth in the Plan must be satisfied or waived in accordance with the Plan before the Plan can be confirmed. Thus, while the Debtor expects the Plan to be confirmed perhaps as early as August 2010, there is no way to predict with any certainty when, if ever, Confirmation will actually occur.

### *Effective Date*

Even if the Plan is confirmed in August 2010, there are a number of additional conditions that must be satisfied or waived before the Plan can become effective. In short, the Effective Date will not occur until after the Plan has been confirmed and the sale of AIC's assets as contemplated by the Plan shall have occurred. No assurance can be given as to if or when the Effective Date will actually occur.

### *What happens if the Plan isn't confirmed or doesn't become effective?*

The Debtor expects that all of the conditions to Confirmation and effectiveness of the Plan will be satisfied (or waived in accordance with the Plan). There is no guaranty, however, that the Plan will become effective. Although the Debtor intends to take all acts reasonably necessary to satisfy the conditions to the Confirmation and effectiveness of the Plan that are within the Debtor's control if, for any reason, the Plan is not confirmed or does not become effective, the Debtor may be forced to propose an alternative plan or plans of reorganization under Chapter 11 of the Bankruptcy Code. If no plan of reorganization can be confirmed, the Debtor may have to convert the Reorganization Case to a liquidation case under Chapter 7 of the Bankruptcy Code.

## OVERVIEW OF THE PLAN

### *General Structure of the Plan*

The following is a brief overview of certain material provisions of the Plan. This overview is qualified in its entirety by reference to the provisions of the Plan, and the Exhibits thereto, as amended, modified or supplemented from time to time.

### *Sale and Bid Procedures*

Contemporaneous with the filing of this Disclosure Statement, the Debtor has filed the Sales Procedure Motion requesting approval of the Asset Purchase Agreement and the sale and bid procedures governing the sale of the Resort Facilities and such other Assets as may be subject to the Asset Purchase Agreement.

### *Summary of Treatment of Claims and Interests Under the Plan*

The table below summarizes the classification and treatment of the prepetition Claims against and Interests in the Debtor under the Plan.

| Type of Claim or Interests | Treatment |
|---|---|
| *Unclassified - Administrative Claims*<br><br>Estimated Aggregate Claims Amount: $7,000,000. | An Administrative Claim is a Claim for (a) any cost or expense of administration asserted or arising under §§ 503, 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code including, (i) any actual and necessary post Petition Date cost or expense of preserving the Debtor's Estate or operating the businesses of the Debtor, (ii) any payment to be made under the Plan to cure a default under an assumed executory contract or unexpired lease, (iii) any post Petition Date cost, indebtedness or contractual obligation duly and validly incurred or assumed by the Debtor in the ordinary course of its business, (iv) compensation or reimbursement of expenses of Professionals to the extent Allowed by the Bankruptcy Court under §§ 330 or 331 of the Bankruptcy Code, and (v) all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546 of the Bankruptcy Code; (b) any fees or charges assessed against the Debtor's Estate under § 1930 of title 28 of the United States Code; and (c) to the extent that PRIAC is not the Purchaser under the Asset Purchase Agreement the PRIAC Tranche B Advance Claims.<br><br>Under the Plan, Administrative Claims are Unimpaired. Unless otherwise provided for therein, each holder of an Allowed Administrative Claim shall receive in full satisfaction of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Administrative Claim becomes Allowed, or (iii) a date agreed to in writing by the Debtor or the Purchaser, as the case may be, and the holder of such Administrative Claim; or (b) such other |

| | |
|---|---|
| | treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor or the Purchaser, as the case may be, or as the Bankruptcy Court may order. |
| | Administrative Claims are not classified and are treated as required by the Bankruptcy Code. The holders of such Claims are not entitled to vote on the Plan. |
| *Class 1 (Unsecured Priority Claims)*:<br><br>Priority Claims that are entitled to priority in payment under § 507 of the Bankruptcy Code.<br><br>Estimated Aggregate Claims Amount: $500,000. | Class 1 consists of Priority Claims, which are Claims against the Debtor entitled to priority pursuant to § 507 of the Bankruptcy Code.<br><br>Class 1 includes Tax Claims of governmental units for taxes owed by the Debtor that are entitled to a certain priority in payment pursuant to § 507(a)(8) of the Bankruptcy Code. The taxes entitled to priority are (a) taxes on income or gross receipts that meet the requirements set forth in § 507(a)(8)(A) of the Bankruptcy Code, (b) property taxes meeting the requirements of § 507(a)(8)(B) of the Bankruptcy Code, (c) taxes that were required to be collected or withheld by the Debtor and for which the Debtor is liable in any capacity as described in § 507(a)(8)(C) of the Bankruptcy Code, (d) employment taxes on wages, salaries or commissions that are entitled to priority pursuant to § 507(a)(4) of the Bankruptcy Code, to the extent that such taxes also meet the requirements of § 507(a)(8)(D), (e) excise taxes of the kind specified in § 507(a)(8)(E) of the Bankruptcy Code, and (f) prepetition penalties relating to any of the foregoing taxes to the extent such penalties are in compensation for actual pecuniary loss as provided in § 507(a)(8)(G) of the Bankruptcy Code.<br><br>Holders of Class 1 Claims are not entitled to vote on the Plan.<br><br>Under the Plan, Class 1 Priority Claims are Unimpaired. |

| | |
|---|---|
| | Each holder of an Allowed Class 1 Priority Claim shall receive in full satisfaction of such Claim: (a) the amount of such unpaid Allowed Claim in Cash on or as soon as reasonably practicable after the later of (i) the Effective Date, (ii) the date on which such Class 1 Claim becomes Allowed, and (iii) a date agreed to by the Debtor or the Purchaser, as the case may be, and the holder of such Class 1 Priority Claim; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor or the Purchaser, as the case may be. |
| *Class 2 (Secured Claim of Nassau County Tax Collector)*<br><br>Estimated Aggregate Claims Amount: $1,275,000 | Class 2 consists of Claims of the Nassau County Tax Collector.<br><br>Under the Plan, Class 2 Secured Claims are Unimpaired. The Nassau County Tax Assessor shall receive, in the sole discretion of the Debtor or the Liquidating Trustee as the case may be, in full satisfaction of such Claim: (a) Cash equal to the amount or such Allowed Class 2 Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Class 2 Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor or the Liquidating Trustee, as the case may be, and the Nassau County Tax Assessor; or (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the Nassau County Tax Assessor and the Debtor or the Liquidating Trustee, as the case may be.<br><br>Estimated Percentage Recovery: 100% |
| *Class 3 (Other Secured Claims)*<br><br>*Class 3A (Secured Claim of Amelia Island Plantation Community Association ("AIPCA")*<br><br>*Class 3B (Secured Claim of* | Class 3 consists of secured claims other than property tax claims and the claims of PRIAC and Compass , including the claim of liens held by Therma Serve, Inc. ($7,056.03) and the Amelia Island Plantation Community Association, Inc. ($205,183.07).<br><br>Under the Plan, Class 3 Secured Claims are |

| | |
|---|---|
| *Therma Serve, Inc.)*<br><br>Estimated Aggregate Claims Amount: $212,240 | Unimpaired. Holders of Class 3 Secured Claims shall receive in full satisfaction of such Claim, Cash equal to the amount of such Allowed Class 3 Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Class 3 Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor or the Liquidating Trustee, as the case may be, and the holders of Class 3 Secured Claims.<br><br>Estimated Percentage Recovery: 100% |
| *Class 4 (Secured Claim of PRIAC, excluding the Tranche B Advance Claims)*<br><br>Estimated Aggregate Claims Amount: $35,269,955.77 | Class 4 consists of the Secured Claim of PRIAC.<br><br>The Debtor estimates that PRIAC will receive a distribution of $31,408,738 consisting of $3,400,000 as an Administrative Expense Claim for the PRIAC Tranche B, $1,399,235 of the Debtor's accounts receivable, and $26,609,503 from the proceeds of the sale of Assets subject to PRIAC's security interest; on account of the Debtor's total indebtedness to PRIAC of $35,269,955.77, comprised of (i) the PRIAC Secured Claim of $28,354,139.55, plus accrued but unpaid prepetition interest of $1,221,197.04, (ii) postpetition interest of $2,760,748.05, (iii) fees and costs estimated to be $450,000, (iv) the PRIAC Tranche B Advance Claim of $3,400,000, and (v) late charges of $17,174.09 minus $933,302.97 of funds held in escrow. PRIAC's Secured Claim consisting of $11,828,952.41 in yield maintenance charges is in dispute. If PRIAC becomes the Alternate Club Purchaser, distributions to PRIAC on account of its Class 4 Claim shall be reduced by $3,700,000.<br><br>The portion of the PRIAC's Secured Claims consisting of $11,828,952.41 in yield maintenance charges is in dispute.<br><br>Under the Plan, the Secured Claim of PRIAC is impaired.<br><br>Estimated Percentage Recovery: 88% |

| | |
|---|---|
| *Class 5 (Subordinated Secured Claim of PRIAC)*<br><br>Estimated Aggregate Claim Amount: $3,700,000. | If the holders of claims in Class 7 reject the Plan or if New Club is not formed, the Debtor shall transfer the Member Facilities to PRIAC as the Alternate Club Purchaser and $3,700,000 shall be credited against PRIAC's Allowed Secured Claim. If the Auction produces additional sales proceeds allocable to pay PRIAC's and Compass' Secured Claims, PRIAC shall voluntarily subordinate its receipt of cash proceeds under Class 5 until after both PRIAC and Compass have been paid the full amount on their respective claims in Classes 4 and 6. If Compass waives any entitlement to any receipt of any amounts on its allowed secured claim, in which event the condition of payment in full of Compass's allowed Class 6 Claim shall be deemed to have been met. |
| *Class 6 (Secured Claim of Compass)*<br><br>Estimated Aggregate Claim Amount: $13,152,221. | Class 6 consists of the Secured Claims of Compass.<br><br>The Debtor estimates that Compass will receive a distribution of $11,619,475, comprised of $2,412,541 allocable to non-debtor assets, $2,021,765 of the Debtor's accounts receivable, and $7,185,169 allocable to the proceeds of the sale of Assets subject to Compass' security interest. Proceeds received from the auction of the Debtor's assets until its debt is fully satisfied. Compass' secured claim shall be paid in Cash on the Effective Date. In consideration of this treatment, Compass has agreed to waive its deficiency claims, including its rights to attorneys' fees and costs, as well as its right to participate in any distribution to unsecured creditors.<br><br>Under the Plan, the Secured Claim of Compass is impaired.<br><br>Estimated Percentage Recovery: 83% |
| *Class 7 (Club Member Claims)*<br><br>Estimated Aggregate Claims | Class 7 consists of the Claims of Current Members of the Existing Club and the Claims of each Resigned Member electing treatment as a |

| | |
|---|---|
| Amount: $41,353,969. | Class 7 Claim. |
| | Under the Plan, all Club Member Claims will be resolved through the establishment of the New Club and the New Club Membership Plan, which will supersede and replace in their entirety the Existing Club, the Existing Club Membership Plan and the Club Agreement. The Board of Directors of AICI, with the agreement of the Debtor, will approve the New Club Membership Plan as an amendment to the Existing Club Membership Plan and the bylaws for the Existing Club and will approve the Member Facilities Lease/Purchase Agreement and the Club Access and Use Agreement, which will supersede and replace in its entirety the NDA, and submit all of these matters to a vote of the Current Members. |
| | The Current Members' vote on these matters will be conducted by means of a separate vote taken by the Club Member pursuant to the Existing Club Membership Plan and the Club Agreement at a duly scheduled meeting of such members or pursuant to their vote on the Plan. |
| | Estimated Percentage Recovery: 100% |
| *Class 8 (Resigned Member Claims)*<br><br>Estimated Aggregate Claims Amount: $4,610,628. | Class 8 consists of Resigned Member Claims.<br><br>If Class 7 votes to accept the Plan the matters voted upon by the Current Members in Class 7, all Resigned Member Claims will be resolved through the establishment of the New Club and the New Club Membership Plan, which will supersede and replace in their entirety the Existing Club, the Existing Club Membership Plan and the Club Agreement. The Member Facilities shall be transferred and sold to the Purchaser, free and clear of (i) any liability to refund Membership Deposits, (ii) any prohibition on the charging of market rate fees for the use and access of the Resort Facilities, except as specifically set forth in the Club Access and Use Agreement, and (iii) all other liens, claims, interests, rights and encumbrances of any kind |

| | arising under the NDA, except for such liens, claims, interests and real estate rights of access and use specifically set forth in the Club Access and Use Agreement, and the Purchaser shall shall then lease the Member Facilities pursuant to the Member Facilities Lease/Purchase Agreement and enter into the Club Access and Use Agreement, the Club Services Agreement and the Long Point Golf Academy Lease with Amelia Equity. |
| --- | --- |
| | The New Club shall assume the entitlement of Resigned Members to refunds of their Membership Deposits, as such rights are modified by the terms and conditions of the New Club Membership Plan. |
| | Estimated Percentage Recovery: 0% |
| *Class 9 (Secured Claim of National Bank of South Carolina ("NBSC")* Estimated Aggregate Claim Amount: $6,485,135. | The Debtor shall surrender and abandon its interests in the Assets which secure NBSC's Claim in compete satisfaction of NBSC's Secured Claim. The value of such Assets are less than the amount of NBSC's Claim, accordingly, NBSC shall have a deficiency claim that shall be treated as a General Unsecured Claim in accordance with the treatment afforded Class 10 Claims. |
| | Under the Plan, The Secured Claim of NBSC is impaired. |
| | Estimated Percentage Recovery: 40% |
| *Class 10 (General Unsecured Claims)* Estimated Aggregate Claims Amount: $13,857,910. | Class 10 consists of General Unsecured Claims, which are all Allowed Claims that are not Administrative Claims, Priority Claims, or Secured Claims. |
| | Under the Plan, Class 10 General Unsecured Claims are Impaired. Each holder of an Allowed General Unsecured Claim shall receive in full satisfaction of such Claim, its Pro Rata Share of the General Unsecured Claim Recovery Fund. |
| | Estimated Percentage Recovery: 15% |

| Class 10 (All Interests in the Debtor) | Under the Plan, Class 10 Interests are Impaired. |
|---|---|
| Estimated Aggregate Claims Amount: $0. | Holders of Class 10 Interests shall not receive or retain any property under the Plan on account of such Interests. On the Effective Date, all Interests shall be cancelled. |
| | Estimated Percentage Recovery: 0% |

## CERTAIN EVENTS PRECEDING THE DEBTOR'S CHAPTER 11 FILING

### *Historical Business Strategy and Operations*

In 1970, the Sea Pines Company of Hilton Head Island, South Carolina ("Sea Pines"), acquired approximately 2,000 acres of uplands and over 1,000 acres of tidal marshes on Amelia Island for the purpose of developing Amelia Island Plantation ("AIP"), a master planned community and world class resort, along with the Amelia Island Plantation Club, a private members only club. To balance the development with the area's massive sand dunes, ancient live oak forests, extensive marshes, and beautiful beach, Sea Pines crafted a master development plan that integrated roads, commercial areas, homesites, recreational areas, and meeting facilities into the natural environment. The master development plan along with a Declaration of Covenants and Restrictions were recorded in deed covenants to protect tidal marshes, dunes, savannas and surrounding wildlife. In 1978, a group of investors headed by Richard L. Cooper acquired AIP. Following the acquisition, the new owners incorporated the Debtor as operator and parent of AIP.

### *Formation of the Existing Club*

In 1995, AIC formed the Existing Club and Amelia Island Club, Inc. ("AICI"), a not-for-profit corporation formed for the purpose of monitoring, enforcing and protecting the rights and privileges of members with respect to their membership in the Existing Club. In conjunction with the organization of the Existing Club and AICI, AIC promulgated the Existing Club Membership Plan, which governs, among other things, use and operation of the Existing Club, membership categories and rights, and the assessment and payment of dues and other charges. Also in connection with the formation of the Existing Club, AIC and AICI entered into the Club Agreement, which sets forth certain terms and conditions relating to the use, operation and maintenance of the Club facilities. Lastly, to protect members' use and access rights to Member facilities, AIC obtained from Barnett Bank of Jacksonville, N.A., the holder of the mortgage on the Club facilities, a non-disturbance agreement and independent covenant that established certain use and access rights of members to the Member Facilities.

In conjunction with the organization of the Club and AICI, AIC promulgated the Amelia Island Club Membership Plan (as amended, the "Membership Plan"), which governs, among other things, use and operation of the Club, membership categories and

rights, and the assessment and payment of dues and other charges. Also in connection with the formation of the Club, AIC and AICI entered into the Club Agreement, which sets forth additional terms and conditions relating to the use, operation and maintenance of the Club facilities. Lastly, to provide certain protection to the members in connection with the use and access rights to Club facilities, AIC obtained from Barnett Bank of Jacksonville, N.A., the then holder of the mortgage on the Club facilities, a non-disturbance agreement and independent covenant, which provides certain protections to members upon the sale or foreclosure of Club facilities.

On May 1, 1995, the Membership Plan became effective and the Amelia Island Plantation Club was merged into the Club, the Membership Plan replaced the Amelia Island Plantation Club Bylaws, and members of the Amelia Island Plantation Club became members of the Club and members of AICI.

Members are entitled to vote on all matters submitted to a membership vote, including the election of the AICI Board of Directors. The AICI Board of Directors manages the affairs of AICI and also serves as the Board of Governors of the Club. In this capacity, the Board of Directors meets regularly with AIC concerning the affairs of the Club and acts as a liaison between the members and AIC, providing the members with appropriate information concerning the operation and management of the Club.

Under the terms of the Membership Plan, membership in the Club is limited to property owners in the AIP community and requires the payment of a refundable membership deposit. Generally, members are entitled to a refund of their membership deposits when a member sells his or her property and the new property owner applies and is accepted as a member and pays a non-refundable initiation fee. When a member resigns or sells his or her property and the new owner does not desire a membership, the resigned member is placed on a waiting list for repayment by the Debtor on a first-resigned, first-reissued basis.

### Development of the Resort Facilities

Between 1997 and 1998 AIC completed construction of the Amelia Inn, Conference Center and Beach Club. The Amelia Inn offers 249 deluxe ocean view hotel rooms in a private, gated community, with private balconies, as well as a spectacular two-tiered pool deck. The Inn received a full renovation in 2007, and features two restaurants, the Ocean Grille and the Sunrise Cafe, a lounge and a sundry retail shop. The AAA Four Diamond facility also hosts 9,814 square feet of meeting space, a small portion of the resort's overall 49,000 square feet.

The Beach Club offers a two-tiered pool deck, Jacuzzi and a children's pool. The Resort hosts age-specific youth and teen programs and a "Just for Kids" program. The Beach Club also features an arcade room and the Beach Club Grill, which serves food and beverages to complement the pool setting and activities.

The Conference Center contains more than 30,000 square feet of conference and function space. The space includes the 11,165 square foot Amelia Ballroom and 5,440 square-foot Cumberland Ballroom. The two ballrooms divide into six smaller function areas. Eleven additional spaces provide for smaller conferences.

In conjunction with the operation of the Amelia Inn, AIC also entered into villa rental agreements with individual property owners, whereby numerous villa owners granted AIC the exclusive right to rent the villas in exchange for a percentage of income generated from such rental. While the villa rental program has been generally successful for AIC, the revenue stream from the program has proved inconsistent as Villa owners have begun to retire their units from the program. To counter the loss of revenue from the villa rental program, in 2005, AIC formulated a redevelopment and renovation plan to generate occupancy revenue, which provided for, among other things, the addition of 125 rooms at the Amelia Inn.

### *Events Leading to the Debtor's Chapter 11 Filing*

To finance the redevelopment and also provide a capital infusion for general operating expenses, AIC entered into negotiations with Redquartz Developments LLC, ("Redquartz"), an Irish hospitality investment group. Under the terms of the proposed deal, Redquartz would have acquired a 51 % equity interest in AIC and provided for a capital infusion to implement the redevelopment and renovation plan. Despite negotiations lasting for over a year, the deal failed to close as the unprecedented disruptions in the financial markets in October 2008 eliminated Redquartz's ability to raise the necessary capital.

In addition to limiting sources of capital for Redquartz, the turmoil in the financial markets caused AIC to suffer substantial negative cash flow beginning in October 2008. To exasperate matters, the federal government's bailout and investment in financial firms of all sizes created taxpayer and legislator enmity towards what was viewed as Wall Street excess. This in turn led to significant decrease in resort use for general business retreats, conferences or meetings. Consequently, AIC's revenues fell from $75 million in 2007 to approximately $57 million in 2009, with profit before adjustments for brokerage and development operations, falling from $7 million in 2007 to a loss in 2009. This loss of resort business, coupled with the failure of the Redquartz deal to close, necessitated AIC finding an alternative source of capital in the form of an equity investor or possibly a purchaser of AIC.

Accordingly, AIC began working with its lenders, PRIAC and Compass to solve the operational funding deficits, which AIC typically encounters from November through February of each year but which financial problems were compounded by the decrease in resort use for meetings, conferences and corporate outings. Given its liquidity shortfalls and the fact that the Existing Club typically generates losses each year, AIC began negotiations with AICI, regarding the conversion of the Existing Club to a member owned equity club. The conversion of the Club would provide capital to AIC, relieve AIC of the obligation to subsidize the Existing Club operations, and relieve AIC from the contingent obligation to refund membership deposits. All of which could possibly prevent a bankruptcy filing.

AIC has also engaged in serious discussions with Red Maple Investors, LLC ("RMI"), an investment company created by investors with homes in the Plantation community, regarding a potential equity investment in AIC. Additionally, AIC received

inquires from various resort operators and hospitality firms regarding a potential sale of the Debtor's Assets.

Despite these efforts, AIC exhausted its operating funds and was unable to secure additional loans to meet its working capital needs before an out-of-court workout could be successfully completed. AIC filed the Reorganization Case because it did not have sufficient cash to maintain operations.

**Historical Operating Results**

The Debtor's revenue trends for the last five years reflect the "boom-bust" cycle associated with the real estate market and the country's current economic recession, with revenues rising to a peak of $113,000,625 in 2007, and falling to $57,442,193 in calendar year 2009:

| Department | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|---|---|
| Brokerage | $ 5,460,331 | $ 7,959,520 | $ 6,702,968 | $ 7,636,121 | $ 2,581,872 | $ 1,654,276 |
| Development | $ 7,164,999 | $ 12,419,500 | $ 9,477,288 | $ 29,588,928 | $ 474,576 | $ 347,254 |
| Real Estate | $ 12,625,330 | $ 20,379,020 | $ 16,180,256 | $ 37,225,049 | $ 3,056,448 | $ 2,001,530 |
| Lodging | $ 25,032,640 | $ 25,626,307 | $ 24,748,251 | $ 27,800,898 | $ 25,940,771 | $ 19,199,299 |
| Food & Beverage | $ 18,924,530 | $ 19,214,589 | $ 19,334,801 | $ 20,880,798 | $ 18,832,476 | $ 14,582,765 |
| Golf | $ 5,827,987 | $ 6,100,407 | $ 7,146,673 | $ 8,577,563 | $ 6,975,737 | $ 5,564,484 |
| Tennis | $ 753,168 | $ 736,162 | $ 754,680 | $ 869,229 | $ 839,809 | $ 678,299 |
| Recreation | $ 1,822,996 | $ 1,968,313 | $ 2,177,786 | $ 2,445,209 | $ 2,435,644 | $ 2,218,630 |
| Spa @ Amelia | $ 2,041,181 | $ 2,246,228 | $ 2,085,963 | $ 2,211,435 | $ 1,964,836 | $ 1,439,230 |
| Membership | $ 3,605,857 | $ 4,149,251 | $ 4,410,834 | $ 4,840,526 | $ 4,927,628 | $ 5,489,141 |
| Retail | $ 4,163,240 | $ 4,482,499 | $ 4,674,788 | $ 4,792,631 | $ 4,232,226 | $ 3,029,520 |
| Other | $ 2,436,085 | $ 2,955,438 | $ 3,090,269 | $ 3,357,287 | $ 3,375,418 | $ 3,239,295 |
| Resort | $ 64,607,684 | $ 67,479,194 | $ 68,424,045 | $ 75,775,576 | $ 69,524,545 | $ 55,440,663 |
| **Total Gross Revenues** | **$ 77,233,014** | **$ 87,858,214** | **$ 84,604,301** | **$ 113,000,625** | **$ 72,580,993** | **$ 57,442,193** |

**EXPENSES**

| | | | | | | |
|---|---|---|---|---|---|---|
| Brokerage | (3,478,107) | (4,588,766) | (3,919,734) | (4,255,040) | (2,194,548) | (1,480,615) |
| Development | (6,196,105) | (9,054,188) | (9,133,252) | (27,675,547) | (1,625,210) | (762,077) |
| Real Estate | (9,674,212) | (13,642,954) | (13,052,986) | (31,930,587) | (3,819,758) | (2,242,692) |
| Lodging | (13,482,997) | (14,299,052) | (13,332,800) | (15,452,873) | (13,164,235) | (9,364,058) |
| Food & Beverage | (14,150,905) | (14,848,384) | (15,028,338) | (16,115,278) | (14,148,329) | (10,997,086) |
| Golf | (4,486,721) | (4,906,797) | (5,882,021) | (6,662,596) | (6,706,768) | (5,975,206) |
| Tennis | (518,880) | (467,385) | (465,083) | (517,204) | (502,534) | (359,627) |
| Recreation | (1,496,744) | (1,645,078) | (1,927,017) | (2,013,865) | (2,095,848) | (1,830,549) |
| Spa @ Amelia | (1,416,849) | (1,580,354) | (1,464,862) | (1,460,967) | (1,303,484) | (1,008,385) |
| Membership | (3,456,408) | (3,963,546) | (3,689,418) | (4,119,289) | (4,131,714) | (3,847,187) |

| | | | | | | |
|---|---|---|---|---|---|---|
| Retail | (3,998,828) | (3,915,543) | (4,040,293) | (4,023,335) | (3,720,170) | (2,559,513) |
| Other | (2,460,049) | (2,778,895) | (2,947,204) | (3,206,191) | (3,062,763) | (2,676,701) |
| Resort | (45,468,381) | (48,405,034) | (48,777,036) | (53,571,598) | (48,835,845) | (38,618,232) |
| | | | | | | |
| Marketing | (3,791,629) | (3,662,346) | (3,710,472) | (3,871,191) | (3,413,475) | (2,844,587) |
| Resort G&A | (5,566,400) | (5,261,511) | (5,407,020) | (5,346,605) | (5,024,586) | (3,702,587) |
| Maintenance | (3,172,708) | (3,583,888) | (3,943,985) | (5,021,202) | (4,194,533) | (3,468,780) |
| Fixed Expenses | (4,997,955) | (5,246,001) | (5,959,052) | (6,030,459) | (5,994,610) | (7,139,932) |
| Overhead | (17,528,692) | (17,753,746) | (19,020,529) | (20,269,457) | (18,627,204) | (17,155,886) |
| | | | | | | |
| EBITDA | $ 4,561,729 | $ 8,056,480 | $3,753,750 | $ 7,228,983 | $1,298,186 | $ (574,617) |
| | | | | | | |
| Depreciation | (5,097,601) | (4,833,941) | (4,623,825) | (4,713,972) | (4,710,605) | (4,566,970) |
| Interest | (3,302,367) | (3,369,004) | (3,717,515) | (3,678,294) | (3,385,256) | (3,169,887) |
| Depreciation & Interest | (8,399,968) | (8,202,945) | (8,341,340) | (8,392,266) | (8,095,861) | (7,736,857) |
| | | | | | | |
| Income ( Loss ) | (3,838,239) | (146,465) | (4,587,590) | (1,163,283) | (6,797,675) | (8,311,474) |

Revenues at the resort are cyclical, with March through May being the "peak season," with October through November traditionally being the "slower revenue" months.

### Room Utilization

As the above summary indicates, the Debtor's revenues are primarily driven by room rentals derived from food, beverage and services provided to guests. The following chart reflects room availability and utilization over the same five year period.

| Room Statistics Comparison | 12/31/2004 Actual | 12/31/2005 Actual | 12/31/2006 Actual | 12/31/2007 Actual | 12/31/2008 Actual | 12/31/2009 Actual |
|---|---|---|---|---|---|---|
| Total Rooms Available | 214,381 | 207,774 | 204,471 | 206,185 | 200,343 | 197,787 |
| Occupied | | | | | | |
| Hotel | 62,616 | 62,920 | 61,722 | 62,175 | 64,588 | 61,981 |
| Villa | 57,352 | 53,145 | 48,931 | 62,477 | 50,385 | 38,631 |
| Total | 119,968 | 116,065 | 110,653 | 124,652 | 114,973 | 100,612 |
| | | | | | | |
| ADR | | | | | | |
| Hotel Group | $165.58 | $170.17 | $171.50 | $182.00 | $186.00 | $172.87 |
| Villa Group | $187.01 | $194.69 | $208.28 | $197.00 | $209.00 | $213.56 |
| Hotel Transient | $163.03 | $185.09 | $195.05 | $179.00 | $155.00 | $119.66 |
| Villa Transient | $243.43 | $253.75 | $267.30 | $249.00 | $251.00 | $183.42 |
| Total ADR | $189.97 | $201.50 | $202.43 | $199.00 | $199.00 | $169.33 |

| Occupied | | | | | | |
|---|---|---|---|---|---|---|
| Hotel Group | 49,871 | 49,064 | 49,612 | 46,705 | 46,180 | 38,293 |
| Villa Group | 29,500 | 26,685 | 26,277 | 29,357 | 24,656 | 16,487 |
| Hotel Transient | 12,745 | 13,856 | 12,110 | 15,470 | 18,408 | 23,688 |
| Villa Transient | 27,852 | 26,460 | 22,654 | 33,118 | 25,729 | 22,144 |
| Owner Villa Nights | 14,220 | 13,234 | 12,636 | 15,074 | 12,356 | 11,282 |
| | 134,188 | 129,299 | 123,289 | 139,726 | 127,329 | 111,894 |

### *Capital Structure as of the Petition Date*

### *PRIAC*

As of the Petition Date, the Debtor was indebted to PRIAC in the approximate amount of $28,354,140, excluding accrued but unpaid interest of $1,221,197.04 (the "PRIAC Prepetition Indebtedness"). The Debtor's debt obligation to PRIAC arises under various documents and transactions dating back to December 2000.

By an Assignment of Mortgage, Note and Other Loan Documents, dated as of December 18, 2000 and recorded in the land records in the State of Florida, County of Nassau (the "Official Records Book"), as Document Number 200035901, in Book 962, Page 1767, iStar Financial, Inc., a Maryland corporation, assigned and delivered to Connecticut General Life Insurance Company, a Connecticut corporation ("Connecticut General"), certain documents evidencing and securing a loan to the Debtor (the "Original Loan Documents"). On December 18, 2000, Connecticut General and the Debtor entered into a Future Advance, Modification, Consolidation and Partial Release Agreement, dated as of December 18, 2000 (the "Future Advance, Modification, Consolidation and Partial Release Agreement"), and recorded in the Official Records Book as Document Number 200035902, in Book 963, Page 1, which Future Advance, Modification, Consolidation and Partial Release Agreement, among other things, (a) modified the Original Loan Documents, (b) referenced a future advance promissory note, dated as of December 18, 2000, made by the Debtor for the benefit of Connecticut General (the "Prior Future Advance Promissory Note"), in the original principal amount of $4,065,421.00, and (c) consolidated all indebtedness, including that of the Prior Future Advance Promissory Note, into a consolidated renewal promissory note, dated as of December 18, 2000, made by the Debtor for the benefit of Connecticut General (the "PRIAC Consolidated Renewal Promissory Note") in an original principal amount of $37,000,000.

Consequently, the PRIAC Prepetition Indebtedness is evidenced and secured by, among other things, the following documents:

- the Consolidated Renewal Promissory Note;

- the Amended and Restated Mortgage and Security Agreement, dated as of December 18, 2000, by and between the Debtor and

Connecticut General, pursuant to the Future Advance, Modification, Consolidation and Partial Release Agreement, as amended by the Second Mortgage Modification and Mortgage Spreading Agreement, dated as of February 14,2001, by and between the Debtor and Connecticut General and recorded in the Official Records Book as Document Number 200109401, in Book 978, Page 1642 (collectively, the "PRIAC Prepetition Mortgage");

- a Master Security Agreement, dated as of December 18, 2000, by and between the Debtor and Connecticut General (the "PRIAC Master Security Agreement");

- a Real Estate Tax Escrow and Security Agreement, dated as of December 18, 2000, by and among the Debtor, Connecticut General and Midland Loan Services, Inc., a Delaware corporation, as escrow holder;

- an Amended and Restated Trademark Security Agreement, dated as of December 18, 2000, by and between the Debtor and Connecticut General;

- a Collateral Assignment of Contracts, Licenses and Permits, dated as of December 18, 2000, by and between the Debtor and Connecticut General and recorded in the Official Records Book as Document Number 200035903, in Book 963, Page 348;

- an Environmental Indemnification Agreement, dated as of December 18, 2000, by the Debtor and Richard L. Cooper, for the benefit of Connecticut General (the "PRIAC Environmental Indemnification Agreement"); and

- an Indemnification Agreement, dated as of December 18, 2000, by the Debtor and Richard L. Cooper for the benefit of Connecticut General (the "PRIAC Indemnification Agreement").

The Consolidated Renewal Promissory Note, the Prepetition Mortgage, the Environmental Indemnification Agreement and the Indemnification Agreement, together with any and all other documents, including, without limitation, those documents referenced above, from time to time executed by the Debtor, Richard L. Cooper, Connecticut General or any other party in connection with the Prepetition Indebtedness and, together with any and all related instruments and financing statements, are collectively called the "Prepetition Loan Documents".

The Prepetition Indebtedness and the Prepetition Loan Documents were assigned to PRIAC, pursuant to (a) an Assignment of Mortgage, dated as of April 1, 2004, and recorded in the Official Records Book as Document Number 200422719, in Book 1242, Page 646, and a Corrective Assignment of Mortgage, dated effective as of April 1, 2004, and recorded in the Official Records Book as Document Number 200925721, in Book

1641, Page 147; (b) an Allonge, dated as of April I, 2004, made by Connecticut General for the benefit of PRIAC, related to the Consolidated Renewal Promissory Note; and (c) an Allonge, dated as of April 1, 2004, made by Connecticut General for the benefit of PRIAC, relating to the Prior Future Advance Promissory Note.

The Prepetition Indebtedness is secured by a substantial portion of the Debtor's real estate's assets, including the Amelia Inn, the Beach Club, the Ocean Club, the Racquet Park, the Long Point, Oak Marsh and Ocean Links golf courses, and the Conference Center.

On September 30, 2008, PRIAC and Compass entered into that certain Intercreditor and Subordination Agreement, pursuant to which PRIAC agreed to subordinate to Compass PRIAC's security interest in certain identified personal property including "any right to payment for goods sold or leased or for services rendered" up to, and not to exceed, $2,000,000, and as otherwise set forth therein.

### Compass

As of the Petition Date, the Debtor was indebted to Compass in the approximate amount of $11,216,903, excluding accrued but unpaid interest (the "Compass Prepetition Indebtedness"). The Compass Prepetition Indebtedness is evidenced by the following:

- that certain Renewal Promissory Note, dated January 19, 2005 in the original principal amount of $4,841,578 (as renewed and amended, the "Non-Revolving Note"): as of the Petition Date with a remaining balance of $3,857,375;

- that certain Renewal Revolving Line of Credit Promissory Note Including Future Advance dated November 7,2008 in the principal amount of $2,000,000 (as renewed and amended, the "Working Capital Revolving Note");

- that certain Revolving Line of Credit Promissory Note dated November 7, 2008 in the principal $2,000,000 (as renewed and amended, the "Brady Point Revolving Note"); and

- that certain Future Advance Promissory Note dated February 13, 2009 in the principal amount of $1,000,000 (as renewed and amended, the "Bridge Note" and together with the Non-Revolving Note and the Working Capital Revolving Note and the Brady Point Revolving Note and the Bridge Note, the "Compass Prior Note").

The Compass Prior Note is purportedly secured by that certain Mortgage and Security Agreement Securing a Construction Loan delivered by AIC to Amelia Realty, Inc., a non-Debtor affiliate ("Amelia Realty") dated August 22, 2000 and recorded in Official Records Book 946, Page 505 of the public records of Nassau County, Florida, as assigned to Compass by Amelia Realty by that certain Assignment of Note, Mortgage, and Loan Documents dated December 21, 2000 and recorded in Official Records Book 963, page 1501 of the public records of Nassau County, Florida, as modified by that

certain Mortgage and Loan Document Modification Evidencing Renewal Note Including Future Advance and Spreading Agreement dated December 21, 2000 and recorded in Official Records Book 963, page 1504 of the public records of Nassau County, Florida as modified by that certain Mortgage and Loan Document Modification Agreement Evidencing Renewal Note dated January 19,2005 and recorded in Official Records Book 1292, page 977, as modified by that certain Mortgage and Loan Document Modification Agreement Evidencing Revolving Line of Credit Promissory Note dated September 30, 2008 and recorded in Official Records Book 1588, Page 1364, all of the public records of Nassau County, Florida, and as further modified by that certain Mortgage and Loan Document Modification Agreement Evidencing Renewal Revolving Line of Credit Promissory Note Including Future Advance and Revolving Line of Credit Promissory Note, dated November 7, 2008 and recorded in Official Records Book 1593, page 1999 and as further modified by that certain Mortgage Modification Agreement Evidencing Future Advance dated February 13, 2009 and recorded in Official Records Book 1605, page 1439 all of the public records of Nassau County, Florida (hereinafter referred to collectively as the "Compass Mortgage") and that certain Conditional Assignment of Rents, Leases and Revenues dated December 21, 2000, and recorded in Official Records Book 963, page 1526, of the public records of Nassau County, Florida.

The Working Capital Revolving Note, the Brady Point Revolving Note and the Bridge Note are guaranteed by various individual and corporate guarantors ("Guarantors") pursuant to those certain Guaranty agreements dated November 4 or 5, 2008, November 4 or 5, 2008 and February 13, 2009, respectively, executed and delivered by the Guarantors.

The Brady Point Renewal Note is also secured by that certain Additional Collateral Mortgage, Security Agreement and Fixture Filing dated November 7, 2008 and recorded in Official Records Book 1594, page I executed and delivered by Brady Point Preserve LLC, a Florida limited liability company and R & J Cooper Investments Limited Partnership, a Delaware limited partnership.

Compass also has provided the Debtor with loans for other purposes including (a) $384,888 for maintenance vehicles and other miscellaneous equipment, (b) $466,978 for the Kountry Inn, (c) $1,250,000 for Links Lodge Soft Costs, (d) $250,000 for a letter of credit drawn upon by Florida Public Utilities, and (e) $7,662 for postage equipment. Additionally, Compass has contingent, unfunded obligations in the amount of $800,000 for a letter of credit posted with respect to the Debtor's workers' compensation insurance and $152,000 in connection with a swap agreement.

In addition to the Debtor's indebtedness to Compass, Amelia Reality is indebted to Compass in the amounts of $996,611 for an office complex and $61,857 for the residence located at 1508 Lewis Street. Amelia Reality has granted a mortgage in favor of Compass for the properties and leases both properties to the Debtor.

Additionally, R&D Cooper Ltd. is indebted to Compass in the amounts of $649,459 for the Falcon's Nest restaurant and $391,874 for Amelia Personal Storage. R&D Cooper has granted a mortgage in favor of Compass for the properties and leases both properties to the Debtor.

### National Bank of South Carolina

In April 2005, the Debtor acquired the Royal Amelia Golf Course located, which is now known as the Amelia River Course ("Amelia River"). To fund the acquisition, and construct certain improvements at Amelia River, the Debtor entered three loan agreements with the National Bank of South Carolina ("NBSC"). The first is loan is evidenced by a Promissory Note dated September 16, 2005 in the original principal amount of $4,887,500 (the "First Note"), which is secured by, *inter alia*, that certain First Mortgage and Security Agreement dated September 16, 2005, from the Debtor in favor of NBSC, recorded in Official Records Book 1352, page 392.

The second loan is evidenced by that certain Promissory Note dated December 12, 2006 in the original principal amount of $1,800,000, as modified by that certain Note Repayment Modification dated September 12, 2007 (as modified, the "Second Note"), which is secured by, *inter alia*, that certain Second Mortgage and Security Agreement dated December 12, 2006, from the Debtor in favor of NBSC, recorded in Official Records Book 1465, page 1539, and that certain Assignment of Leases, Rents and Profits dated December 12, 2006, from the Debtor in favor of Compass, recorded in Official Records Book 1465, page 1565.

The third loan is evidenced by that certain South Carolina Universal Note dated March 25, 2008 in the original principal amount of $280,000 (the "Third Note").

As of the Petition Date, the Debtor was indebted to NBSC under the First Note, the Second Note and the Third Note in the approximate amount of $6,485,135.

### Affiliated Party Transactions

A significant portion of the assets comprising the Amelia Island Plantation are owned by the Cooper family. Those assets include the following amenities (collectively, the "Cooper Assets"):

The Cooper Assets are leased to the Debtor under renewable short-term leases, all of which were current on the Petition Date.

In addition to the foregoing, the Debtor was party to a Consulting Agreement with Richard Cooper, which entitled him to receive $12,000 per month. The Consulting Agreement has been rejected postpetition.

## OPERATIONS DURING THE REORGANIZATION CASE

### First Day Relief

At the beginning of the Reorganization Case, the Debtor filed a number of motions (the "First Day Motions") designed to allow the Debtor to continue its operations in Chapter 11, while minimizing disruption and loss of productivity and maintaining the confidence and support of customers, employees and suppliers, including:

- Debtor's Emergency Motion for Authority to Obtain Credit and Incur Debt [Docket No. 11];

- Debtor's Emergency Motion for Order Authorizing the Debtor to Honor Pre-Petition Gift Certificates, Customer Deposits and Script [Docket No. 13];

- Debtor's Motion to Limit Notice and Establish Notice Procedures [Docket No. 10];

- Debtor's Emergency Motion for Authority to Use Cash Collateral and Request for Emergency Preliminary Hearing [Docket No. 16];

- Debtor's Emergency Motion for Order Pursuant to 11 U.S.C. § 105(A) & 363 Authorizing (I) the Maintenance of Bank Accounts and the Continued Use of Existing Business Forms, and (II) the Maintenance of Debtor's Existing Cash Management System [Docket No. 18]; and

- Emergency Motion for Authority to Pay Pre-Petition Wages, Payroll Taxes and Benefits to Non-Officer Employees [Docket No. 22].

The Bankruptcy Court entered appropriate orders granting the First Day Motions.

### *Retention of Professionals*

The following professionals have been employed by the Debtor during the pendency of this reorganization:

Stutsman Thames & Markey, P.A., a Jacksonville, Florida based firm, has been employed as AIC's bankruptcy counsel. The primary lawyers involved in the reorganization are Richard Thames and Eric McKay.

AIC retained Foley & Lardner LLP to assist with financing and real estate matters. The primary Foley & Lardner lawyers involved in the reorganization are Gardner Davis and Emerson Lotzia.

Greenberg Traurig, P.A. has been retained as special counsel to AIC to the preparation and interpretation of the club membership agreements. The primary Greenberg Trauig lawyers involved in the reorganization are Dennis Hiller and Glenn Gerena.

AIC retained the Bachara Construction Law Group to represent AIC in the following matters: (1) *Beachside Villas Condominium Association, Inc. v. Amelia Island Company, et al.*; Circuit Court, Fourth Judicial Circuit, Nassau County, Florida; Case No.: 07-CA-132 (2) *Amerisure Mutual Insurance Company, et al. v. Auchter Company, et al.*; United States District Court, Middle District of Florida, Jacksonville Division; Case No.: 3:08-cv-00645-TJC-HTS and (3) a pre-suit claim against AIC by Carver and Associates. The primary Bachara lawyers involved in the reorganization are Henry G. Bachara, Jr., Julie Sears, and Brent Zimmerman.

AIC retained Fisher & Phillips, LLP to provide legal advice in the areas of labor and employment law.

To serve as financial consultant, AIC retained Huron Consulting Group, Inc. Huron designated Stuart A. Walker as the primary professional assist with this reorganization.

AIC retained TPG of Florida, LLC to act as AIC's broker with respect to the sale of the resort property. TPG designated Lou Plasencia and Steve Kindle as the primary professionals to market the resort property.

### Professional Fee Order

The Debtor requested approval of the Fee Order, an administrative order to establish procedures for interim compensation and reimbursement of expenses of professionals that would be retained in connection with the administration of the Reorganization Case. On December 18, 2009, the Bankruptcy Court entered the Fee Order [Docket No. 135], which required all Professionals to file monthly notices of fees and expenses as well as periodic interim applications for approval of compensation and reimbursement of expenses incurred during the applicable period.

### Appointment of the Creditors' Committee

On December 3, 2009, the U.S. Trustee appointed the Creditors' Committee to represent the interests of unsecured creditors in the case. The membership of the Creditors' Committee has been amended once during the Chapter 11 case; the current members of the Creditors' Committee are:

AMELIA ISLAND PLANTATION
COMMUNITY ASSOCIATION
c/o Robert S. Bolan
P.O. Box 3000 Amelia Island, FL
32035 Telephone No.: 904-491-4568
Fax No.: 904-491-1647

MARTIN COFFEE COMPANY, INC.
c/o Ben Johnson
1633 Marshall Street
Jacksonville, FL 32206
Telephone No.: 904-355-9661
Fax No.: 904-355-9673

SYSCO JACKSONVILLE, INC.,
c/o David J. Czerw
150 I Lewis Industrial Dr.
Jacksonville, FL 32254
Telephone No.: 904-695-8189
Fax No.: 904-695-8101

THERMA SERVE, INC.
c/o Scott Royer
6676 Columbia Park Dr. S. Jacksonville,
FL 32258 Telephone No.: 904-260-8002
Fax No.: 904-260-8004

TIME INC.
*c/o* Sheila Vaughan
1271 Avenue of Americas, 05-51 New
York, NY 10020
Telephone No.: 212-522-2007
Fax No.: 212-522-0484

VALLEYCREST GOLF COURSE
MAINTENANCE *c/o* Ashley Wilson
24151 Ventura Blvd.
Calabasas, CA 91302
Telephone No.: 818-737-3195
Fax No.: 818-225-5628

As members of the Creditors' Committee, the above individuals are charged with the task of monitoring the debtor's performance during the pendency of the case, investigating insider or affiliated party transactions, ensuring that all assets and claims of the debtor are being properly administered, judging the feasibility of the Plan, negotiating the proposed treatment of unsecured claims pursuant to the Plan and making recommendations concerning the confirmation of any plan of reorganization.

The Creditors' Committee hired Atlanta based law firm Kilpatrick Stockton, LLP to represent it in this case and to assist the Committee with the performance of its statutory duties. Paul M. Rosenblatt, Esq. and Shane G. Ramsey have been the attorneys primarily involved in representation of the Creditors' Committee.

The Creditors' Committee is entitled to request payment or reimbursement of fees and costs from the Debtor for its selected counsel, which fees and costs are subject to bankruptcy court approval and payment as an administrative expense.

### *Turnover of Amelia River Golf Course*

Amelia River was constructed on property leased by the City of Fernandina. As a component of the Debtor's acquisition of Amelia River, the Debtor is party to a lease agreement with the City of Fernandina to enable the Debtor to operate the golf course. The current ground rent under the lease is $12,979.17 per month. In addition to the ground rent, AIC pays to the City of Fernandina 1.5% of its gross receipts in connection with the operation of Amelia River including the club house, restaurant, pro shop, golf cart rental, driving range and green fees. The Debtor became party to the lease agreement through a series of assignments, the last of which being an assignment of the lessee's interests in the golf course from Summerton Inn, Inc. to the Debtor on or about September 16, 2005.

Although the Debtor anticipated that Amelia River would lose money in the short term, the Debtor acquired Amelia River to provide a future development option for additional hotel and villa rooms and club memberships upon completion of a development project known as Crane Island. With the recession and decrease in demand for Florida real estate, the future benefits that Amelia River would provide the Debtor are overridden by the immediate burdens that Amelia River places on the Debtor's operations. Accordingly, the Debtor has taken steps to abandon or turnover Amelia River to NBSC, which holds a first lien on the property. Along with abandoning the property to NBSC, the Debtor has also sought to reject the lease with the City of Fernandina. . The Debtor has therefore consented to a modification of the bankruptcy stay to permit NBSC

to initiate proceedings to foreclose its mortgages and security interests in the Amelia River Golf Course.

### *Rejection of Certain Executory Contracts and Unexpired Leases*

As debtors in possession, the Debtor has the right under § 365 of the Bankruptcy Code, subject to the approval of the Bankruptcy Court, to assume, assume and assign or reject executory contracts and unexpired leases. § 365 of the Bankruptcy Code provides generally that a debtor may assume, assume and assign or reject an executory contract at any time before the confirmation of a plan of reorganization, but the Bankruptcy Court, on the request of a party in interest, may order the debtor to determine whether to assume or reject a particular executory contract within a specified period of time. In addition, § 365 of the Bankruptcy Code further provides that a debtor is given until 60 days after the date of commencement of its bankruptcy to decide whether to assume, assume and assign or reject an unexpired lease of nonresidential real property. This period may be extended for "cause."

The Debtor anticipates that it may file additional motions to reject burdensome Executory Contracts or Unexpired Leases prior to the Confirmation Date. In addition, other Executory Contracts and Unexpired Leases will be assumed, assumed and assigned, or rejected in accordance with the Plan. Leases or contracts expiring by their express terms during the Chapter 11 process will generally be renewed on an as needed or month to month basis.

### *Utilities*

Utility services are obtained by the Debtor through numerous providers, including Florida Public Utilities Company ("FPU"), Nassau-Amelia Utilities ("NAU"), Florida Power and Light ("FPL") and the City of Fernandina Beach Utilities ("CFBU"). Pursuant to § 366 of the Bankruptcy Code, debtor in a Chapter 11 proceeding is required to post a postpetition security deposit with its utility providers to provide "adequate assurance of future payment." The required deposit is a function of average monthly consumption and the risk of non-payment determined on a case-by-case basis. The following deposits have been or will be posted with the Debtor's utility providers pending the sale of the Debtor's assets:

| Provider | Average Consumption | Deposit |
|---|---|---|
| FPU | $166,432 | $193,000 |
| NAU | $20,827 | $20,000 |
| CFBU | $2,274 | $0 |

|       |        |
|-------|--------|
| FPL   | $385   |
| $1,854 |       |

**Ad Valorem** *Taxes*

The Debtor's assets are subject to *ad valorem* taxes assessed by the Nassau County Tax Collector.

For the 2009 tax year, the Nassau County Property Appraiser's Office valued the Debtor's real property at $111,245,545. That valuation resulted in tax bills issued to the Debtor in the combined amount of $1,471,106. The Debtor hired DeBartolo Solutions as its tax consultant to petition the Nassau County taxing authority, and specifically the Value Adjustment Board, for an adjustment to the assessed value.

On or about May 10, 2010, the Debtor reached a compromise of the tax claim for 2009, which resulted in tax savings to the Debtor of approximately $356,158

*Claims Process and Bar Dates*

It is anticipated that the Confirmation Order will establish the Administrative Claim Bar Date, thereby serving as the Administrative Claim Bar Date Order. Unless otherwise ordered by the Bankruptcy Court, it is expected that the Administrative Claim Bar Date will be 30 days after the Effective Date.

*Period of Exclusivity to file a Plan of Reorganization*

Under § 1121 of the Bankruptcy Code, a debtor has the exclusive right to (a) file a plan of reorganization during the first 120 days of its Chapter 11 case and (b) solicit acceptances of such a plan during the first 180 days of the case. These periods may be extended for "cause". The Debtor sought, and the Bankruptcy Court granted, one extension of the exclusivity period. The Debtor currently has the exclusive right to file a plan of reorganization through May 21, 2010 and has the exclusive right to solicit acceptances of such a plan through July 21, 2010. The Debtor has reserved the right to request further extensions of the periods of exclusivity.

*Recovery Actions*

The Debtor believes that a number of prepetition transactions occurred that may have given rise to preference actions under §§ 547 and 550 of the Bankruptcy Code. A debtor may seek to avoid and recover certain prepetition payments and other transfers made by the debtor to or for the benefit of a creditor in respect of an antecedent debt, if such transfer (a) was made when the debtor was insolvent and (b) enabled the creditor to receive more than it would receive in a hypothetical liquidation of the debtor in a Chapter 7 where the transfer had not been made. Transfers made to a creditor that was not an "insider" of the debtor are generally only subject to these provisions if the payment was made within 90 days prior to the debtor's filing of a petition under Chapter 11. Under § 547 of the Bankruptcy Code, certain defenses, in addition to the solvency of the debtor

at the time of the transfer and the lack of preferential effect of the transfer, are available to a creditor from which a preference recovery is sought. Among other defenses, a debtor may not recover a payment to the extent such creditor subsequently gave new value to the debtor on account of which the debtor did not, among other things, make an otherwise unavoidable transfer to or for the benefit of the creditor. A debtor may not recover a payment to the extent such payment was part of a substantially contemporaneous exchange between the debtor and the creditor for new value given to the debtor. Further, a debtor may not recover a payment if such payment was made, and the related obligation was incurred, in the ordinary course of business of both the debtor and the creditor. The debtor has the initial burden of proof in demonstrating the existence of all the elements of a preference, including its insolvency, at the time of the payment. The creditor has the initial burden of proof as to the aforementioned defenses.

## GENERAL INFORMATION CONCERNING THE PLAN

The holders of Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Unsecured Priority Claims (Class 1), will receive Cash or other property equal to 100% of the allowed amount of their Claims.

The holders of Allowed Secured Claims in Class 2 will receive, in the sole discretion of the Debtor or the Liquidating Trustee as the case may be, in full satisfaction of such Claim: (a) Cash equal to the amount or such Allowed Class 2 Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Class 2 Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor or the Liquidating Trustee, as the case may be, and the holder of such Class 2 Secured Claim; (b) reinstatement of such Allowed Secured Claim; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor or the Liquidating Trustee, as the case may be.

Allowed Secured Claims in Class 3 will receive, in the sole discretion of the Debtor or the Liquidating Trustee as the case may be, in full satisfaction of such Claim: (a) Cash equal to the amount or such Allowed Class 3 Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Class 3 Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor or the Liquidating Trustee, as the case may be, and the holder of such Class 3 Secured Claim; (b) such other treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtor or the Liquidating Trustee, as the case may be.

Holders of Allowed Claims in Class 4 (Secured Claim of PRIAC), Class 5 (Subordinated Claim of PRIAC), Class 6 (Secured Claim of Compass), Class 7 (Club Member Claims), Class 8 (Resigned Member Claims), Class 9 (Secured Claim of NBSC), Class 10 (General Unsecured Claims), and Class 11 (Interests in the Debtor) will receive the following treatment:

### Class 4 (Secured Claims of PRIAC)

As detailed in the Chapter 11 Distribution of Proceeds, if the sale of Assets to Noble closes, the Debtor estimates that PRIAC will receive a distribution of $31,408,738

consisting of $3,400,000 as an Administrative Expense Claim for the PRIAC Tranche B, $1,399,235 of the Debtor's accounts receivable, and $26,609,503 from the proceeds of the sale of Assets subject to PRIAC's security interest; on account of the Debtor's total indebtedness to PRIAC of $35,269,955.77, comprised of (i) the PRIAC Secured Claim of $28,354,139.55, plus accrued but unpaid prepetition interest of $1,221,197.04, (ii) postpetition interest of $2,760,748.05, (iii) fees and costs estimated to be $450,000, (iv) the PRIAC Tranche B Advance Claim of $3,400,000, and (v) late charges of $17,174.09 minus $933,302.97 of funds held in escrow. PRIAC's Secured Claim consisting of $11,828,952.41 in yield maintenance charges is in dispute. If PRIAC becomes the Alternate Club Purchaser, distributions to PRIAC on account of its Class 4 Claim shall be reduced by $3,700,000.

Distribution of sale proceeds to PRIAC will occur upon the Closing (as defined in the Asset Purchase Agreement).

Subject to the terms and conditions of this Plan, PRIAC's right to credit bid under §§ 363(k) and 1129(b)(2)(A)(ii) of the Bankruptcy Code shall remain fully intact and PRIAC may exercise such right in connection with any purchase of Assets securing the Secured Claims of PRIAC by any proposed Purchaser. In a circumstance where PRIAC seeks to credit bid, the Bankruptcy Court shall first determine whether PRIAC's yield maintenance charges are valid and enforceable against the Debtor and also resolve any other objections to Claims held by PRIAC.

In order for PRIAC to be entitled to credit bid, all the following conditions must be satisfied: (1) PRIAC must hold of record and own beneficially the PRIAC Secured Claim and the PRIAC Subordinated Secured Claim; (2) PRIAC is not a party to any oral or written option, purchase right, commitment, understanding, contract or other agreement to sell, transfer or otherwise dispose of the assets acquired pursuant to such credit bid; (3) PRIAC is bidding on behalf of PRIAC and not on behalf of or as agent for another person; and (4) PRIAC has provided a certificate to the Debtor, in form and content reasonably satisfactory to Debtor, that all the foregoing conditions have been satisfied and remain in full force and effect.

If PRIAC becomes the Purchaser and therefore purchases PRIAC's collateral on or after the Effective Date, all liens, claims, interests and encumbrances of PRIAC liens, claims, interests and encumbrances secured by its collateral as identified in the PRIAC loan documents shall remain intact and unaltered.

### *Class 5 (PRIAC Subordinated Claims):*

As set forth in the Cram Down provisions of Article IX, if the holders of claims in Class 7 reject the Plan or if New Club is not formed, the Debtor shall transfer the Member Facilities to PRIAC as the Alternate Club Purchaser and $3,700,000 shall be credited against PRIAC's Allowed Secured Claim. If the Auction produces additional sales proceeds allocable to pay PRIAC's and Compass' Secured Claims, PRIAC shall voluntarily subordinate its receipt of cash proceeds under Class 5 until after both PRIAC and Compass have been paid the full amount on their respective claims in Classes 4 and 6. If Compass waives any entitlement to any receipt of any amounts on its allowed

secured claim, in which event the condition of payment in full of Compass's allowed Class 6 Claim shall be deemed to have been met.

If PRIAC is paid Cash in full on account of the PRIAC Subordinated Secured Claim, then the Member Facilities shall be transferred to the Liquidating Trustee as an asset of the liquidation estate for the benefit of General Unsecured Creditors, subject to all obligations to which PRIAC would have been obligated had it received the deed in lieu of foreclosure, in which event the Liquidating Trustee shall be deemed to be the Alternate Club Purchaser.

### *Class 6 (Secured Claims of Compass):*

The Noble Asset Purchase Agreement provides for the sale of non-Debtor assets in which Compass has a security interest. Accordingly, if the sale to Noble closes, proceeds distributed to Compass are allocable to Debtor Assets and non-debtor assets. As provided in the Chapter 11 Distribution of Proceeds, on account of its Secured Claims of $10,739,680, plus its security interest for non-debtor assets of $2,412,541, the Debtor estimates that Compass will receive a distribution of $11,619,475, comprised of $2,412,541 allocable to non-debtor assets, $2,021,765 of the Debtor's accounts receivable, and $7,185,169 allocable to the proceeds of the sale of Assets subject to Compass' security interest.

Distribution of sale proceeds to Compass will occur upon the Closing (as defined in the Asset Purchase Agreement).

Compass' right to credit bid under §§ 363(k) and 1129(b)(2)(A)(ii) of the Bankruptcy Code shall remain fully intact and Compass may exercise such right in connection with any purchase of Assets securing the Secured Claims of Compass by any proposed Purchaser. In the event of a credit bid situation, Compass' right to participate in any distributions to Unsecured Creditors shall be preserved.

In order for Compass to be entitled to credit bid, all of the following conditions must be satisfied: (1) Compass must own a record and own beneficially the Compass Secured Claim arising under its prepetition loans to the Debtor; (2) Compass is not a party to any oral or written option, purchase right, commitment, understanding, contract or other agreement to sell, transfer or otherwise dispose of the assets acquired pursuant to such credit bid; (3) Compass is bidding on behalf of Compass and not on behalf of or as agent for another person; and (4) Compass has provided a certificate to the Debtor, in form and content reasonably satisfactory to Debtor, that all the foregoing conditions have been satisfied and remain in full force and effect.

### *Class 7 (Club Member Claims):*

Under the Plan, all Club Member Claims will be resolved through the establishment of the New Club and the New Club Membership Plan, which will supersede and replace in their entirety the Existing Club, the Existing Club Membership Plan and the Club Agreement. The Board of Directors of AICI, with the agreement of the Debtor, will approve the New Club Membership Plan as an amendment to the Existing Club Membership Plan and the bylaws for the Existing Club and will approve the

Member Facilities Lease/Purchase Agreement and the Club Access and Use Agreement, which will supersede and replace in its entirety the NDA, and submit all of these matters to a vote of the Current Members. The Current Members' vote on these matters will be conducted by means of a separate vote taken by the Club Member pursuant to the Existing Club Membership Plan and the Club Agreement at a duly scheduled meeting of such members or pursuant to their vote on the Plan. In voting for the Plan, each holder of a Club Member Claim will be voting to approve the New Club Membership Plan and to receive in satisfaction of the Current Member's Allowed Class 7 Claim, New Club Membership Rights in accordance with the terms of the New Club Membership Plan. In voting for the Plan, each holder of a Club Member Claim also shall be voting to approve the Member Facilities Lease/Purchase Agreement and the Club Access and Use Agreement. The Member Facilities shall be transferred and sold to the Purchaser which shall then lease the Member Facilities pursuant to the Member Facilities Lease/Purchase Agreement and enter into the Club Access and Use Agreement with Amelia Equity. The New Club shall assume the entitlement of Current Members to refunds of their Membership Deposits, as such rights are modified by the terms and conditions of the New Club Membership Plan. Also, pursuant to the New Club Membership Plan, each Current Member will have the option to (i) pay a conversion fee of $2,000.00 for a full golf membership or $1,500.00 for all other memberships and receive a membership in the New Club as an equity member, (ii) not pay a conversion fee and receive a membership in the New Club as a non-equity member, or (iii) not join the New Club and be placed on the New Club's resign list for non-equity memberships for a refund of a percentage of his or her Membership Deposit pursuant to the terms and conditions in the New Club Membership Plan. In addition, a Current Member may elect a different category of membership in the New Club subject to the terms and conditions in the New Club Membership Plan.

Approval of the Plan by the holders of Club Member Claims and the establishment of the New Club and the New Club Membership Plan, as described above, are conditioned on the following. First, more than two-thirds in amount and more than one-half in number of the holders of Club Member Claims who vote must vote in favor of the Plan. Second, the AICI Board of Directors must determine that a sufficient number of members have agreed to join the New Club for the New Club to be feasible. Third, the Effective Date must occur.

If the holders of Club Member Claims vote to reject the Plan, then the provisions for a deed in lieu of the Member Facilities to be transferred to PRIAC in Article IX of this Plan shall be effectuated.

### Class 8 (Resigned Member Claims):

If Class 7 votes to accept the Plan and the Board of Directors of AICI ratifies the matters voted upon by the Current Members in Class 7, all Resigned Member Claims will be resolved through the establishment of the New Club and the New Club Membership Plan, which will supersede and replace in their entirety the Existing Club, the Existing Club Membership Plan and the Club Agreement. The Member Facilities shall be transferred and sold to the Purchaser, free and clear of (i) any liability to refund Membership Deposits, (ii) any prohibition on the charging of market rate fees for the use

and access of the Resort Facilities, except as specifically set forth in the Club Access and Use Agreement, and (iii) all other liens, claims, interests, rights and encumbrances of any kind arising under the NDA, except for such liens, claims, interests and real estate rights of access and use specifically set forth in the Club Access and Use Agreement, and the Purchaser shall shall then lease the Member Facilities pursuant to the Member Facilities Lease/Purchase Agreement and enter into the Club Access and Use Agreement, the Club Services Agreement and the Long Point Golf Academy Lease with Amelia Equity. The New Club shall assume the entitlement of Resigned Members to refunds of their Membership Deposits, as such rights are modified by the terms and conditions of the New Club Membership Plan. Also, in such circumstance, each holder of a Resigned Club Member Claim shall receive in satisfaction of the Resigned Member's Allowed Class 8 Claim, (i) the right to obtain an equity membership in the New Club in the same or a different category of his or her resigned membership in the Existing Club upon payment of a conversion fee of $2,000.00 for a full golf membership or $1,500.00 for all other memberships, subject to the terms and conditions in the New Club Membership Plan, (ii) the right to obtain a non-equity membership in the New Club, or (iii) placement on the New Club's resign list for non-equity memberships in the same order that the Resigned Member occupies on the current resigned list of the Existing Club, for refund of a percentage of his or her Membership Deposit pursuant to the terms and conditions in the New Club Membership Plan.

If the holders of Club Member Claims in Class 7 vote to reject the Plan, then the provisions for a deed in lieu of the Member Facilities to be transferred to the Alternate Club Purchaser in Article IX of this Plan shall be effectuated. The rights and remedies, if any, of a Resigned Member shall apply to the Alternate Club Purchaser as set forth in the NDA and the provisions of the Existing Club Membership Plan except that any Class 8 Claimant may elect to renew their Club Membership in which event they will release their claim for a member deposit refund against the Debtor. The member deposit refund claim for each Resigned Member shall not receive any further consideration or payment under this Plan.

### Class 9 (Secured Claim of NBSC):

Debtor shall surrender and abandon its interests in the Assets which secure NBSC's Claims in compete satisfaction of NBSC's Secured Claim. The balance of NBSC's Claims shall be treated as a General Unsecured Claim in accordance with the treatment afforded Class 10 Creditors.

### Class 10 (General Unsecured Claims):

Unless otherwise agreed by the holder of an Allowed Class 10 Claim and the Debtor, each holder of an Allowed Claim in Class 10 will be entitled to receive in satisfaction of its Allowed Class 10 Claim a Pro Rata Share of Quarterly Distributions from the General Unsecured Claim Recovery Fund commencing on the first Quarterly Distribution Date.

Pursuant to 11 U.S.C. § 502(d), no payments shall be made to any entity from which property is recoverable under §§ 542, 543, 550 or 553 of the Bankruptcy Code or

to any entity that is a transferee of a transfer avoidable under §§ 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, unless such entity or transferee has paid the amount, or turned over any such property from which such entity or transferee is liable under §§ 522(I), 542, 543, 550 or 553 of the Bankruptcy Code. The Claim of any recipient of a payment avoidable under §§ 542, 543, 550 or 553 of the Bankruptcy Code who fails to pay or turnover the amount of the payment to the Debtor within sixty (60) days of a judgment or order avoiding the transfer or requiring such turnover shall be extinguished and forever barred.

### *Class 11 (Interest in the Debtor):*

No property will be distributed to or retained by the holders of allowed Class 11 Interests and Claims. Holders of Class 11 Interests and Claims will be deemed to have rejected the Plan and are not entitled to vote thereon.

### *Payment of Administrative Claims*

#### *Administrative Claims in General*

Debtor will continue to pay Allowed Administrative Expenses and Ordinary Course Liabilities through the Effective Date. Except as otherwise provided in the Plan or unless otherwise agreed by the holder of an Administrative Claim and the Debtor or Liquidating Trustee, each holder of an Allowed Administrative Claim which is unpaid as of the Effective Date will receive from the Liquidating Trustee, in full satisfaction of its Administrative Claim, Cash equal to the allowed amount of such Administrative Claim either (A) on the Effective Date or (B) if the Administrative Claim is not allowed as of the Effective Date, within 30 days after the date on which (i) an order allowing such Administrative Claim becomes a Final Order or (ii) a Stipulation of Amount and Nature of Claim is executed by the Liquidating Trustee and the holder of the Administrative Claim.

Administrative Claims include Claims for costs and expenses of administration allowed under §§ 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estate and operating the business of the Debtor, including Claims based on liabilities incurred by the Debtor in the ordinary course of its business and the PRIAC Tranche B Advance Claim; (b) Professional Fee Claims; (c) U.S. Trustee Fees; and (d) Claims for reclamation allowed in accordance with § 546( c )(2) of the Bankruptcy Code and § 2-702 of the Uniform Commercial Code.

Unless PRIAC is the Purchaser pursuant to its right to credit bid, the PRIAC Tranche B Advance Claims shall be an allowed Administrative Claim without the necessity for PRIAC to file an Administrative Claim, and shall be paid in accordance with the provisions of paragraph 3.3a. If there is a dispute over the calculation of the PRIAC Tranche B Advance Claim, PRIAC shall be paid the principal amount of its post-petition advances on or before the Effective Date, with the balance of the PRIAC Tranche B Advance Claim held in escrow pending resolution of the dispute, which dispute shall

be scheduled for an evidentiary hearing before the Bankruptcy Court within 45 days of the Effective Date, or at such other time as the Bankruptcy Court's schedule will allow. PRIAC shall submit a written calculation of the PRIAC Tranche B Advance Claims on or before 20 days after the Effective Date, and in the absence of an objection, the amount submitted shall be conclusively deemed to be the correct calculation of the interest and other fees, costs, and charges component of the PRIAC Tranche B Advance Claims.

### *U.S. Trustee Fees*

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, will be paid by the Debtor or Liquidating Trustee in Cash equal to the amount of such Administrative Claims. A ll fees payable pursuant to 28 U.S.C § 1930 will be paid by the Liquidating Trustee in accordance therewith until the closing of the Reorganization Case pursuant to § 350(a) of the Bankruptcy Code.

### *Ordinary Course Liabilities*

Professionals or other entities asserting a Professional Fee Claim for services rendered to the Debtor before the Effective Date must file and serve on the Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, the Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claims no later than 60 days after the Effective Date. Objections to any Professional Fee Claims, including any objections by the U.S. Trustee, must be filed and served on the Liquidating Trustee and the requesting party within 30 days after the filing of the applicable request for payment of the Professional Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including Fee Order, regarding the payment of Professional Fee Claims.

### *Bar Dates for Administrative Claims*

Except as otherwise provided in the Plan, requests for payment of Administrative Claims must be filed by the Administrative Claim Bar Date and served pursuant to the procedures specified in the Administrative Claim Bar Date Order. Holders of Administrative Claims that are required to file and serve a request for payment of such Administrative Claims and that do not file and serve such a request by such date will be forever barred from asserting such Administrative Claims against the Debtor, the Liquidating Trustee or its property and such Administrative Claims will be deemed waived and released as of the Effective Date. Objections to such requests must be filed and served on the Liquidating Trustee within 30 days after the filing of the applicable request for payment of Administrative Claims.

Professionals or other entities asserting a Professional Fee Claim for services rendered to the Debtor before the Effective Date must file and serve on the Liquidating Trustee and such other entities who are designated by the Bankruptcy Rules, the

Confirmation Order, the Fee Order or other order of the Bankruptcy Court an application for final allowance of such Professional Fee Claims no later than 60 days after the Effective Date. Objections to any Professional Fee Claims, including any objections by the U.S. Trustee, must be filed and served on the Liquidating Trustee and the requesting party within 30 days after the filing of the applicable request for payment of the Professional Fee Claims. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court, including Fee Order, regarding the payment of Professional Fee Claims.

Holders of Administrative Claims based on liabilities incurred by the Debtor in the ordinary course of its business, including Administrative Trade Claims, Administrative Claims of governmental units for Taxes (including Tax audit Claims arising after the Petition Date) and Administrative Claims arising from those contracts and leases of the kind described in Section 5.6, will not be required to file or serve any request for payment of such Administrative Claims.

### *Payment of Priority Tax Claims*

Pursuant to § 1129(a)(9)( c) of the Bankruptcy Code, unless otherwise agreed by the holder of a Priority Tax Claim and the Debtor or Liquidating Trustee, each holder of an Allowed Priority Tax Claim will receive payment in full of its Priority Tax Claim. The Debtor estimates that the aggregate amount of Allowed Priority Tax Claims will be approximately $500,000.

The holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty (a) will be subject to treatment in Class 10 and (b) the holder of an Allowed Priority Tax Claim will not be entitled to assess or attempt to collect such penalty from the Liquidating Trustee or its property (other than as the holder of a Class 10 Claim).

### *Discharge of Claims and Termination of Interests*

Except as provided in the Plan or the Confirmation Order, the rights afforded under the Plan and the treatment of Claims and Interests under the Plan will be in exchange for and in complete satisfaction, discharge and release of all Claims and termination of all Interests arising on or before the Effective Date, including any interest accrued on Claims from the Petition Date. Except as provided in the Plan or in the Confirmation Order, Confirmation will, as of the Effective Date: (a) discharge the Debtor from all Claims or other debts and Interests that arose on or before the Effective Date, and all debts of the kind specified in §§ 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (i) a proof of Claim based on such debt is filed or deemed filed pursuant to § 501 of the Bankruptcy Code, (ii) a Claim based on such debt is allowed pursuant to § 502 of the Bankruptcy Code, or (iii) the holder of a Claim based on such debt has accepted the Plan; and (b) terminate all Interests and other rights of equity security holders in the Debtor.

In accordance with the foregoing, except as provided in the Plan or the Confirmation Order, the Confirmation Order will be a judicial determination, as of the

Effective Date, of a discharge of all Claims and other debts and liabilities against the Debtor and a termination of all Interests and other rights of equity security holders in the Debtor, pursuant to §§ 524 and 1141 of the Bankruptcy Code, and such discharge will void any judgment obtained against the Debtor at any time, to the extent that such judgment relates to a discharged Claim or terminated Interest.

## *Injunctions*

As of the Effective Date, all entities that have held, currently hold or may hold a Claim or other debt or liability of the Debtor, or an Interest or other right of an equity security holder with respect to the Debtor, that is discharged, waived, settled or deemed satisfied in accordance with the terms of the Plan will be permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Debtor, the Liquidating Trustee or the property of either of them, other than to enforce any right pursuant to the Plan to a distribution; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtor, the Liquidating Trustee or the property of either of them, other than as permitted by the Plan as described in (a) above; (c) creating, perfecting or enforcing any lien or encumbrance of any kind against the Debtor, the Liquidating Trustee or the property of either of them; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to the Debtor or the Liquidating Trustee; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

All entities that have held, currently hold or may hold any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that are released pursuant to the Plan, will be permanently enjoined from taking any of the following actions against any released entity or its property on account of such released claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities: (a) commencing or continuing in any manner any action or other proceeding; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order; (c) creating, perfecting or enforcing any lien or encumbrance; (d) asserting a setoff, right of subrogation or recoupment of any kind against any debt, liability or obligation due to any released entity; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the Plan.

## *Preservation of Rights of Action Held by the Debtor and the Liquidating Trustee*

Except as provided in the Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with the Plan, in accordance with § 1123(b) of the Bankruptcy Code, the Debtor or the Liquidating Trustee, or their successors, will retain and may enforce any claims, demands, rights and causes of action that the Debtor or its Estate may hold, including the Recovery Actions, to the extent not expressly released under the Plan. The Debtor or the Liquidating Trustee, or their successors, may pursue such retained claims, demands, rights or causes of action, as appropriate, in accordance with the best interests of the Debtor or the Liquidating

Trustee, or their successors, holding such claims, demands, rights or causes of action. Further, the Liquidating Trustee retain their rights to file and pursue any adversary proceedings against any trade creditor or vendor related to debit balances or deposits owed to the Debtor.

### *Limitation of Liability*

THE DEBTOR, THE LIQUIDATING TRUSTEE AND THEIR RESPECTIVE DIRECTORS, OFFICERS, EMPLOYEES AND PROFESSIONALS, ACTING IN SUCH CAPACITY AND THE CREDITORS' COMMITTEE OR MEMBERS THEREOF, AND THEIR RESPECTIVE PROFESSIONALS WILL NEITHER HAVE NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION OR CONSUMMATION OF THE PLAN, THIS DISCLOSURE STATEMENT OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE PLAN, ALTHOUGH THE PROVISIONS OF SECTION 12.2 OF THE PLAN DESCRIBED IN THIS PARAGRAPH WILL HAVE NO EFFECT ON (A) THE LIABILITY OF ANY ENTITY THAT WOULD OTHERWISE RESULT FROM THE FAILURE TO PERFORM OR PAY ANY OBLIGATION OR LIABILITY UNDER THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN OR (B) THE LIABILITY OF ANY ENTITY THAT WOULD OTHERWISE RESULT FROM ANY SUCH ACT OR OMISSION TO THE EXTENT THAT SUCH ACT OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

### *Releases*

AS OF THE EFFECTIVE DATE, IN CONSIDERATION FOR THE OBLIGATIONS OF THE DEBTOR AND THE LIQUIDATING TRUSTEE UNDER THE PLAN AND THE CASH AND CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS AND DOCUMENTS TO BE ENTERED INTO OR DELIVERED IN CONNECTION WITH THE PLAN, EACH HOLDER OF A CLAIM THAT VOTES IN FAVOR OF THE PLAN WILL BE DEEMED TO FOREVER RELEASE, WAIVE AND DISCHARGE ALL CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES (OTHER THAN THE RIGHT TO ENFORCE THE DEBTOR'S OR THE LIQUIDATING TRUSTEE'S OBLIGATIONS UNDER THE PLAN AND THE CONTRACTS, INSTRUMENTS, RELEASES AND OTHER AGREEMENTS AND DOCUMENTS DELIVERED THEREUNDER), WHETHER LIQUIDATED OR UNLIQUIDATED, FIXED OR CONTINGENT, MATURED OR UNMATURED, KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, THEN EXISTING OR THEREAFTER ARISING IN LAW, EQUITY OR OTHERWISE, THAT ARE BASED IN WHOLE OR IN PART ON ANY ACT, OMISSION, TRANSACTION OR OTHER

OCCURRENCE TAKING PLACE ON OR PRIOR TO THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTOR, THE REORGANIZATION CASE OR THE PLAN THAT SUCH ENTITY HAS, HAD OR MAY HAVE AGAINST THE DEBTOR, THE CREDITORS' COMMITTEE OR MEMBERS THEREOF, OR ANY OF THEIR RESPECTIVE PRESENT OR FORMER DIRECTORS, OFFICERS, EMPLOYEES, ACCOUNTANTS (INCLUDING INDEPENDENT CERTIFIED PUBLIC ACCOUNTANTS), ADVISORS, ATTORNEYS, INVESTMENT BANKERS, UNDERWRITERS, CONSULTANTS OR OTHER AGENTS OR SHAREHOLDERS, ACTING IN SUCH CAPACITY (WHICH RELEASE WILL BE IN ADDITION TO THE DISCHARGE OF CLAIMS AND TERMINATION OF INTERESTS PROVIDED IN THE PLAN AND UNDER THE CONFIRMATION ORDER AND THE BANKRUPTCY CODE), EXCEPT FOR THOSE CLAIMS, OBLIGATIONS, SUITS, JUDGMENTS, DAMAGES, DEMANDS, DEBTS, RIGHTS, CAUSES OF ACTION AND LIABILITIES BASED ON: (A) ACTS OR OMISSIONS OF ANY SUCH PERSON CONSTITUTING GROSS NEGLIGENCE OR WILLFUL MISCONDUCT; OR (B) CONTRACTUAL OBLIGATIONS OF, OR LOANS OWED BY, ANY SUCH PERSON TO THE DEBTOR.

### Executory Contracts and Unexpired Leases

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into in connection with the Plan, on the Effective Date, pursuant to § 365 of the Bankruptcy Code, the Debtor will assume or assume and assign, as indicated, each Executory Contract and Unexpired Lease listed on the Contract Assumption Schedule. Each such contract and lease, including those listed on the Contract Assumption Schedule, will be assumed only to the extent that any such contract or lease constitutes an Executory Contract or Unexpired Lease. Listing a contract or lease on the Contract Assumption Schedule will not constitute an admission by the Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that the Debtor has any liability thereunder.

Each Executory Contract or Unexpired Lease assumed will include any modifications, amendments, supplements or restatements to such contract or lease, irrespective of whether such modification, amendment, supplement or restatement is listed on the Contract Assumption Schedule.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the assumptions and assignments described in Section 5.1 of the Plan, pursuant to §§ 365 and 1123 of the Bankruptcy Code, as of the Effective Date. An order of the Bankruptcy Court entered on or prior to the Confirmation Date will specify the procedures for providing notice to each party whose Executory Contract or Unexpired Lease is being assumed or assumed and assigned pursuant to the Plan of: (a) the contract or lease being assumed or assumed and assigned; (b) the Cure Amount Claim, if any, that the Debtor believes it would be obligated to pay in connection with such assumption; and (c) the procedures for such party to object to the assumption or assumption and assignment of the applicable contract or lease or the amount of the proposed Cure Amount Claim.

To the extent that such Claims constitute monetary defaults, the Cure Amount Claims associated with each Executory Contract or Unexpired Lease to be assumed pursuant to the Plan will be satisfied, pursuant to § 365(b)(1) of the Bankruptcy Code, at the option of the Debtor or the Purchaser: (a) by payment of the Cure Amount Claim in Cash on the Effective Date; or (b) on such other terms as are agreed to by the parties to such Executory Contract or Unexpired Lease. If there is a dispute regarding (a) the amount of any Cure Amount Claim; (b) the ability of the Purchaser or any assignee to provide "adequate assurance of future performance" (within the meaning of § 365 of the Bankruptcy Code) under the contract or lease to be assumed; or (c) any other matter pertaining to assumption or assumption and assignment of such contract or lease, the payment of any Cure Amount Claim required by § 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order resolving the dispute and approving the assumption.

On the Effective Date, except for an Executory Contract or Unexpired Lease that was previously assumed, assumed and assigned or rejected by an order of the Bankruptcy Court or that is assumed pursuant to Section 5.1.a of the Plan, each Executory Contract or Unexpired Lease that has not previously expired or terminated pursuant to its own terms will be rejected pursuant to § 365 of the Bankruptcy Code. The Confirmation Order will constitute an order of the Bankruptcy Court approving such rejections, pursuant to § 365 of the Bankruptcy Code, as of the Effective Date.

Notwithstanding anything to the contrary in the Bar Date Order, if the rejection of an Executory Contract or Unexpired Lease pursuant to Section 5.3 of the Plan gives rise to a Claim, such Claim will be forever barred and will not be enforceable against the Debtor, the Liquidating Trustee, their successors or their property unless a proof of Claim or request for payment of Administrative Claim is filed and served on the Liquidating Trustee pursuant to the procedures specified in the Confirmation Order, the notice of the entry of the Confirmation Order or another order of the Bankruptcy Court no later than 30 days after the Effective Date.

Contracts and leases entered into after the Petition Date by the Debtor and not assumed and assigned pursuant to Section 5.1.a of the Plan, including any Executory Contracts or Unexpired Leases assumed by the Debtor and not assumed by the Purchaser, will be treated as Ordinary Course Liabilities in accordance with Section 3.1.a(iii) of the Plan.

### Insurance Policies and Agreements

The Debtor does not believe that the insurance policies issued to, or insurance agreements entered into prior to the Petition Date constitute Executory Contracts. To the extent that such insurance policies or agreements are considered to be executory contracts, then, notwithstanding anything contained in Article V of the Plan to the contrary, the Plan will constitute a motion to assume and assign such insurance policies and agreements, and, subject to the occurrence of the Effective Date, the entry of the Confirmation Order will constitute approval of such assumption and assignment pursuant to § 365(a) of the Bankruptcy Code. Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective

Date, no payments are required to cure any defaults of the Debtor existing as of the Confirmation Date with respect to each such insurance policy or agreement.

### Dissolution of Committee

Subject to any applicable Bankruptcy Court order, on the Effective Date the Creditors' Committee will dissolve, and the members of the Creditors' Committee will be released and discharged from all duties and obligations arising from or related to the Reorganization Case. The Professionals retained by the Creditors' Committee will not be entitled to assert any Professional Fee Claims for any services rendered or expenses incurred after the Effective Date, except for services rendered and expenses incurred in connection with any applications for allowance of compensation and reimbursement of expenses pending on the Effective Date or filed and served after the Effective Date pursuant to Section 3.l.a(iv)(B)(l) of the Plan and in connection with any appeal of the Confirmation Order.

### Modification or Revocation of the Plan

Subject to the restrictions on modifications set forth in § 1127 of the Bankruptcy Code the Debtor or the Liquidating Trustee, as the case may be, reserves the right to alter, amend or modify the Plan before its substantial consummation.

## DISTRIBUTIONS UNDER THE PLAN

### Distributions for Claims Allowed as of the Effective Date

Except as otherwise provided in Article VI of the Plan, distributions to be made on the Effective Date to holders of Claims that are allowed as of the Effective Date will be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as is practicable, but in any event no later than 60 days after the Effective Date unless (a) such Claim is a Cure Amount Claim associated with an Executory Contract or Unexpired Lease to be assumed pursuant to the Plan about which there is dispute, in which case the payment on account of such Claim will be made in accordance with Section 5.2 of the Plan.

### Distributions on the Effective Date in Respect of
### Class 10 General Unsecured Claims

From and after the Effective Date, Cash to be distributed on account of Class 10 Claims (a) will be maintained by and in the name of the Liquidating Trustee in the General Unsecured Claims Reserve and held in trust pending distribution by the Liquidating Trustee for the benefit of the holders of such Claims; (b) will be accounted for separately; and (c) will not constitute property of the Liquidating Trustee.

### *Method of Distributions to Holders of Claims*

The Liquidating Trustee will make all distributions required under the Plan. The Liquidating Trustee will serve without bond and may employ or contract with other entities to assist in or make the distributions required by the Plan.

### *General Unsecured Claims Reserve*

On the Effective Date, the Plan Cash will be placed in the General Unsecured Claims Reserve for the benefit of holders of Allowed Claims in Class 10.

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the Liquidating Trustee will make all distributions that become deliverable to holders of Disputed Claims that have become Allowed Claims during the immediately preceding calendar quarter.

### *Distribution Record Date*

The Liquidating Trustee will have no obligation to recognize the transfer of, or the sale of any participation in, any Allowed Claim that occurs after the Distribution Record Date and will be entitled for all purposes herein to recognize and make distributions only to those holders of Allowed Claims that are holders of such Claims, or participants therein, as of the Distribution Record Date.

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 prior to the Distribution Record Date will be treated as the holders of such Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to such transfer has not expired by the Distribution Record Date.

### *Means of Cash Payments*

Except as otherwise specified in the Plan, Cash payments made pursuant to the Plan will be in United States currency by checks drawn on a domestic bank selected by the Liquidating Trustee or, at the option of the Liquidating Trustee, by wire transfer from a domestic bank; provided, however, that Cash payments to foreign holders of Allowed Claims may be made, at the option of the Debtor, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction. If a check included in a distribution to a holder of an Allowed Claim is not cashed within 180 days of the issuance thereof, the Liquidating Trustee will void such check and such distribution will be treated as undeliverable in accordance with Section 6.2.c of the Plan.

### *Timing and Calculation of Amounts to Be Distributed*

On the Effective Date or as promptly thereafter as is practicable, the Liquidating Trustee will make distributions to holders of Class 10 Claims allowed as of the Effective Date from the General Unsecured Claims Reserve in accordance with Section 3.3.d of the Plan. The amount of such distributions will be calculated as if each then-unresolved Disputed Claim in Class 10 were an Allowed Claim in its Face Amount.

### Compliance with Tax Requirements

To the extent applicable, the Liquidating Trustee will comply with all Tax withholding and reporting requirements imposed on it by any governmental unit, and all distributions pursuant to the Plan will be subject to such withholding and reporting requirements. The Liquidating Trustee will be authorized to take any actions that it determines, in its reasonable discretion, to be necessary, appropriate or desirable to comply with such withholding and reporting requirements; *provided, however,* that, notwithstanding the foregoing or any other provision of the Plan, each entity receiving a distribution pursuant to the Plan will have sole and exclusive responsibility for the satisfaction and payment of any Tax obligations imposed on it by any governmental unit on account of such distribution, including withholding obligations.

### Setoffs

Except with respect to claims of the Debtor released pursuant to the Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, may, pursuant to § 553 of the Bankruptcy Code or applicable non-bankruptcy law, setoff against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim (before any distribution is made on account of such Claim) the claims, rights and causes of action of any nature that the Debtor or Liquidating Trustee may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effect a setoff nor the allowance of any Claim hereunder will constitute a waiver or release by the Debtor or Liquidating Trustee of any claims, rights and causes of action that the Debtor or Liquidating Trustee may possess against such a Claim holder, which are preserved under the Plan.

### Prosecution of Objections to Claims

All objections to Claims must be filed and served on the holders of such Claims by the Claims Objection Bar Date, and, if filed prior to the Effective Date, such objections will be served on the parties on the then-applicable service list in the Reorganization Case. If an objection has not been filed to a proof of Claim or a scheduled Claim by the Claims Objection Bar Date, the Claim to which the proof of Claim or scheduled Claim relates will be treated as an Allowed Claim if such Claim has not been allowed earlier. An objection is deemed to have been timely filed as to all Tort Claims, thus making each Tort Claim a Disputed Claim as of the Claims Objection Bar Date. Each such Tort Claim will remain a Disputed Claim until it becomes an Allowed Claim in accordance with Section 1.1 (8) of the Plan, if ever.

After the Effective Date, only the Debtor, the Liquidating Trustee or the Purchaser will have the authority to file, settle, compromise, withdraw or litigate to judgment objections to Claims. After the Effective Date, the Liquidating Trustee may settle or compromise any Disputed Claim after notice and hearing and approval of the Bankruptcy Court on any Claim in excess of $25,000. This grant of authority to the Debtor and Liquidating Trustee will not limit the right of the U.S. Trustee or any other

party in interest to object to Professional Fee Claims as contemplated by Section 3.1.a(iv)(B)(1) of the Plan.

### *Liquidation and Payment of Tort Claims*

At the Debtor's or Liquidating Trustee's option, any unliquidated Tort Claim as to which a proof of Claim was timely filed in the Reorganization Case will be determined and liquidated in the administrative or judicial tribunal(s) in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction. The Debtor and the Liquidating Trustee may exercise the above option by service upon the holder of the applicable Tort Claim of a notice informing the holder of such Claim that the Debtor or Liquidating Trustee has exercised such option. Upon the Debtor's service of such notice, the automatic stay provided under § 362 of the Bankruptcy Code will be deemed modified, without the necessity for further Bankruptcy Court approval, solely to the extent necessary to allow the parties to determine or liquidate the Tort Claim in the applicable administrative or judicial tribunal(s). Notwithstanding the foregoing, at all times prior to or after the Effective Date, the Bankruptcy Court will retain jurisdiction relating to Tort Claims, including the Debtor's right to have such Claims determined and/or liquidated in the Bankruptcy Court (or the District Court) pursuant to Section 157(h)(2)(B) of title 28 of the United States Code, as may be applicable). Any Tort Claim determined and liquidated pursuant to a judgment obtained in accordance with Section 7.2 of the Plan and applicable non-bankruptcy law that is no longer appealable or subject to review will be deemed an Allowed Claim in Class 10 against the Debtor in such liquidated amount. In no event will a distribution be made under the Plan to the holder of a Tort Claim on account of any portion of an Allowed Claim in excess of the Debtor's deductible or self-insured retention under any applicable insurance policy.

### *Treatment of Disputed Claims*

Except as otherwise provided herein, no payments or distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever, except that the undisputed portion of a Disputed Claim may be paid in the discretion of the Liquidating Trustee if the disputed portion is less than 10% of the total claim. In lieu of distributions under the Plan to holders of Disputed Claims in Class 10, the General Unsecured Claims Recovery Fund will be established on the Effective Date to hold property for the benefit of those Claim holders, as well as holders of Allowed Claims in Class 10 entitled to a distribution in respect thereof.

### *Distributions on Account of Disputed Claims Once They Are Allowed*

On each Quarterly Distribution Date or as promptly thereafter as is practicable, the Liquidating Trustee will make all distributions on account of any Disputed Claim that has become an Allowed Claim during the immediately preceding calendar quarter.

# VOTING AND CONFIRMATION OF THE PLAN

### General

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtor, including that:

- the Plan has classified Claims and Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtor has complied with the applicable provisions of the Bankruptcy Code;

- the Debtor, as proponent of the Plan within the meaning of § 1129 of the Bankruptcy Code, has proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure required by § 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by the requisite votes of creditors and equity interest holders, except to the extent that cramdown is available under § 1129(b) of the Bankruptcy Code;

- the Plan is in the "best interests" of all holders of Claims or Interests in an impaired Class that have not accepted the Plan (that is, that such creditors will receive at least as much pursuant to the Plan as they would receive or retain in a Chapter 7 liquidation);

- the Plan is feasible (that is, there is a reasonable prospect that the Debtor will be able to perform their obligations under the Plan); and

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid, or the Plan provides for the payment of such fees on the Effective Date.

### Voting Procedures and Requirements

Pursuant to the Bankruptcy Code, only classes of claims against, or equity interests in, a debtor that are "impaired" under the terms of the Debtor's plan are entitled to vote to accept or reject the plan. A class is "impaired" if the legal, equitable or contractual rights attaching to the claims or equity interests of that class are modified,

other than by curing defaults and reinstating maturity. Classes of claims that are not impaired are not entitled to vote on a plan and are conclusively presumed to have accepted that plan. Classes of claims or equity interests that receive no distributions under a plan are not entitled to vote on that plan and are deemed to have rejected that plan unless such class otherwise indicates acceptance.

Under the Plan, only Class 1 is unimpaired and deemed to have accepted the Plan. Classes 2, 3, 4, 6, 7, 8, 9 and 10 may vote on the Plan.

Pursuant to § 502 of the Bankruptcy Code and Bankruptcy Rule 3018, the Bankruptcy Court may estimate and temporarily allow a Claim for voting or other purposes. By order of the Bankruptcy Court, voting procedures have been established, which include certain vote tabulation rules that temporarily allow or disallow certain Claims for voting purposes only. These voting procedures, including the tabulation rules, are described in the solicitation materials provided with your Ballot.

**VOTING ON THE PLAN BY EACH HOLDER OF AN IMPAIRED CLAIM ENTITLED TO VOTE ON THE PLAN IS IMPORTANT. IF YOU HOLD CLAIMS IN MORE THAN ONE CLASS OF IMPAIRED CLAIMS ENTITLED TO VOTE OR MULTIPLE CLAIMS IN ANY SUCH CLASS, YOU MAY RECEIVE MORE THAN ONE BALLOT. YOU SHOULD COMPLETE, SIGN AND RETURN EACH BALLOT YOU RECEIVE.**

**PLEASE CAREFULLY FOLLOW ALL OF THE INSTRUCTIONS CONTAINED ON THE BALLOT OR BALLOTS PROVIDED TO YOU. ALL BALLOTS MUST BE COMPLETED AND RETURNED IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED.**

**THE PLAN PROVIDES THAT IF THE HOLDERS OF CLASS 4 CLAIMS VOTE TO REJECT THE PLAN, THE DEBTOR WILL SEEK CONFIRMATION OF THE PLAN UNDER THE CRAMDOWN PROVISIONS OF § 1129(b) OF THE BANKRUPTCY CODE. IF ANY OTHER CLASS REJECTS THE PLAN, THE DEBTOR MAY, WITH RESPECT TO SUCH CLASS, SEEK TO SATISFY THE REQUIREMENTS FOR CONFIRMATION OF THE PLAN PURSUANT TO § 1129(b) OF THE BANKRUPTCY CODE AND, IF REQUIRED, MAY AMEND THE PLAN TO CONFORM TO THE STANDARDS OF § 1129(B).**

*Confirmation Hearing*

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on whether the Debtor has fulfilled the requirements of § 1129 of the Bankruptcy Code relating to the Confirmation of the Plan.

The Confirmation Hearing may be continued or adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the continued or adjourned date made at the Confirmation Hearing. Any objection to Confirmation of the Plan must be made in writing and must specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or Interest held by the objector. Any such objections must be filed and served upon the

persons designated in the notice of the Confirmation Hearing, in the manner and by the deadline described in such notice.

### Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of § 1129 of the Bankruptcy Code are satisfied. These requirements include that the Plan:

- is accepted by the requisite holders of claims and equity interests in each impaired class of the Debtor or, if not so accepted, has been accepted by the requisite holders of at least one impaired class and is "fair and equitable" and "does not discriminate unfairly" as to each non-accepting class;

- is either accepted by, or is in the "best interests" of, each holder of a claim or equity interest in each impaired class of the Debtor;

- is feasible; and

- complies with the other applicable provisions of the Bankruptcy Code.

### Acceptance or Cramdown

A plan is accepted by an impaired class of claims if holders of at least two-thirds in dollar amount and a majority in number of claims in such class that are allowed or have been temporarily allowed for voting purposes, as the case may be, and that are held by holders of such claims who actually vote to accept or reject such plan vote to accept it. § 1129(b) of the Bankruptcy Code contains so-called "cramdown" provisions pursuant to which a plan may be confirmed even if it is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it and the Bankruptcy Court finds that it is "fair and equitable" and "does not discriminate unfairly" as to each impaired class that does not accept the Plan or is deemed to have rejected it. The "fair and equitable" standard, also known as the "absolute priority rule", requires, among other things, that unless a dissenting class of unsecured claims receives full compensation for the aggregate allowed amount of such claims, no holder of an allowed claim in any class junior to such class may receive or retain any property on account of such claim. With respect to a dissenting class of secured claims, the "fair and equitable" standard requires, among other things, that holders of such claims either retain their liens and receive deferred Cash payments with a value as of the date on which such plan is effective, equal to the value of their interest in property of the applicable estate, or receive the "indubitable equivalent" of their secured claims. The "fair and equitable" standard has also been interpreted to prohibit any class of claims senior to a dissenting class from receiving under a plan more than 100% of the aggregate allowed amount of such claims. The requirement that a plan not "discriminate unfairly" means, among other things, that a dissenting class of claims must be treated substantially equally with respect to other classes of claims of equal rank.

The Debtor does not believe that the Plan unfairly discriminates against any Class that may not accept or otherwise consent to the Plan. The Debtor believes that the Plan is "fair and equitable" and "does not discriminate unfairly" as to each impaired Class entitled to vote upon the Plan or deemed to have rejected it. If Class 7 votes to reject the Plan, the Debtor will seek Confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code. The Debtor may also seek confirmation of the Plan with respect any other impaired Class that does not accept the Plan and has reserved the right to modify the Plan to the extent that Confirmation of the Plan requires modification.

### Best Interests Test; Liquidation Analysis

Notwithstanding acceptance of a plan by each impaired class (or satisfaction of the "cramdown" provisions of the Bankruptcy Code in lieu thereof), for a plan to be confirmed, the Bankruptcy Court must determine that the plan is in the best interest of each holder of a claim who is in an impaired class and has not voted to accept the plan. Accordingly, if an impaired class does not unanimously accept a plan, the best interests test requires the Bankruptcy Court to find that the plan provides to each member of such impaired class a recovery on account of such class member's claim that has a value, as of the date such plan is consummated, at least equal to the value of the distribution that such class member would receive if the debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.

To estimate what holders of Claims or Interests in each impaired Class would receive if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Reorganization Case were converted to a Chapter 7 case under the Bankruptcy Code and the Debtor's assets were liquidated by a Chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtor would consist of the net proceeds from such disposition of the Debtor' assets plus any Cash held by the Debtor.

The information contained in Exhibit II hereto provides a summary of the Liquidation Values of the Debtor's interests in property, assuming a hypothetical Chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the Debtor's Assets. As more fully described in Exhibit II, the liquidation analysis is based on a number of estimates and assumptions that are subject to significant uncertainties, including estimates and assumptions relating to the proceeds of sales of assets, the timing of such sales, the impact of pending liquidations on continuing operations and values and certain Tax matters. While the Debtor believes that these estimates and assumptions are reasonable for the purpose of preparing hypothetical Chapter 7 liquidation analyses, no assurance exists that such estimates and assumptions would be valid if the Debtor were, in fact, to be liquidated.

Furthermore, as noted below, the Debtor believes that a Chapter 7 liquidation could result in substantial litigation that could delay the liquidation beyond the periods assumed in Exhibit II. This delay could materially reduce the amount determined on a present value basis available for distribution to creditors. Moreover, the Debtor believe that such litigation and attendant delay could adversely affect the values realizable in the sale of the Debtor' assets to an extent that cannot be estimated at this time.

Based on the liquidation analyses set forth in Exhibit II, the Debtor believes that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive under a Chapter 7 liquidation. In an actual liquidation of the Debtor, distributions to holders of Claims may be made substantially later than the Effective Date assumed in connection with the Plan. This delay could materially reduce the amount determined on a present value basis available for distribution to creditors, including holders of General Unsecured Claims.

The Liquidation Value available to holders of General Unsecured Claims and Interests would be reduced by, among other things: (a) the Claims of secured creditors to the extent of the value of their collateral; (b) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtor's Chapter 7 case; (c) unpaid Administrative Claims of the Reorganization Case; and (d) Priority Claims and Priority Tax Claims. The Debtor's cost of liquidation in Chapter 7 cases would include the compensation of a trustee, as well as of counsel and of other professionals retained by such trustee, asset disposition expenses, applicable Taxes, litigation costs, Claims arising from the operation of the Debtor during the pendency of the Chapter 7 case and all unpaid Administrative Claims incurred by the Debtor during the Reorganization Case that are allowed in the Chapter 7 cases. The liquidation itself would trigger certain Priority Claims, such as Claims for severance pay, and would likely accelerate the payment of other Priority Claims and Priority Tax Claims that would otherwise be payable in the ordinary course of business. These Priority Claims and Priority Tax Claims would be paid in full out of the net liquidation proceeds, after payment of Secured Claims, before the balance would be made available to pay General Unsecured Claims or to make any distribution on account of Interests. The Debtor believes that the liquidation also would generate a significant increase in General Unsecured Claims, such as rejection damage Claims, and Tax and other governmental Claims.

In summary, the Debtor believes that a Chapter 7 liquidation would result in substantial diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan, because of, among other factors: (a) the failure to realize the maximum going concern value of the Debtor's assets; (b) the substantial negative impact of conversion to a Chapter 7 case and subsequent liquidation on the employees and customers of the Debtor; (c) additional costs and expenses involved in the appointment of a trustee, attorneys, accountants and other professionals to assist such trustee in the Chapter 7 case; (d) additional expenses and Claims, some of which would be entitled to priority in payment, that would arise by reason of the liquidation and from the rejection of unexpired real estate leases and other Executory Contracts and Unexpired Leases in connection with cessation of the Debtor's operations; and (e) the substantial time that would elapse before entities would receive any distribution on account of their Claims. Consequently, the Debtor believes that the Plan will provide a substantially greater ultimate return to holders of Claims than would a Chapter 7 liquidation.

### *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor, or any successor to the Debtor (unless such liquidation or

reorganization is proposed in the plan). For purposes of determining whether the Plan meets this requirement, the Debtor has analyzed its ability to meet its obligations under the Plan.

### Compliance with Applicable Provisions of the Bankruptcy Code

Section 1129(a)(1) of the Bankruptcy Code requires that a plan comply with the applicable provisions of the Bankruptcy Code. The Debtor has considered each of these issues in the development of the Plan and believes that the Plan complies with all provisions of the Bankruptcy Code.

### Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated numerous alternatives to the Plan, including the consummation of an alternative plan of reorganization under Chapter 11 of the Bankruptcy Code, delaying the adoption of any plan of reorganization and the liquidation of the Debtor.

Due to a lack of working capital and the liability to satisfy PRIAC's administrative expense claim for extensions of credit under PRIAC's Tranch B advances, the Debtor has determined that a sale of the resort, as opposed to a stand alone reorganization, is the best means of maximizing the recovery to creditors and other parties in interest. The Debtor is also committed to preserving an integrated resort for the benefit of club members and residents living in the surrounding areas.

While the Debtor has concluded that the Plan is the best alternative and will maximize recoveries by holders of Claims, if the Plan is not confirmed, the Debtor could attempt to formulate and propose a different plan. In addition, upon the expiration of the period in which the Debtor has the exclusive right under the Bankruptcy Code to file and solicit acceptances with respect the Plan, any other party in interest in the Reorganization Case could attempt to formulate and propose a different plan of reorganization or liquidation.

**THE DEBTOR BELIEVES THAT THE PLAN AFFORDS GREATER BENEFITS TO CREDITORS THAN EITHER THE CONSUMMATION OF AN ALTERNATIVE PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE OR LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.**

## RISK FACTORS

For the Plan to be confirmed, each impaired Class of Claims and Interests is given the opportunity to vote to accept or reject the Plan, except, however, for those Classes which will not receive any distribution under the Plan and which are, therefore, considered to have rejected the Plan. With regard to the impaired Classes which vote on the Plan, the Plan will be deemed accepted by a Class of impaired Claims if the Plan is accepted by holders of Claims of such Class actually voting on the Plan who hold at least two-thirds in an amount and more than one-half in number of the total Allowed Claims of

such Class. The Plan will be deemed accepted by a Class of impaired Interests if it is accepted by the members actually voting on the Plan who hold at least two-thirds in an amount of the total Allowed Interests voted. Only those members of a Class who vote to accept or reject the Plan will be counted for voting purposes.

If any impaired Class of Claims or Interests does not accept the Plan, pursuant to § 1129(b) of the Bankruptcy Code, the Bankruptcy Court may still confirm the Plan at the request of the Debtor if, among other things, as to each impaired Class which has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable." The Debtor believes that the Plan affords fair and equitable treatment for all Allowed Claims and Interests.

Any objection to the Plan by a member of a Class of Claims or Interests could either prevent Confirmation of the Plan or delay such Confirmation for a significant period of time.

If certain holders of Claims or Interests (a) contest the Allowed Amount of their Claims or Interests under the Plan and successfully contend that such amount should be higher than the amount reflected on the Schedules or (b) successfully contend that the Claims or Interests of such holders of Claims or Interests should be included in a different Class under the Plan, the Bankruptcy Court may deem the Plan not feasible, and may deny Confirmation of the Plan.

## CERTAIN TAX CONSEQUENCES OF CONSUMMATION OF THE PLAN

**A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW. NO RULING HAS BEEN REQUESTED FROM THE IRS; NO OPINION HAS BEEN REQUESTED FROM THE DEBTOR'S COUNSEL CONCERNING ANY TAX CONSEQUENCE OF THE PLAN; AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.**

**THE DESCRIPTION THAT FOLLOWS DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS. FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX EXEMPT ORGANIZATIONS AND NON-U.S. TAXPAYERS, NOR DOES IT ADDRESS TAX CONSEQUENCES TO HOLDERS OF INTERESTS IN THE DEBTOR. IN ADDITION, THE DESCRIPTION DOES NOT DISCUSS STATE, LOCAL OR NON-U.S. TAX CONSEQUENCES.**

**To ensure compliance with United States Internal Revenue Service Circular 230, (a) any discussion of U.S. federal tax issues in this Disclosure Statement is not intended or written to be relied upon, and cannot be relied upon by Holders, for purposes of avoiding penalties that may be imposed on such Holders under the Code; (b) such discussion is written to support the promotion of the Plan; and (c)**

**each Holder of a claim should seek advice based on such Holder's particular circumstances from an independent tax advisor.**

### Cancellation of Debt Income

Generally, the discharge of a debt obligation by a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income, which must be included in the debtor's income. COD income, however, is not recognized by a taxpayer that is a debtor in a reorganization case if the discharge is granted by the court or pursuant to a plan of reorganization approved by the court. The Plan, if approved, would enable the Debtor to qualify for this bankruptcy exclusion rule with respect to any COD income triggered by the Plan.

If debt is discharged in a reorganization case, however, certain income tax attributes otherwise available and of value to the debtor are reduced, in most cases by the amount of the indebtedness forgiven. Tax attributes subject to reduction include: (a) net operating losses ("NOLs") and NOL carryforwards; (b) most credit carryforwards, including the general business credit and the minimum tax credit; (c) capital losses and capital loss carryforwards; (d) the tax basis of the debtor's depreciable and nondepreciable assets, but not in an amount greater than the excess of the aggregate tax bases of the property held by the debtor immediately after the discharge over the aggregate of the debtor's liabilities immediately after the discharge; and (e) foreign tax credit carryforwards,

### U.S. Federal Income Tax Consequences to Claim Holders

The U.S. federal income tax consequences to a holder receiving, or entitled to receive, a payment in partial or total satisfaction of a Claim may depend on a number of factors, including the nature of the Claim, the holder's method of accounting, and its own particular tax situation. Because the holders' Claims and tax situations differ, holders should consult their own tax advisors to determine how the Plan affects them for federal, state and local tax purposes, based on their particular tax situations.

Among other things, the U. S. federal income tax consequences of a payment to a holder may depend initially on the nature of the original transaction pursuant to which the Claim arose. For example, a payment in repayment of the principal amount of a loan is generally not included in the gross income of an original lender.

The U.S. federal income tax consequences of a transfer to a holder may also depend on whether the item to which the payment relates has previously been included in the holder's gross income or has previously been subject to a loss or bad debt deduction. For example, if a payment is made in satisfaction of a receivable acquired in the ordinary course of a holder's trade or business, the holder had previously included the amount of such receivable payment in its gross income under its method of accounting, and had not previously claimed a loss or bad debt deduction for that amount, the receipt of the payment should not result in additional income to the holder but may result in a loss. Conversely, if the holder had previously claimed a loss or bad debt deduction with

respect to the item previously included in income, the holder generally would be required to include the amount of the payment in income.

A holder receiving a payment under the Plan in satisfaction of its Claim generally may recognize taxable income or loss measured by the difference between (a) the amount of cash and the fair market value (if any) of any property received and (b) its adjusted tax basis in the Claim. For this purpose, the adjusted tax basis may include amounts previously included in income (less any bad debt or loss deduction) with respect to that item. The character of any income or loss that is recognized will depend upon a number of factors, including the status of the creditor, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the creditor has previously claimed a bad debt deduction with respect to the Claim, and the creditor's holding period of the Claim. This income or loss may be ordinary income or loss if the distribution is in satisfaction of accounts or notes receivable acquired in the ordinary course of the holder's trade or business for the performance of services or for the sale of goods or merchandise. Generally, the income or loss will be capital gain or loss if the Claim is a capital asset in the holder's hands.

Market discount is the amount by which a holder's tax basis in a debt obligation immediately after its acquisition is exceeded by the adjusted issue price of the debt obligation at such time, subject to a *de minimis* exception. A holder generally is required to include gain on the disposition of a market discount debt instrument as ordinary income to the extent of the accrued market discount on the debt instrument.

### Information Reporting and Backup Withholding

Certain payments or distributions pursuant to the Plan may be subject to information reporting to the IRS. Moreover, such reportable payments may be subject to backup withholding (at the then applicable rate (currently 28%)) unless the taxpayer: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.

**THE FOREGOING IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE**

**FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**


**Remainder of Page Intentionally Left Blank**

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtor believes that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtor urges all holders of Claims in voting Classes to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

**AMELIA ISLAND COMPANY**

By _____
     Jack B. Healan, Jr.
     Its President

-and-

Gardner F. Davis, Esq.
**Foley & Lardner LLP**
One Independent Drive
Suite 1300
Jacksonville, Florida 32202
(904) 359-2000
(904) 359-8700 (Facsimile)

Special Counsel for Amelia Island Company

-and-

**STUTSMAN THAMES & MARKEY, P.A**

*/s/ Richard R. Thames*
By _____
     Richard R. Thames
     Eric N. McKay

Florida Bar Number 0718459
Florida Bar Number 0010215
50 North Laura Street, Suite 1600
Jacksonville, Florida 32202
(904) 358-4000
(904) 358-4001 (Facsimile)
rrt@stmlaw.net
enm@stmlaw.net
Attorneys for Amelia Island Company