Exhibit I

Asset Purchase Agreement

ASSET PURCHASE AGREEMENT

May 18, 2010,

by and among

AMELIA ISLAND COMPANY,

AMELIA ISLAND MANAGEMENT, INC.,

AMELIA ISLAND REALTY, INC.,

R&D COOPER, LTD

RICHARD A. COOPER, as Trustee under two separate Trust Agreements, each dated
December 31, 1985, and each known as TRUST AGREEMENT OF RICHARD L. COOPER and
ROBERT N. GUDBRANSON as Trustee under two separate Trust Agreements, each dated
December 31, 1985, and each known as TRUST AGREEMENT OF RICHARD L. COOPER


and

NOBLE HOSPITALITY FUND ACQUISITIONS, LLC

2758048 v03

**TABLE OF CONTENTS**

**ARTICLE I DEFINITIONS AND USAGE OF CERTAIN TERMS** ......................................................... **3**
    1.01    Definitions. ......................................................................................................... 3
    1.02    Usage. ............................................................................................................... 18

**ARTICLE II SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING** ............................. **19**
    2.01    Ancillary Assets. ............................................................................................... 19
    2.02    Purchased Assets. .............................................................................................. 20
    2.03    Intentionally Deleted. ........................................................................................ 22
    2.04    Excluded Assets. ............................................................................................... 22
    2.05    Consideration. ................................................................................................... 23
    2.06    Liabilities. ......................................................................................................... 25
    2.07    Closing. ............................................................................................................. 27
    2.08    Condition of Purchased Assets. ......................................................................... 27
    2.09    Tax Treatment of Deposit and Purchase Price. ................................................. 29
    2.10    Due Diligence Period. ....................................................................................... 29

**ARTICLE III REPRESENTATIONS AND WARRANTIES OF THE SELLERS** ........................... **30**
    3.01    Organization. ..................................................................................................... 30
    3.02    Power, Authorization and Non-Contravention. ................................................. 30
    3.03    No Violations; Compliance with Legal Authorizations; Governmental Authorizations. . 31
    3.04    Litigation. .......................................................................................................... 31
    3.05    Title; Real Property. ......................................................................................... 31
    3.06    Absence of Certain Changes or Events. ............................................................ 32
    3.07    Brokers. ............................................................................................................. 33
    3.08    Tax Returns. ...................................................................................................... 33
    3.09    Environmental Matters. ..................................................................................... 33
    3.10    Organizations Lists. .......................................................................................... 33
    3.11    Access. .............................................................................................................. 34
    3.12    Zoning. .............................................................................................................. 34
    3.13    Utilities. ............................................................................................................. 34

**ARTICLE IV REPRESENTATIONS AND WARRANTIES OF PURCHASER** ............................. **34**
    4.01    Organization. ..................................................................................................... 34
    4.02    Power, Consents; Absence of Conflicts. ........................................................... 34
    4.03    Binding Agreement. .......................................................................................... 35
    4.04    Brokers. ............................................................................................................. 35
    4.05    Sufficiency and Evidence of Funds. ................................................................. 35

**ARTICLE V COVENANTS OF SELLERS** ....................................................................................... **35**
    5.01    Advice of Changes. ........................................................................................... 35
    5.02    Conduct of Business. ......................................................................................... 36
    5.03    Necessary Consents. ......................................................................................... 37
    5.04    Litigation. .......................................................................................................... 37
    5.05    Employment Matters. ........................................................................................ 37
    5.06    Satisfaction of Closing Conditions. .................................................................. 39
    5.07    Access to Information. ...................................................................................... 39
    5.08    Casualty. ........................................................................................................... 40
    5.09    Corporate Name Changes. ................................................................................ 41

2758048 v03

**ARTICLE VI COVENANTS OF PURCHASER** .......................................................................... **41**
    6.01    Advice of Changes. ................................................................................................. 41
    6.02    Litigation. ............................................................................................................... 42
    6.03    Surveying and Creation of Legal Description of the Office Complex Building 1 Parcel. 42
    6.04    Satisfaction of Conditions Precedent. .................................................................... 42
    6.05    Employee Matters. ................................................................................................. 42

**ARTICLE VII ADDITIONAL COVENANTS** ............................................................................. **42**
    7.01    Further Assurances. ............................................................................................... 42
    7.02    Confidentiality. ...................................................................................................... 43
    7.03    Liquor License. ...................................................................................................... 43
    7.04    Checked Baggage. .................................................................................................. 44
    7.05    Safe Deposit Boxes. .............................................................................................. 44
    7.06    Consulting/Employment Arrangements. ................................................................ 44

**ARTICLE VIII BANKRUPTCY PROCEDURES, ETC.** ........................................................... **45**
    8.01    Filing of Sale Procedures Motion. ......................................................................... 45
    8.02    Other Filings. ......................................................................................................... 45
    8.03    Assumed Contracts and Leases; Rejected Contracts and Leases. ........................... 45
    8.04    Bankruptcy Court Approval. .................................................................................. 46
    8.05    Certain Tax Matters. ............................................................................................. 46
    8.06    Break-Up Fee and Expense Reimbursement; Deposit. ........................................... 47

**ARTICLE IX CONDITIONS TO OBLIGATIONS OF SELLERS** ............................................ **48**
    9.01    Accuracy of Representations and Warranties; Performance of Covenants. ............ 48
    9.02    Compliance with Law. ........................................................................................... 48
    9.03    Government Consents. ............................................................................................ 49
    9.04    Bankruptcy Orders. ................................................................................................ 49
    9.05    Other Deliveries. .................................................................................................... 49
    9.06    Club Transaction. ................................................................................................... 50
    9.07    Compass/PRIAC Releases and Other Lender Releases. ......................................... 50
    9.08    Office Complex Building 1 ..................................................................................... 50

**ARTICLE X CONDITIONS TO OBLIGATIONS OF PURCHASER** ..................................... **50**
    10.01   Accuracy of Representations and Warranties; Performance of Covenants. ............ 51
    10.02   Compliance with Law. ........................................................................................... 51
    10.03   Government Consents; No Injunction. .................................................................... 51
    10.04   Third-Party Consents; Assignments; Other Documents. ........................................ 51
    10.05   Bankruptcy Orders. ................................................................................................ 51
    10.06   Title Insurance and Survey. ................................................................................... 51
    10.07   Other Deliveries. .................................................................................................... 52
    10.08   Club Transactions. ................................................................................................. 53
    10.09   Office Complex Building 1 ..................................................................................... 54
    10.10   Compass/PRIAC Releases and Other Lender Releases. ......................................... 54

**ARTICLE XI TERMINATION; REMEDIES** ........................................................................... **54**
    11.01   Termination of Agreement. .................................................................................... 54

**ARTICLE XII PRORATIONS** ................................................................................................... **55**
    12.01   Prorations Generally. ............................................................................................. 55
    12.02   Rules for Specific Items of Income and Expense. .................................................. 58

2758048 v03

| | | |
|---|---|---|
| 12.03 | Interest. | 59 |
| 12.04 | Revenue Contracts and Reservations. | 59 |
| 12.05 | Survival. | 59 |

**ARTICLE XIII SELLERS' AGENT** ............................................................................. **60**
| | | |
|---|---|---|
| 13.01 | Appointment and Reliance. | 60 |
| 13.02 | Authority and Limitation of Liability. | 60 |
| 13.03 | Disputes. | 61 |

**ARTICLE XIV MISCELLANEOUS** ................................................................................. **61**
| | | |
|---|---|---|
| 14.01 | Entire Agreement. | 61 |
| 14.02 | Assignment; Binding Upon Successors and Assigns. | 61 |
| 14.03 | No Third Party Beneficiaries. | 62 |
| 14.04 | No Joint Venture. | 62 |
| 14.05 | Severability. | 62 |
| 14.06 | Section Headings. | 62 |
| 14.07 | Amendment, Extension and Waivers. | 62 |
| 14.08 | Survival of Representations, Warranties and Covenants. | 63 |
| 14.09 | Public Announcement. | 63 |
| 14.10 | Governing Law. | 63 |
| 14.11 | Jurisdiction; Venue; Waiver of Jury Trial. | 63 |
| 14.12 | Costs and Attorneys' Fees. | 64 |
| 14.13 | Notices. | 64 |
| 14.14 | Counterparts. | 65 |
| 14.15 | Costs and Expenses. | 65 |
| 14.16 | Escrow Agent Provisions. | 66 |
| 14.17 | Option to Purchase Stock of Company after Purchased Assets are Purchased. | 66 |

**Exhibits**

Exhibit A          Form of Sale Procedures Order (containing Bidding Procedures)

**Schedules**

| | |
|---|---|
| Schedule 2.01(a) | Ancillary Properties |
| Schedule 2.01(d) | Cooper Assumed Contracts and Leases |
| Schedule 2.01(j) | Assignable Security/Other Deposits (Ancillary Assets) |
| Schedule 2.02(e) | Assumed Contracts and Leases |
| Schedule 2.02(l) | Assignable Security/Other Deposits |
| Schedule 2.03 | Intentionally Deleted |
| Schedule 2.04(b) | Excluded Right, Title and Interest (Excluded Assets) |
| Schedule 2.04(d) | Excluded Personal Property and Assets |
| Schedule 2.04(k) | Non-Transferable Deposits (e.g. Utility Deposits) |
| Schedule 2.04(u) | Excluded Contracts and Rights to Services |
| Schedule 2.05(a)(i)(1) | Compass Mortgages to be Released |
| Schedule 2.05(a)(i)(2) | Compass Guaranties to be Released |
| Schedule 2.05(a)(ii)(1) | Other Lender Mortgages |
| Schedule 2.05(a)(ii)(2) | Other Lender Guaranties |
| Schedule 2.06(a) | Assumed Liabilities |
| Schedule 3.02(b) | Necessary Consents |

2758048 v03

| | |
|---|---|
| Schedule 3.03(a) | No Violations |
| Schedule 3.03(b) | Compliance with Legal Authorization |
| Schedule 3.03(d) | Violations of Encumbrance or Legal Requirement |
| Schedule 3.04 | Litigation |
| Schedule 3.05(b) | Owned Real Property |
| Schedule 3.05(c) | Leases |
| Schedule 3.05(d) | Intellectual Property Rights |
| Schedule 3.05(e) | *Intentionally Deleted* |
| Schedule 3.06 | Certain Changes or Events |
| Schedule 3.09 | Environmental Reports |
| Schedule 5.02(a) | Exceptions to Conducting Business in the Ordinary Course |
| Schedule 5.05(f) | Key Personnel |
| Schedule 5.06 | Exceptions to Obtaining Necessary Consents |
| Schedule 7.06 | Consulting/Employment Arrangements |
| Schedule 8.03(b) | Seller's Contracts Not Assigned to Purchaser |
| Schedule 10.06(a) | Existing Surveys |
| Schedule 10.06(b) | Title Insurance Commitment |
| Schedule 10.08(a) | Plan A – Equity Club |
| Schedule 10.08(b) | Plan B- Non-Equity Club |

2758048 v03

# ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** (this "**Agreement**") is entered into as of May 18, 2010.

## BY AND AMONG:

(1) Noble Hospitality Fund Acquisitions, LLC, a limited liability company organized under the laws of the State of Delaware (together with its successors and permitted assigns, "**Purchaser**");

(2) Amelia Island Company, a corporation organized under the laws of the State of Delaware (the "**Company**");

(3) Amelia Island Management, Inc., a corporation organized under the laws of the State of Florida ("**AIM**"), which is wholly-owned by the Company;

(4) Amelia Realty, Inc., a corporation organized under the laws of the State of Florida ("**Realty**");

(5) R&D Cooper, LTD, a limited liability company organized under the laws of the State of Ohio ("**R&D Cooper**");

(6) RICHARD A. COOPER, as Trustee under two separate Trust Agreements, each dated December 31, 1985, and each known as TRUST AGREEMENT OF RICHARD L. COOPER and ROBERT N. GUDBRANSON as Trustee under two separate Trust Agreements, each dated December 31, 1985, and each known as TRUST AGREEMENT OF RICHARD L. COOPER (the "**Cooper Trusts**"); and

(7) Company, AIM, Realty, R&D Cooper and Cooper Trusts are collectively the "**Sellers**" and each individually a "**Seller**". Company and AIM are collectively the "**Company Seller**".

Purchaser and Sellers are sometimes referred to herein individually as a "party" or collectively as the "parties."

## RECITALS:

(A) Sellers, either individually or collectively with one or more Sellers, own or lease the Real Property used in the development and operation of Amelia Island Plantation (defined below) located in Nassau County, Florida, including the Hotel commonly known as Amelia Island Plantation Inn and Resort Golf Courses at Amelia Island Plantation operated thereon, certain Tangible Personal Property used in connection therewith, as well as certain other assets comprising the Purchased Assets.

(B) Company has leasehold interests in and, pursuant to this Agreement, has the contractual right to purchase the Ancillary Assets (defined below) which are used in connection with the Business, and intends to acquire the Ancillary Assets and to transfer the Ancillary Assets to Purchaser as a part of the Real Property. A portion of the Purchase Price must be used by the Company to satisfy debt not owned by Compass or PRIAC on the Ancillary Assets generally known as Village Center 1, 2 and 4 and the Resort Operations Building.

(C) Purchaser desires to purchase from Sellers, and Sellers desire to sell to Purchaser, the Purchased Assets upon the terms and subject to the conditions set forth in this Agreement.

2758048 v03

1

(D)     On November 13, 2009 Company filed in United States Bankruptcy Court for the Middle District of Florida (the "**Bankruptcy Court**"), a voluntary petition to commence a case under chapter 11 of the Bankruptcy Code, Case No. 3:09-BK-09601-PMG (the "**Chapter 11 Case**").

(E)     Pursuant to such filing, Sellers desire to sell, transfer, convey, assign and deliver to Purchaser, in accordance with Sections 105(a), 363 and 365, 1123(a)(5)(D), 1141(c), and the other applicable provisions of the Bankruptcy Code, all of the Purchased Assets, together with the Assumed Liabilities, of the Sellers upon the terms and subject to the conditions set forth in this Agreement, and Purchaser desires to purchase and take delivery of such Purchased Assets and Assumed Liabilities upon such terms and subject to such conditions.

(F)     The parties intend that the sale of the Purchased Assets will be in accordance with the provisions of the Bankruptcy Code and that the Bankruptcy Court shall enter the Sale Order (defined below) in conjunction with the Bankruptcy Court's confirmation of the Company's Plan (defined below) and the issuance of the Confirmation Order (defined below). Both the Sale Order and the Confirmation Order shall authorize the sale of the Purchased Assets in accordance with Sections 363 and 1123(a)(5)(D) of the Bankruptcy Code and shall also approve, pursuant to Sections 365 and 1123(b)(2) of the Bankruptcy Code and the terms and conditions of this Agreement, the assumption and assignment of the executory contracts and unexpired leases identified on Schedule 2.02(e) of this Agreement. Additionally, both the Sale Order and the Confirmation shall authorize the assumption of the liabilities identified on Schedule 2.06(a).

(G)     Realty, R&D Cooper and Cooper Trusts (collectively, the "**Cooper Sellers**", and each individually, a "**Cooper Seller**") are not debtors under the Chapter 11 Case and have not filed any petitions in Bankruptcy Court, but are under common Control with the shareholders of the Company, and will benefit from the transfer of all of the Purchased Assets as set forth in this Agreement.

(H)     The Cooper Sellers each desire to sell, transfer, convey, assign and deliver to the Company for use in the Business, all of the Ancillary Assets, together with the Assumed Liabilities related thereto, owned or held by the Cooper Sellers upon the terms and subject to the conditions set forth in this Agreement, and in turn the Company desires to sell, transfer, convey, assign and deliver to Purchaser as part of the Purchased Assets, all such Ancillary Assets, together with the Assumed Liabilities related thereto, upon the terms and subject to the conditions set forth in this Agreement, and Purchaser desires to purchase and take delivery of such Ancillary Assets and Assumed Liabilities upon such terms and subject to such conditions.

(I)     Major conditions for Purchaser's obligations under this Agreement include that the rights of the Club shall be modified by the Bankruptcy Court pursuant to Section 10.08.

(J)     A major covenant of Purchaser is to enter into a consulting services agreement with Jack B. Healan, Jr. pursuant to Section 7.06.

(K)     Capitalized terms used in these Recitals shall have the meaning given such terms in Section 1.01 hereof.

**NOW, THEREFORE,** in consideration of the premises and the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, and intending to be legally bound, the parties hereto agree as follows:

2758048 v03

# ARTICLE I

## DEFINITIONS AND USAGE OF CERTAIN TERMS

1.01    Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1.01:

"**Access and Use Arrangement**" is either (i) the Agreement between the Club and Purchaser which results from the Club Transfer Agreement pursuant to a new equity club (a/k/a Plan A) or (ii) the terms and conditions for access by the Club Members to certain facilities as approved by the Bankruptcy Court as the non-equity plan (a/k/a Plan B) both of which allows the Purchaser to use certain Club facilities, such as limited access to the Long Point Golf Course and Long Point Clubhouse and allows the members of the Club to use certain facilities owned by Purchaser such as the Resort Golf Courses, the beach club, the racquet park and health and fitness facilities at Amelia Island, all pursuant to the terms and conditions therein.  The Access and Use Arrangement is more particularly described in Schedules 10.08(a) and 10.08(b).

"**Accounts Receivable**" means (a) all trade accounts receivable and other rights to payment from customers of the Business and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of products sold or services rendered to customers of the Business and the Company Seller, and (b) all other accounts or notes receivable of the Business and the Company Seller, and the full benefit of all security for such accounts or notes, and (c) any claim, remedy or other right related to any of the foregoing.

"**Actions**" has the meaning set forth in Section 13.02(e) hereof.

"**Additional Deposit**" has the meaning set forth in Section 2.05(c) hereof.

"**Affiliate**" means with respect to any Person, any Person that directly or indirectly, Controls, is Controlled by, or is under common Control with, such Person.

"**Agent**" has the meaning set forth in Section 13.01 hereof.

"**Aggregate Consideration**" has the meaning set forth in Section 2.09(c) hereof.

"**Agreement**" has the meaning set forth in the preamble.

"**AIM**" has the meaning set forth in the preamble.

"**Amelia Island Plantation**" means the resort and residential community in northeast Florida located on the Atlantic Ocean and the Amelia River at the south end of Amelia Island, containing golf and tennis facilities, ocean front inn and beach club, and shopping, dining facilities and other recreational amenities.

"**Ancillary Agreements**" means either of or both of the "Seller's Ancillary Agreements" and the "Purchaser Ancillary Agreements" as the context requires.

"**Ancillary Assets**" has the meaning set forth in Section 2.01 hereof.

2758048 v03

"**Ancillary Properties**" means, collectively, the assets described and currently owned by the respective Sellers as follows:

|  | Property | Owner | Legal Description |
|---|---|---|---|
| 1. | Warehouse Laundry | Amelia Realty, Inc. | Schedule 2.01(a)(1) |
| 2. | Office Complex (Buildings 1 and 3 only and specifically excluding Buildings 2 and 4) | Amelia Realty, Inc. | Schedule 2.01(a)(2) |
| 3. | Village Center 1 | R&D Cooper Ltd. | Schedule 2.01(a)(3) |
| 4. | Village Center 2 | R&D Cooper Ltd. | Schedule 2.01(a)(4) |
| 5. | Village Center 3 | R&D Cooper Ltd. | Schedule 2.01(a)(5) |
| 6. | Village Center 4 | R&D Cooper Ltd. | Schedule 2.01(a)(6) |
| 7. | Falcon's Nest | R&D Cooper Ltd. | Schedule 2.01(a)(7) |
| 8. | 1508 Lewis Street | Amelia Realty, Inc. | Schedule 2.01(a)(8) |
| 9. | Resort Operations Building | Cooper Trusts | Schedule 2.01(a)(9) |

"**Apportionment Time**" means 11:59 p.m. local time at the Hotel on the day preceding the Closing Date.

"**Asset Purchase**" has the meaning set forth in Section 2.09(b) hereof.

"**Assumed Contracts and Leases**" has the meaning set forth in Section 2.02(e) hereof.

"**Assumed Contracts and Leases Assignment**" has the meaning set forth in Section 9.05(c) hereof.

"**Assumed Cure Amounts**" means any Cure Amounts.

"**Assumed Liabilities**" has the meaning set forth in Section 2.06(a) hereof.

"**Auction**" means the auction of the Purchased Assets to be conducted if one or more qualified bids are received by the bid deadline. The Auction will be conducted immediately following the Confirmation Hearing, before and at the direction of the Honorable Paul M. Glenn, Chief United States Bankruptcy Judge, in the Bryan Simpson United States Courthouse, Room 4D, 300 North Hogan Street, Jacksonville, Florida 32202.

2758048 v03

"**Audit Firm**" shall mean a nationally recognized accounting firm that has not had any material relationship with the Sellers or Purchaser or any of their respective Affiliates at any time within the three (3) year period immediately preceding the Closing unless such requirement is waived by all parties.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*, as amended, or any successor thereto, and any rules and regulations promulgated thereunder.

"**Bankruptcy Court**" has the meaning set forth in the recitals.

"**Bidding Procedures**" means the bidding procedures and time frames that will govern the Auction and that have been approved by the Bankruptcy Court pursuant to the Sale Procedures Order. A copy of the Bidding Procedures in substantially final form is set forth in the Sale Procedures Order attached hereto as Exhibit A.

"**Bidding Qualification Date**" means the date on which, pursuant to the Bidding Procedures, any bidder who desires to bid on the Purchased Assets must, in order to be permitted to bid for the Purchased Assets, deposit into escrow Four Million Dollars ($4,000,000) and put such deposit at risk to the same extent that the Deposit is at risk under the terms of this Agreement as of the date thereof.

"**Breach**" means any material breach of, or any material inaccuracy in, any representation or warranty or any material breach of, or failure to perform or comply in any material respect with, any covenant or obligation, in or of this Agreement or any other Contract, or any event that with the passing of time or the giving of notice, or both, would constitute such a material breach, inaccuracy or failure.

"**Break-Up Fee**" has the meaning set forth in Section 8.06 hereof.

"**Business**" means, subject to adjustment pursuant to the implementation of Plan B in Section 10.08(b), the business conducted by Company Seller, on the date hereof, which shall include the ownership, development, leasing, operation and management of the Hotel and Resort Golf Courses, the Long Point Golf Course and Clubhouse, the Ocean Clubhouse, the Long Point Maintenance Facilities, and the Long Point Golf Academy Facility, the Ancillary Assets, together with conference facilities, restaurants, spa, shops, the real estate brokerage operation of the Company, hotel and condominium and real estate development operations of the Company, property management operations and rental management arrangements for properties not owned by the Sellers, all development rights of the Company and all declarant or developer rights of Company in any declaration or covenants affecting the Real Property specifically and affecting Amelia Island Plantation generally, all as a going concern. For the avoidance of doubt, the Company has been leasing all of the Ancillary Assets for the conducting of some of the Business of the Company thereon and the Business does not include the business of Realty, R&D Cooper and Cooper Trusts in acting as landlord in the leases to Company on the Ancillary Assets or any other activities of Realty, R&D Cooper and Cooper Trusts, including but not limited to Realty's operation of brokerage activities, Realty's ownership of the office condominium described as Unit 101A according to the Declaration of Condominium for Village Center at Gateway to Amelia and Buildings 2 and 4 of the office complex, or R&D Cooper's operation and ownership of the personal storage facility all as described as Excluded Property.

"**Business Day**" means any day other than (i) Saturday or Sunday or (ii) any other day on which banks in New York, New York are permitted or required to be closed.

"**Chapter 11 Case**" means the voluntary case commenced by Company on the Petition Date under chapter 11 of the Bankruptcy Code.

2758048 v03

"**Closing**" has the meaning set forth in Section 2.07 hereof.

"**Closing Date**" has the meaning set forth in Section 2.07 hereof.

"**Club**" means the Amelia Island Club, a membership organization currently offered to persons and entities that own property in Amelia Island Plantation and to others as specified in the Club's Membership Plan.

"**Club Member Refund Rights**" means all rights of the Club Members under the Club's Membership Plan which is attached to and incorporated by reference into the NDA, including all rights to claim refunds of Club Member Deposits upon sale of the Member's membership in the Club, upon expiration of 30 years after the Club Member's purchase of the Club membership, or otherwise. "Club Member Refund Rights" does not include, however, the Access and Use Arrangement.

"**Club Members**" means the members of the Club pursuant to the terms of the Membership Plan attached to the NDA, as amended from time to time.

"**Club Transfer Agreement**" means that agreement by the Purchaser to sell to the Club the facilities generally known as Long Point Golf Course, Long Point Clubhouse, the Ocean Clubhouse, the Long Point Maintenance Facilities and the Long Point Golf Academy Facility subject to the terms and conditions contained therein, including but not limited to the Access and Use Arrangement all as further described in Schedule 10.08(a).

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Commitment**" has the meaning set forth in Section 10.06(b) hereof.

"**Company**" has the meaning set forth in the preamble.

"**Company Seller**" has the meaning set forth in the preamble.

"**Company's Plan**" means the Chapter 11 plan of reorganization or liquidation to be proposed by Company in the Chapter 11 Case seeking, among other things, Bankruptcy Court approval of the transactions contemplated by this Agreement, under which, upon approval by the Bankruptcy Court, the Company will have authority, and will be directed, to perform all its obligations under this Agreement and proceed to Closing, as such plan may be amended from time to time in accordance with the Bankruptcy Code and consistent with this Agreement.

"**Compass**" has the meaning set forth in Section 9.07.

"**Compass/PRIAC Releases**" has the meaning set forth in Section 2.05(a)(i) hereof.

"**Confidential Information**" has the meaning set forth in Section 7.02 hereof.

"**Confidential Materials**" means books, records or files (whether in a printed or electronic format) that consist of or contain any of the following: strategic plans for the Business containing proprietary information of Company Seller; internal analyses; information regarding the marketing of the Business for sale; information relating to obtaining internal authorization for the sale of the Business by Company Seller; attorney work product; attorney-client privileged documents; or internal correspondence of Sellers related to any of the foregoing; or documents, information and agreements relating to the

internal ownership and leasing structure of Company Seller for the Purchased Assets, except as set forth in Section 14.17.

"**Confidentiality Agreement**" has the meaning set forth in Section 7.02 hereof.

"**Confirmation Order**" means an Order of the Bankruptcy Court, confirming the Company's Plan, which order as entered shall be consistent with and incorporate the material terms of this Agreement.

"**Consumables**" means all opened and unopened food and alcoholic or non-alcoholic beverages located at the Hotel or elsewhere on the Purchased Assets which are reasonably determined by Purchaser to be useable according to industry standards and in accordance with the standards of operation Purchaser intends to employ in the operation of the Hotel and Business, excluding, however, any alcoholic beverages that may not be legally transferred to Purchaser under Legal Requirements.

"**Contract**" means, with respect to any Person, any written agreement, contract, subcontract, lease, license, sublicense, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment, power of attorney, purchase order, work order, commitment, covenant, obligation, promise or undertaking of any nature to which such Person is a party or by which its properties or assets may be bound.

"**Control**" (including with correlative meaning, Controlling, Controlled by and under common Control with) shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise.

"**Cooper Assumed Contracts and Leases**" has the meaning set forth in Section 2.01(d) hereof.

"**Cooper Cash Consideration**" has the meaning set forth in Section 2.05(f)(i) hereof.

"**Cooper Family**" has the meaning set forth in Section 2.05(a)(i) hereof.

"**Cooper Participation**" has the meaning set forth in Section 2.05(f)(ii) hereof.

"**Cooper Sellers**" has the meaning set forth in the recitals.

"**Cooper Trusts**" has the meaning set forth in the preamble.

"**Cure Amounts**" means amounts required to be paid in order to cure any pre- or post-petition monetary or other defaults under any Assumed Contracts and Leases in accordance with the provisions of Section 365 of the Bankruptcy Code, the Sale Order, the Sale Procedures Order, the Executory Contract and Unexpired Lease Assumption and Assignment Order and the Confirmation Order.

"**Deductible**" has the meaning set forth in Section 5.08(a) hereof.

"**Deposit**" has the meaning set forth in Section 2.05(c) hereof.

"**Disclosure Schedules**" means the Disclosure Schedules to this Agreement provided by the Sellers to Purchaser.

"**Disclosure Statement**" has the meaning set forth in Section 8.01.

2758048 v03

7

"**Due Diligence Period**" has the meaning as set forth in Section 2.10 hereof.

"**Effective Time**" means 11:59 p.m. on the Closing Date.

"**Employee Claims**" shall mean any and all claims (including all fines, judgments, penalties, costs, litigation and/or arbitration expenses, attorneys' fees and expenses, and costs of settlement with respect to any such claim) by any employee or employees of Company with respect to the employment at the Hotel of such employee or employees. "Employee Claims" shall include, without limitation, the following: (i) claims that are eventually resolved by arbitration, by litigation or by settlement; (ii) claims that also involve allegations that any applicable employment-related contracts affecting the employees at the Hotel have been breached; (iii) claims for wages, salaries or benefits of any kind, including vacation pay and sick pay; and (iv) claims that involve allegations that one or more of the Employment Laws has been violated.

"**Employment Laws**" shall mean any federal, state or local law (including the common law), statute, ordinance, rule, regulation, order or directive with respect to employment, conditions of employment, benefits, compensation, or termination of employment that currently exists or may exist at any time during the Term, including, but not limited to, Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act, the Workers Adjustment and Retraining Act, the Occupational Safety and Health Act, the Immigration Reform and Control Act of 1986, the Polygraph Protection Act of 1988 and the Americans With Disabilities Act of 1990.

"**Employee Plans**" means (a) all "employee benefit plans" (as defined in Section 3(3) of ERISA); (b) all employment, consulting, employee non-competition, employee non-solicitation, employee loan or other compensation agreements, and all collective bargaining agreements, all bonus or other incentive compensation, equity or equity-based compensation, stock purchase, deferred compensation, change in control, severance, leave of absence, vacation, salary continuation, medical, life insurance or other death benefit, educational assistance, training, service award, section 125 cafeteria, dependant care, pension, welfare benefit or other material employee or fringe benefit plans, policies, agreements or arrangements, in each case as to which the Company or any ERISA Affiliate has any obligation or liability, contingent or otherwise, thereunder for current or former employees, directors or individual consultants of the Company Seller.

"**Encumbrance**" means any charge, claim (as defined in section 101(5)(A) and (B) of the Bankruptcy Code), debt, Liability, Employee Claim, community property interest, condition, equitable interest, lien, option, pledge, charge, defect, adverse claim, security interest, mortgage, deed of trust, security interest, lease, right of way, easement, covenant, encroachment, servitude, option, right of first refusal or similar restriction, including any restriction on use or reservation of any kind, voting (in the case of any security or equity interest), transfer, receipt of income, the Club Membership Refund Rights, or exercise of any other attribute of ownership of any kind whatsoever, whether or not any of the foregoing is liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured, perfected, choate or inchoate, recorded, actual or contingent.

"**Environmental Claim**" means any investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand arising under or relating to Environmental Law, including any such matter relating to (a) any actual, alleged or suspected failure to comply with any Environmental Law or to possess or comply with any Environmental Permit, (b) any actual, alleged or suspected presence, Release or threatened Release of or exposure to any Hazardous Substance at any location, including any requirement or obligation to investigate, clean up or remediate any property or condition, (c) any actual or alleged contractual or other obligations arising under or relating to Environmental Laws, or (d) any personal injury, property damage, natural resources damage or other

2758048 v03

8

investigation, claim, litigation, action, suit, proceeding, order, judgment, written notice or written demand and any fines or penalties relating to any of the foregoing.

"**Environmental Law**" means any Legal Requirement, directive, rule, order, administrative ruling, decree, decision, judgment, interpretive guidance or requirement of any Governmental Authority (including any state, local, foreign or international counterparts or equivalents and any transfer of ownership notification or approval statutes) relating to: (i) the protection, investigation or restoration of the environment, human health and safety, or natural resources, (ii) the generation, handling, use, storage, treatment, transport, disposal, Release or threatened Release of any Hazardous Substance or (iii) noise, odor, vibration or wetlands protection.

"**Environmental Permit**" means any Governmental Authorization issued pursuant to any Environmental Law.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any entity that is a member of: (a) a "controlled group of corporations," as defined in Section 414(b) of the Code; (b) a group of entities under "common control," as defined in Section 414(c) of the Code; or (c) an "affiliated service group," as defined in Section 414(m) of the Code, or treasury regulations promulgated under Section 414(o) of the Code, any of which includes Sellers.

"**Escrow Agent**" has the meaning set forth in Section 2.05(c) hereof.

"**Excluded Assets**" has the meaning set forth in Section 2.04 hereof.

"**Excluded Contracts**" has the meaning set forth in Section 2.04(a) hereof.

"**Executory Contract and Unexpired Lease Assumption and Assignment Order**" means an Order of the Bankruptcy Court, which may be the Sale Order, that: (a) approves the provisions of Section 8.03(a); (b) authorizes Sellers, pursuant to Section 365 of the Bankruptcy Code, to assign to Purchaser, and Purchaser to assume, the Assumed Contracts and Leases; (c) determines that Purchaser has provided adequate assurance of future performance relative to the Assumed Contracts and Leases; and (d) establishes the amounts necessary to cure all defaults under the Assumed Contracts and Leases.

"**Existing Membership Reservation Agreement**" has the meaning set forth in Section 10.08(a) hereof.

"**Existing Surveys**" has the meaning set forth in Section 10.06(a) hereof.

"**Expense Reimbursement**" has the meaning set forth in Section 8.06 hereof.

"**Final Accounting**" has the meaning set forth in Section 12.01(b) hereof.

"**Force Majeure**" means acts of God, acts of terrorism, acts of the public enemy, labor disturbances, fire or explosion, war, insurrection, or any like causes beyond a party's reasonable control.

"**Furnishings**" means all furniture, fixtures, equipment, vehicles and other items of tangible personal property located at the Hotel and owned by any Seller (excluding the Consumables and Miscellaneous Hotel Assets).

2758048 v03

9

"**GAAP**" means U. S. generally accepted accounting principles, applied on a consistent basis from period to period.

"**Governmental Authority**" means any: (a) nation, state, commonwealth, province, territory, county, municipality or district; (b) federal, state, local, municipal, foreign or other government; or (c) governmental or quasi-governmental authority of any nature (including any governmental division, department, agency, commission, instrumentality, official, organization, unit, body or entity and any court or other tribunal).

"**Governmental Authorization**" means any approval, consent, ratification, waiver, license, permit or authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

"**Guest Ledger**" means all charges accrued to the open accounts of any guests or customers of the Hotel as of the Apportionment Time for the use or occupancy of any guest, conference or banquet rooms or other facilities at the Hotel, and restaurant, bar or banquet services, or any other goods or services provided by or on behalf of the Company at the Hotel.

"**Hazardous Substance**" means: (a) any material, substance or waste that is classified as "hazardous," "toxic," a "pollutant," a "contaminant," "radioactive" or words of similar meaning or effect under Environmental Laws; (b) any petroleum product or by-product, asbestos, asbestos-containing material, polychlorinated biphenyls, radioactive materials, radon, mold, urea formaldehyde insulation, or chlorofluorocarbons or other ozone-depleting substances; or (c) any substance, material or waste which by law requires special handling in its collection, storage, treatment or disposal.

"**Hotel**" means, subject to adjustment pursuant to the implementation of Plan B in Section 10.08(b), collectively, (i) the Real Property, (ii) the Resort Golf Courses, (iii) the Long Point Golf Course and Clubhouse, the Ocean Clubhouse, the Long Point Maintenance Facilities, and the Long Point Golf Academy Facility, (iv) the conference facilities, racquet park, health and fitness facility, beach club, restaurants, spa, shops, the real estate brokerage operation of the Company, hotel and condominium and real estate development operations of the Company, property management operations and rental management arrangements for properties not owned by the Sellers, all declarant or developer rights of Company in any declaration or covenants affecting the Real Property specifically and affecting Amelia Island Plantation generally, and (v) all Furnishings, Consumables, Inventories, Miscellaneous Hotel Assets, assignable Governmental Authorizations relating to any of the foregoing, and assignable Intellectual Property Rights used or to be used in connection with the Hotel, but excluding the Confidential Materials, operated and known to the public as Amelia Island Plantation with an address of 6800 First Coast Highway, Fernandina Beach, Florida 32034.

"**Improvements**" means all buildings, improvements and fixtures, and components thereof, including the roof, foundation, load-bearing walls and other structural elements thereof; heating, ventilation, air conditioning, mechanical, electrical, plumbing and other building systems; environmental control, remediation and abatement systems; sewer, storm and waste water systems; irrigation and other water distribution systems; parking facilities; fire protection, security and surveillance systems; and telecommunications, computer, wiring and cable installations.

"**Initial Deposit**" has the meaning set forth in Section 2.05(c) hereof.

"**Inspection Activities**" has the meaning set forth in Section 5.07 hereof.

2758048 v03

"**Intellectual Property Rights**" means all worldwide intellectual property rights, including: (a) patents, patent applications and patent rights; (b) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, domain names, websites, including access to the FTP files of the websites to obtain website information and content pertaining to the Hotel, and other indicia of source and all goodwill associated therewith; (c) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (d) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (e) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; and (f) surveys, architectural, consulting and engineering blueprints, plans and specifications and drawings, site plans, environmental and other physical reports related to the Hotel (to the extent in Seller's (or its agents') possession); (g) all telephone numbers, TWX numbers, post office boxes, signage rights, utility and development rights and privileges; (h) all records in sales and catering databases and all other customer data, listings and directories owned by Company Seller, pre-paid advertising, group files, credit records labels, promotional literature, security codes, copyrights, software licenses, other intangible property used in connection with the Hotel, all customer and guest lists and information, any goodwill of Company Seller, all licenses (including, without limitation, all liquor licenses subject to any required government approvals), permits, warranties and guarantees; and (i) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records, it being understood and agreed that all intellectual property rights associated with Amelia Island Plantation shall be included within the definition of "Intellectual Property Rights."

"**Interim Liquor Agreement**" has the meaning set forth in Section 7.03(b) hereof.

"**Inventoried Baggage**" has the meaning set forth in Section 7.04 hereof.

"**Inventories**" means (i) all china, glassware, linens, silverware, kitchen and bar small goods, paper goods, guest supplies, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, laundry supplies, stationery, menus, uniforms, brochures and other promotional materials, and all other similar supplies and materials located at the Hotel and owned by Company Seller, and (ii) all other inventories of the Business, wherever located, including all finished goods, sundry, gift shop and all other merchandise, materials and supplies to be used, consumed or resold by the Company Seller.

"**Key Personnel**" has the meaning set forth in Section 5.05(f) hereof.

"**Leases**" has the meaning set forth in Section 3.05(c) hereof.

"**Leased Real Property (Tenant)**" has the meaning set forth in Section 3.05(c) hereof.

"**Legal Requirement**" means any federal, state, local, municipal, foreign, international, multinational, or other constitution, law, ordinance, by-law, principle of common law, regulation, rule, statute, or treaty.

"**Liability**" with respect to any Person, means any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

"**Liquor Licenses**" has the meaning set forth in Section 7.03(a) hereof.

2758048 v03

"**Losses**" means any and all direct and indirect Liabilities, judgments, claims, suits, proceedings, settlements, losses, damages, fees, penalties, interest obligations and expenses (including costs of investigation and defense and reasonable attorney and other professional advisor and consulting fees and expenses) incurred or suffered by any Person.

"**Marked Commitment**" has the meaning set forth in Section 10.06(b) hereof.

"**Material Adverse Effect**" means (a) a material adverse change in or a material adverse effect on the Business taken as a whole as currently conducted such that the reasonable and fair market value of the Purchased Assets has been impaired in an amount in excess of One Million and No/100 Dollars ($1,000,000.00) or the estimate of the cost of such circumstance or event is in excess of One Million and No/100 Dollars ($1,000,000.00) and/or (b) a material adverse change in or a material adverse effect on the current operations or condition (financial or otherwise) of the Sellers, taken as a whole such that the reasonable and fair market value of the Purchased Assets has been impaired in an amount in excess of One Million and No/100 Dollars ($1,000,000.00) or the estimate of the cost of such circumstance or event is in excess of One Million and No/100 Dollars ($1,000,000.00); and/or (c) a material adverse change in or a material adverse effect on the Purchased Assets or the use thereof, taken as a whole such that the reasonable and fair market value of the Purchased Assets has been impaired in an amount in excess of One Million and No/100 Dollars ($1,000,000.00) or the estimate of the cost of such circumstance or event is in excess of One Million and No/100 Dollars ($1,000,000.00); and/or (d) a material adverse impact on the ability of any Seller to consummate the transactions contemplated by this Agreement, or to perform under this Agreement or the Seller's Ancillary Agreements; and/or (e) a material adverse change in or a material adverse effect on the legality, validity, binding effect or enforceability of this Agreement or the Seller's Ancillary Agreements, in each case set forth in clauses (a) through (e), <u>other than</u> any event, occurrence or effect resulting from (i) conditions affecting the industry of the Company Seller generally which do not disproportionately impact the Company Seller, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts and Leases and the Business when compared to other businesses in the same industry, (ii) the announcement of this Agreement, the transactions contemplated hereby or the identity of Purchaser, (iii) changes in applicable Legal Requirements, the Uniform System of Accounts or GAAP after the date hereof, (iv) the fact that the Company is operating as a debtor-in-possession under the Bankruptcy Code, (v) any actions taken by any Seller at Purchaser's request or with Purchaser's prior written consent, (vi) changes in economic, regulatory or political conditions generally which do not disproportionately impact the Company Seller, the Purchased Assets, the Assumed Liabilities, the Assumed Contracts and Leases and the Business when compared to other businesses in the same industry, or (vii) the entry of the Sale Procedures Order, the Sale Order and the filing and administration of the Chapter 11 Case; and/or (f) any event, circumstance, occurrence, or act or failure to act related to the Purchased Assets that has resulted in, or would be reasonably likely to result in, the imposition of criminal liability on any Seller or the Purchaser, or any Affiliate thereof, for a felony. For the avoidance of doubt, continued deterioration in the revenues or bookings of the Hotel, and any reasonable business decisions made with respect to such continued deterioration in revenues or bookings, shall not constitute a Material Adverse Effect for any purpose under this Agreement.

"**Material Seller's Contract**" means an executory Seller's Contract that:

(i)     is a material loan or credit agreement, indenture, note, debenture, mortgage, pledge, security agreement, capital lease or guarantee;

(ii)     (A) involves or would reasonably be expected to involve aggregate annual payments after the date hereof by any Seller in excess of Fifty Thousand Dollars ($50,000) or its foreign currency equivalent as of the date of this Agreement or aggregate annual payments after the date hereof to any Seller in excess of Fifty Thousand Dollars ($50,000) or its foreign

12

2758048 v03

currency equivalent as of the date of this Agreement or (B) notwithstanding the foregoing clause (A), which involves or would reasonably be expected to involve aggregate annual payments after the date hereof to or by any Seller in excess of Twenty Five Thousand Dollars ($25,000) or its foreign currency equivalent as of the date of this Agreement and is not terminable without penalty on thirty (30) days or less notice by any Seller;

        (iii)    has a term in excess of two (2) years after the date hereof;

        (iv)    has a term in excess of one (1) year after the date hereof and is not terminable without penalty on thirty (30) days or less notice by any Seller;

        (v)    is required to be filed with any Governmental Authority;

        (vi)    by its terms restricts the conduct of any line of business by any Seller;

        (vii)    provides for or otherwise relates to a joint venture, partnership, strategic alliance or similar arrangement;

        (viii)    is an agreement with an Affiliate;

        (ix)    is an employment, retention, severance or similar agreement;

        (x)    is a collective bargaining agreement or labor agreement;

        (xi)    is a management agreement;

        (xii)    is a material Lease;

        (xiii)    is a material equipment lease;

        (xiv)    relates to the Intellectual Property Rights owned or used by the Sellers; or

        (xv)    is a Third Party use agreement related to the use of the Hotel.

"**Miscellaneous Hotel Assets**" means all general intangibles (including all Intellectual Property Rights therein) relating to design, development, operation and use of the Hotel, all rights and work product under construction, service, consulting, engineering, architectural and other contracts (including warranties contained therein), receipts, accounting and business records, books and files relating solely to ownership or operation of the Hotel other than the Confidential Materials, plans and specifications of any portion of the Hotel, and keys and lock and safe combinations relating to the Hotel.

"**NDA**" means that certain Non-Disturbance Agreement and Independent Covenant dated as of May 1, 1995, and recorded in Official Records Book 730, page 1056, public records of Nassau County, Florida, including all exhibits and attachments thereto.

"**Necessary Consents**" has the meaning set forth in Section 3.02(b) hereof.

"**Non-Foreign Person**" means any Person that is a citizen or national of, or is organized under the laws of, the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico), provided that such Person (i) is not an Affiliate of any foreign government, any agency of a foreign government, or any representative of a foreign government, (ii) is not Controlled by or under common

2758048 v03

Control with any Person organized under the laws of any country other than the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico) or who is not a citizen or national of the United States, and (iii) has its headquarters or principal place of business in the United States (including one of the fifty (50) states, the District of Columbia, or Puerto Rico).

"**Objection Notice**" has the meaning set forth in Section 12.01(d) hereof.

"**Order**" means any final, non-appealable order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Authority or arbitrator, provided, however, that no order shall fail to be an Order solely because of the possibility that a motion pursuant to Federal Rule of Civil Procedure 60 or Federal Rule of Bankruptcy Procedure 9024 may be filed with respect to such order.

"**Other Filings**" has the meaning set forth in Section 8.02 hereof.

"**Other Lender Releases**" has the meaning set forth in Section 2.05(a)(ii).

"**Owned Real Property**" means the land described in the commitment attached in Schedule 10.06(b), together with all right, title and interest of Sellers in and to (i) all rights, ways, easements, privileges and appurtenances thereto, (ii) all strips and gores appurtenant thereto, (iii) any land lying in the bed of any streets, roads and alleys appurtenant thereto, and (iv) the Improvements located thereon.

"**Party**" has the meaning set forth in the preamble hereto.

"**Permitted Encumbrance**" means (i) Encumbrances for Taxes and assessments that are not yet delinquent, (ii) any rights of Third Parties under the terms of Assumed Contracts and Leases, and (iii) the exceptions to title set forth in the Commitment. The Parties acknowledge that "Permitted Encumbrance" does not include the Club Member Refund Rights or the NDA.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, trust or unincorporated organization or any government or any agency or political subdivision thereof.

"**Petition Date**" means November 13, 2009, the date of commencement of the Chapter 11 Case.

"**Post-Closing Tax Period**" means (i) any taxable period beginning after the Effective Time and (ii) with respect to a Straddle Period, the portion of such taxable period beginning immediately after the Effective Time.

"**Pre-Closing Tax Period**" means (i) any taxable period ending on or before the Effective Time and (ii) with respect to a Straddle Period, the portion of such taxable period ending at the Effective Time.

"**PRIAC**" has the meaning set forth in Section 9.07.

"**Proceeding**" means any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, judicial or investigative, whether formal or informal, whether public or private).

"**Property Taxes**" means personal property taxes, real property taxes and occupancy taxes imposed with respect to the operation of the Business and the ownership of the Purchased Assets.

"**Purchase Price**" has the meaning set forth in Section 2.05(b) hereof.

2758048 v03

"**Purchased Assets**" has the meaning set forth in Section 2.02 hereof.

"**Purchaser**" has the meaning set forth in the preamble.

"**Purchaser Ancillary Agreements**" has the meaning set forth in Section 4.02 hereof.

"**Purchaser Representatives**" has the meaning set forth in Section 5.07 hereof.

"**Purchaser's Knowledge**" means the actual knowledge of Rodney S. Williams, Mark K. Rafuse and Benjamin Q. Brunt, who are the primary representatives of Purchaser assigned by Purchaser to supervise the integration and implementation of the transactions contemplated under this Agreement.

"**Real Property**" has the meaning set forth in Section 3.05(e) hereof.

"**Record**" means any information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, depositing, disposing of or migrating into or through the environment or any natural or man-made structure.

"**Releases of Guaranties**" has the meaning set forth in Section 2.05(a)(i) hereof.

"**Releases of Mortgages**" has the meaning set forth in Section 2.05(a)(i) hereof.

"**Releases of Other Guaranties**" has the meaning set forth in Section 2.05(a)(ii) hereof.

"**Releases of Other Mortgages**" has the meaning set forth in Section 2.05(a)(ii) hereof.

"**Remediation**" means investigation, cleanup, removal, containment, disposal, restoration or other remedial activities to correct conditions at the Real Property as required by Environmental Law. Remediation shall include any monitoring or sampling activities required by any Environmental Law, regardless of whether any such remediation activities are required by any Governmental Authority.

"**Requested Information**" means, to the extent it is in any Seller's possession and to the extent it is not deemed to be Confidential Materials: (i) any surveys (including land and as built) of all or any portion of the Purchased Assets involving real property and the improvements thereon; (ii) any covenants, conditions, restrictions, reciprocal easement agreements and other similar agreements which affect or will affect or be binding on all or any portion of the Purchased Assets; (iii) any appraisals, property condition assessments, soils, engineering, environmental, geotechnical, traffic or other studies, reports, notices and information pertaining to all or any portion of the Real Property; (iv) any zoning variances, licenses and permits, authorizations, approvals, development agreements, and any correspondence with any Governmental Authority regarding all or any portion of the Purchased Assets; (v) all leases, concession agreements, service contracts, vendor contracts, and other contracts and agreements related to the Hotel, including all Seller's Contracts; (vi) all reasonably available financial and operational information relating to the Purchased Assets or Assumed Liabilities, none of which shall be deemed Confidential Materials; (vii) information related to any intercompany loans from or to Sellers that are contemplated to be Purchased Assets or Assumed Liabilities; (viii) any Phase I or Phase II environmental report and property condition report (i.e., a report on the condition of the Hotel's structural, mechanical, electrical and plumbing systems) and all other information related to the environmental condition of the Hotel or of the

2758048 v03

Hotel's compliance with any Environmental Laws; and (ix) any other pertinent information concerning the Purchased Assets or Assumed Liabilities that any Seller may have in its possession.

"**Resolution Period**" has the meaning set forth in Section 12.01(d) hereof.

"**Resort Golf Courses**" are the two golf courses at Amelia Island Plantation known as the Oak Marsh Golf Course and the Ocean Links Golf Course.

"**Resort Operations Building**" has the meaning set forth in the definition of Ancillary Properties and as described on Schedule 2.01(a)(9).

"**Retained Deposit**" has the meaning set forth in Section 2.05(c).

"**Retained Liabilities**" has the meaning set forth in Section 2.06(b) hereof.

"**Sale Procedures Motion**" means a motion, consistent with and incorporating all of the terms of this Agreement, filed by the Company in accordance with Section 8.01 hereof, with the Bankruptcy Court requesting entry of the Sale Procedures Order (i) approving the Bidding Procedures and bid protections (e.g. Break Up Fee and Expense Reimbursement), (ii) approving the form and manner of notice of the Auction, (iii) scheduling the Auction to proceed at the conclusion of the confirmation hearing in the Chapter 11 Case, (iv) approving procedures for determining Cure Amounts, all pursuant to Sections 363, 365, 1123, 1129, 1145 and 1146 of the Bankruptcy Code and (v) approving this Agreement.

"**Sale Procedures Order**" means an Order granting the Sale Procedures Motion, substantially in the form attached as Exhibit A hereto, (i) approving the Bidding Procedures and bid protections (e.g. Break Up Fee and Expense Reimbursement), (ii) approving the form and manner of notice of the Auction, (iii) scheduling the Auction to proceed at the conclusion of the confirmation hearing, (iv) approving procedures for determining Cure Amounts, all pursuant to Sections 363, 365, 1123, 1129, 1145 and 1146 of the Bankruptcy Code, and (v) approving this Agreement.

"**Sale Order**" means an Order of the Bankruptcy Court approving the sale of the Purchased Assets to the Purchaser, approving the assumption and assignment of the Assumed Contracts and Leases, and granting such other relief as may be appropriate.

"**Sale Transaction**" means (a) the sale of the Hotel or all or substantially all of the Sellers' assets, or (b) a merger, consolidation, equity purchase or similar transaction that results in a change of Control of the Sellers.

"**Schedule Delivery Date**" means the date which is ten (10) days before the Closing Date.

"**Seller**" or "**Sellers**" has the meaning set forth in the preamble.

"**Seller's Ancillary Agreements**" means all agreements to which a Seller is or will be a party that are required to be executed pursuant to or in connection with this Agreement.

"**Seller's Contract**" means any Contract: (a) to which any Seller is a party; or (b) by which any Seller or any of its assets or properties is bound or subject to any obligation, including Leases, but excluding the Employee Plans.

"**Sellers' Knowledge**" means the actual knowledge of Richard A. Cooper, director, vice president, secretary and general counsel of the Company and Controlling equity interest owner of the

2758048 v03

Cooper Sellers, Jack B. Healan, Jr., president and treasurer of the Company, S. Norman Bray, vice president of the Company, Laura T. Palmisano, vice president of the Company, and Tonda Tan, vice president of the Company, (or if such individuals or their positions have been discontinued their closest functional equivalent) on the date of this Agreement and/or on the Closing Date.

"**Stand-Alone Plan**" means a plan of reorganization for Company that does not involve a Sale Transaction.

"**Straddle Period**" means any taxable period beginning on or before the Closing Date and ending after the Closing Date.

"**Survey**" has the meaning set forth in Section 10.06(a) hereof.

"**Tangible Personal Property**" means all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories and Furnishings) of every kind owned or leased by a Person (wherever located and whether or not carried on such Person's books), together with any express or implied warranty by the manufacturers or the sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

"**Taxes**" means (a) any and all federal, state, local, foreign and other taxes, assessments and other governmental charges, fees, levies, tariffs, duties, impositions and Liabilities relating to taxes, including taxes based upon or measured by gross receipts, income, profits, alternative or add-on minimum, estimated, net worth, sales, use, occupation, value added, ad valorem, transfer, gains, windfall profits, capital stock, franchise, license, registration, recording, documentary, stamp, withholding, wage, payroll, recapture, employment, social security, disability, workers' compensation, unemployment, severance, unclaimed property, escheat, excise and property (real and personal) taxes, together with all interest, penalties and additions imposed with respect to such amounts, (b) any Liability for payment of any amounts of the type described in clause (a) as a result of being a member of an affiliated, consolidated, combined or unitary group, and (c) any Liability for amounts of the type described in clauses (a) and (b) as a result of any express or implied obligation to indemnify another Person or as a result of any obligations under any agreements or arrangements with any other Person with respect to such amounts and including any Liability for Taxes of a predecessor entity.

"**Tax Returns**" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by Sellers relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"**Terminable Breach**" has the meaning set forth in Section 5.01 hereof.

"**Termination Date**" has the meaning set forth in Section 11.01(a)(iii) hereof.

"**Third Party**" means a Person that is not (i) a party to this Agreement or (ii) an Affiliate of a party to this Agreement.

"**Topping Transaction**" has the meaning set forth in Section 8.06(b).

"**Transfer Taxes**" has the meaning set forth in Section 8.05(b) hereof.

"**Transferred Employee**" has the meaning set forth in Section 5.05(a) hereof.

2758048 v03

"**True-Up**" has the meaning set forth in Section 12.01(b) hereof.

"**Uniform System of Accounts**" shall mean the *Uniform System of Accounts for the Lodging Industry*, Tenth Revised Edition, 2006, as published by the American Hotel & Lodging Educational Institute, as revised from time to time to the extent such revision has been or is in the process of being generally implemented within Amelia Island Plantation.

"**VDR**" means the Sellers' virtual and non-virtual data room hosted by The Plasencia Group, Inc..

"**WARN Act**" means collectively, all federal, state and local plant closing laws, including the Worker Adjustment Retraining and Notification Act (29 U.S.C. § 2101, *et seq.*), as amended.

1.02    Usage.

(a)    Interpretation. In this Agreement, unless a clear contrary intention appears:

(i)    the singular number includes the plural number and vice versa;

(ii)    references to any Person includes such Person's successors and assigns but, if applicable, only if such succession and assignment is not prohibited by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually;

(iii)    reference to any gender includes each other gender;

(iv)    reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof;

(v)    reference to any Legal Requirement means such Legal Requirement as amended, modified, codified, replaced or reenacted, in whole or in part, and in effect from time to time, including rules and regulations promulgated thereunder and reference to any section or other provision of any Legal Requirement means that provision of such Legal Requirement from time to time in effect and constituting the substantive amendment, modification, codification, replacement and reenactment of such section or other provision; provided, however, that the foregoing shall not apply in instances in which the Legal Requirement refers to a specific date, time or period;

(vi)    "hereunder," "hereof," "hereto" and words of similar import shall be deemed references to this Agreement as a whole and not to any particular Article, Section or other provision thereof;

(vii)    "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term;

(viii)    "or" is used in the inclusive sense of "and/or";

(ix)    with respect to the determination of any period of time, "from" means "from and including" and "to" means "to but excluding";

2758048 v03

(x)     references to documents, instruments or agreements shall be deemed to refer as well to all addenda, exhibits, schedules or amendments thereto; and

(xi)     all references to "dollars" or "$" shall mean U.S. dollars.

(b)     Accounting Terms and Determinations. Unless otherwise specified herein, all accounting terms used herein shall be interpreted and all accounting determinations hereunder shall be made in accordance with the Uniform System of Accounts.

## ARTICLE II

## SALE AND TRANSFER OF PURCHASED ASSETS; CLOSING

2.01     Ancillary Assets.

Upon the terms and subject to the conditions set forth in this Agreement, effective as of immediately prior to the Effective Time, the Cooper Sellers shall sell, convey, assign, transfer and deliver to the Company, free and clear of all Encumbrances other than the Permitted Encumbrances, and the Company shall purchase and acquire from the Cooper Sellers, the Cooper Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, located on the Ancillary Properties, consisting solely of the following:

(a)     that portion of the Real Property constituting the Ancillary Properties as described on Schedule 2.01(a);

(b)     all Tangible Personal Property of the Cooper Sellers located at the Ancillary Properties, except as excluded under Section 2.04(b);

(c)     all Inventories and Consumables of the Cooper Sellers located at the Ancillary Properties;

(d)     all Seller's Contracts and Leases of the Cooper Sellers set forth on Schedule 2.01(d) (collectively, the "**Cooper Assumed Contracts and Leases**");

(e)     to the extent transferable and owned by the Cooper Sellers, all Governmental Authorizations relating to the Ancillary Properties and all pending applications therefor or renewals thereof referred to in Section 3.03(c);

(f)     to the extent owned by the Cooper Sellers, all data and Records related to the Ancillary Properties (other than the Confidential Materials), including client and customer lists and Records, referral sources, equipment logs, operating guides and manuals, financial and accounting Records, Tax Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information currently exist);

(g)     to the extent transferable and owned by the Cooper Sellers, all of the intangible rights and property owned or licensed by the Cooper Sellers in connection with the Ancillary Properties, including Intellectual Property Rights (including the right to sue and recover for past infringement), goodwill, and further including all files, correspondence, records or other documentation associated therewith;

2758048 v03

(h)     to the extent transferable, all insurance benefits of the Cooper Sellers, including rights and proceeds, arising from or relating to the Ancillary Assets or the Assumed Liabilities related to the Ancillary Assets prior to the Effective Time, except as excluded under Section 2.04(d);

(i)     all rights of the Cooper Sellers relating to deposits and prepaid expenses, claims for refunds, indemnification rights and rights to offset relating to the Ancillary Assets;

(j)     all security or other deposits relating to the Ancillary Assets and any equipment owned or leased by the Cooper Sellers, as set forth on Schedule 2.01(j);

(k)     to the extent within any Cooper Seller's possession, all customer lists and sales invoices related to the Ancillary Properties, whether generated by, or used by, any of the Cooper Sellers or any Affiliate of the Cooper Sellers; and

(l)     all proceeds of the foregoing and all other property of the Cooper Sellers of every kind, character or description, tangible and intangible, known or unknown, located on the Ancillary Assets except for the Excluded Assets.

All of the foregoing property and assets are herein referred to collectively as the "**Ancillary Assets**."

2.02    Purchased Assets.

Upon the terms and subject to the conditions set forth in this Agreement, effective as of the Effective Time, Sellers shall sell, convey, assign, transfer and deliver to Purchaser, free and clear of all Encumbrances other than the Permitted Encumbrances, and Purchaser shall purchase and acquire from Sellers, Sellers' property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located related to the Business other than the Excluded Assets, including all such property and assets constituting the Ancillary Assets acquired by the Company from the Cooper Sellers pursuant to Section 2.01 hereof. The Purchased Assets (as defined below) shall include the following:

(a)     the Real Property;

(b)     all Tangible Personal Property of the Sellers, including all Tangible Personal Property owned or leased by the Sellers and located at or in any of the Ancillary Properties, except as excluded under Section 2.04(b);

(c)     the Hotel, including all Furnishings, Inventories, Consumables and Miscellaneous Hotel Assets of the Sellers, including all such Furnishings, Inventories, Consumables and Miscellaneous Hotel Assets owned or leased by the Sellers and located at or in any of the Ancillary Properties;

(d)     the Guest Ledger;

(e)     all Seller's Contracts and Leases set forth on Schedule 2.02(e), including the Cooper Assumed Contracts and Leases, if any (collectively, the "**Assumed Contracts and Leases**") (Schedule 2.02(e) contains contracts covering both Purchased Assets and Excluded Assets for the information of Purchaser, but such contracts cannot be assumed in part with respect to the Purchased Assets without the consent of the other parties to such contracts);

2758048 v03

(f)    to the extent transferable, all Governmental Authorizations relating to the Business or the Purchased Assets and all pending applications therefor or renewals thereof referred to in Section 3.03(c);

(g)    all data and Records related to the operations of the Business (other than the Confidential Materials), including client and customer lists and Records, referral sources, equipment logs, operating guides and manuals, financial and accounting Records, Tax Records, creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records (all in the state in which such records and information currently exist) and, subject to Legal Requirements, copies of all personnel Records and other Records described in Section 2.04(f);

(h)    to the extent transferable, all of the intangible rights and property owned or licensed by the Sellers, including Intellectual Property Rights (including the right to sue and recover for past infringement), goodwill, and further including all files, correspondence, records or other documentation associated therewith, except as excluded under Section 2.04(o);

(i)    to the extent transferable, all insurance benefits of the Sellers, including rights and proceeds, arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time, and including all key man life insurance policies (including the cash surrender value of all such policies) held by Sellers with respect to its Key Personnel or other executives, except as excluded under Section 2.04(d);

(j)    all claims, demands and rights of recovery, reimbursement, compensation, contribution or other remuneration from Third Parties with respect to the condition, fitness, habitability or merchantability of any of the Purchased Assets, including, without limiting the generality of the foregoing, under the Amelia Inn roof defect claim and the <u>Amelia Island Company v. Carver and Associates</u> cases identified on <u>Schedule 3.04</u>.

(k)    all rights of the Sellers relating to deposits and prepaid expenses, claims for refunds, indemnification rights and rights to offset relating to the Purchased Assets;

(l)    all security or other deposits relating to the Real Property and any equipment owned or leased by the Sellers, including those related to the Ancillary Assets set forth on <u>Schedule 2.01(j)</u>, all as set forth on <u>Schedule 2.02(l)</u>;

(m)    to the extent within any Seller's possession, all customer lists and sales invoices related to the Business, whether generated by, or used by, any of the Sellers or any Affiliate of the Sellers;

(n)    the Company's claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provisions of the Bankruptcy Code with respect to the Assumed Liabilities, the Assumed Cure Amounts and the Assumed Contracts and Leases, as well as all other claims, causes of action and rights of recovery of Sellers with respect to the Assumed Liabilities; and

(o)    all proceeds of the foregoing and all other property of the Company Seller of every kind, character or description, tangible and intangible, known or unknown, wherever located, or similar to the properties described above except for the Excluded Assets.

All of the foregoing property and assets are herein referred to collectively as the "**Purchased Assets.**"

2758048 v03

Notwithstanding the foregoing, the transfer of the Purchased Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless the Purchaser expressly assumes such Liability pursuant to Section 2.06(a).

2.03    Intentionally Deleted.

2.04    Excluded Assets.

Notwithstanding anything to the contrary contained in Section 2.01(a) or elsewhere in this Agreement, all of Company Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, that are not related to the Business are not part of the sale and purchase contemplated hereunder, are excluded from the Purchased Assets, and shall remain the property of the Sellers after the Closing (collectively, the "**Excluded Assets**"). Excluded Assets shall include the following:

(a)    all of the Seller's Contracts that are not Assumed Contracts and Leases (the "**Excluded Contracts**");

(b)    any Seller's right title and interest in the Amelia River Golf Course and Pro Shop/Clubhouse, Kountry Inn, the lots owned by Brady Point Preserve LLC, Amelia Personal Storage and Buildings 2 and 4 of the Office Complex and Office Condominium Unit 101A at Village Center at Gateway to Amelia, all as described on Schedule 2.04(b);  For the avoidance of doubt, other than the Ancillary Properties owned by Realty and R&D Cooper specifically identified on Schedule 2.01(a) and the other Ancillary Assets of Realty and R&D Cooper specifically related to such Ancillary Assets to be conveyed to Company pursuant to Section 2.01, all other assets owned by Realty and R&D Cooper shall be Excluded Assets and shall remain the property of Realty and R&D Cooper;

(c)    all rights of the Sellers under this Agreement and the Seller's Ancillary Agreements;

(d)    the personal property and assets expressly set forth on Schedule 2.04(d);

(e)    the Company's claims, causes of action and rights of recovery pursuant to Sections 544 through 550 and Section 553 of the Bankruptcy Code and any other avoidance action under any other applicable provision of the Bankruptcy Code that is not a Purchased Asset;

(f)    all rights under insurance policies to the extent relating to claims for losses related to any Excluded Asset or Retained Liabilities;

(g)    the Sellers' corporate seals, stock Record books, corporate Record books containing minutes of meetings of directors and stockholders, and such other Records having to do solely with the Sellers' organization or stock capitalization or Excluded Assets or Retained Liabilities except as set forth in Section 14.17;

(h)    all personnel Records and other Records that the Sellers are required by law to retain in their possession and all Confidential Materials;

(i)    assets, rights, privileges, claims, contracts and properties owned or held by Employee Plans;

2758048 v03

(j)     all cash, cash equivalents and short-term investments (including all restricted cash and cash deposits to or for the benefit of utilities), including any cash deposits maintained in escrow and, except as included in Section 2.02(d) or Section 12.02(a), all Accounts Receivable for all periods prior to the Apportionment Time;

(k)     non-transferable deposits such as utility deposits, set forth on <u>Schedule 2.04(k);</u>

(l)     any interest in and to any Tax refunds and credits to the extent relating to time periods prior to the Closing Date, including Tax refunds from Affiliates of any Seller;

(m)     the Purchase Price;

(n)     any equity interest in any of the Sellers, except as set forth in Section 14.17;

(o)     all contracts of employment, whether written or oral, with any current or former employee, independent consultant or other service provider of or to the Sellers or any of their Affiliates;

(p)     all assets, rights, privileges, claims, contracts and properties in the possession of Sellers that are related to the assets, rights, privileges, claims, contracts and properties of stockholders or members of the Sellers and not otherwise related to the lawful operation of the Business;

(q)     all files, correspondence, records or other documentation related solely to Sellers' stockholders and members, except as set forth in Section 14.17;

(r)     any inter-company receivables due to the Sellers from any Affiliate of any Seller;

(s)     all licenses issued to any of the Sellers from the State of Florida Department of Business and Professional Regulation Division of Alcoholic Beverages and Tobacco, except as listed on <u>Schedule 3.02(b),</u> except as set forth in Section 14.17;

(t)     any assets or reserves maintained pursuant to Employee Plans or other employee benefit plans (as defined under Section 3(3) of ERISA) or payroll practices regarding benefits or compensation earned through the Closing Date (for this purpose, Purchaser acknowledges that the assets of the three qualified employee benefit plans maintained by the Company for the benefit of the Sellers' eligible employees are not Purchased Assets); and

(u)     all Contracts and all rights to services, set forth on <u>Schedule 2.04(u);</u> and

(v)     all of Company's rights, demands, claims (as defined in the Bankruptcy Code) and causes of action arising with respect to the assertion or defense of claims against the Company under Sections 502 and 503 of the Bankruptcy Code, Federal Rule of Bankruptcy Procedure 3007 and any other applicable Legal Requirement.

2.05    <u>Consideration.</u>

(a)     In exchange for the Cooper Sellers' conveyance of the Ancillary Assets to Company,

(i)     Company agrees to cause Compass and PRIAC to execute and deliver releases concurrent with the Closing of: (1) certain mortgages (and related instruments) held by Compass Bank and PRIAC, which mortgages are more fully set out in <u>Schedule 2.05(a)(i)(1)</u>

2758048 v03

attached hereto and incorporated herein (the "**Releases of Mortgages**") and (2) certain guaranties executed by members of the family of Richard A. Cooper (the "**Cooper Family**") in favor of Compass, which guaranties are more fully set out in Schedule 2.05(a)(i)(2) attached hereto and incorporated herein (the "**Releases of Guaranties**") (the Releases of Mortgages and the Releases of Guaranties, collectively, the "**Compass/PRIAC Releases**").

(ii)     Company agrees to cause the lenders described in the below mortgages, via the payment of cash payoffs, to execute and deliver releases concurrent with the Closing of: (1) certain mortgages (and related instruments) held by the lenders shown in the mortgages, which mortgages are more fully set out in Schedule 2.05(a)(ii)(1) attached hereto and incorporated herein (the "**Releases of Other Mortgages**") and (2) certain guaranties executed by members of the family of the Cooper Family in favor of the lenders shown in the guaranties, which guaranties are more fully set out in Schedule 2.05(a)(ii)(2) attached hereto and incorporated herein (the "**Releases of Other Guaranties**") (the Releases of Other Mortgages and the Releases of Other Guaranties, collectively, the "**Other Lender Releases**").  Specifically, Nine Hundred Thousand Dollars ($900,000) of the Purchase Price shall be allocated to satisfy the mortgage on the Resort Operations Building.

(b)     Subject to the terms and conditions hereof, Purchaser shall purchase the Purchased Assets and shall assume the Assumed Liabilities in exchange for Forty-Five Million Nine Hundred Thousand and no/100 Dollars ($45,900,000) (the "**Purchase Price**"), which Purchase Price, as adjusted pursuant to Section 2.05 hereof, shall be paid by Purchaser to the Company at Closing via wire transfer of immediately available funds to such account(s) as Company may direct.

(c)     On or before three (3) business days after the execution of this Agreement, Purchaser shall deliver to Commonwealth Title Insurance Company, as escrow agent (the "**Escrow Agent**"), an initial deposit (together with the interest accrued thereon, the "**Initial Deposit**") in the sum of Two Million Dollars ($2,000,000).  On or before the later of (i) the termination of the Due Diligence Period or the issuance of the Sale Procedures Order by the Bankruptcy Court, Purchaser shall deliver to Escrow Agent an additional deposit of Two Million Dollars ($2,000,000) (together with the interest accrued thereon, the "**Additional Deposit**").  The Initial Deposit and Additional Deposit are collectively referred to as the "**Deposit**").  The Deposit shall be held by the Escrow Agent and shall be placed in an interest-bearing escrow account in accordance with the terms of this Agreement. All fees related to the Escrow Agent shall be paid by Purchaser. On the Closing Date, the Purchaser and the Company shall direct the Escrow Agent to deliver the Deposit to the Company, provided that the Escrow Agent shall retain One Million Dollars ($1,000,000) of the Deposit (the "**Retained Deposit**"), and shall not make any distribution to any Seller or Affiliate thereof or any other Third Party with respect to the Retained Deposit, until after any payments with respect to the True-Up have been made in accordance with this Section 2.05(c), at which time any remaining portion of the Retained Deposit shall be paid to Company. Any amount, up to the Retained Deposit, that Company is determined to owe Purchaser as a result of the True-Up shall be paid by the Escrow Agent, by wire transfer of immediately available funds to such account(s) as Purchaser may direct, within five (5) days following the True-Up. Any amount above the amount of the Retained Deposit that Company is determined to owe Purchaser as a result of the True-Up shall not result in any liability of Seller and Purchaser releases Seller from liability in excess of the Retained Deposit. Any amount that Purchaser is determined to owe Company as a result of the True-Up shall be paid by Purchaser, by wire transfer of immediately available funds to such account(s) as Company may direct, within five (5) days following the True-Up.

(d)     At the Closing, Purchaser shall pay the Assumed Cure Amounts to the Escrow Agent. The Escrow Agent shall pay the Assumed Cure Amounts to the applicable Assumed Contract

2758048 v03

counterparties in accordance with the Executory Contract and Unexpired Lease Assumption and Assignment Order.

(e)     The Purchase Price that is payable to the Company pursuant to this Section 2.05 shall in all instances be (i) reduced by the amount of the Deposit, and (ii) adjusted by the prorations under Article XII, and (iii) adjusted, as applicable, pursuant to Section 2.05(c).

(f)     As additional consideration for the Cooper Sellers' conveyance of the Ancillary Assets to Company for the purpose of Company's conveyance of such Ancillary Assets to Purchaser, subject to the terms and conditions hereof, Purchaser:

(i)     shall pay the amount of One Million and no/100 Dollars ($1,000,000) (the "**Cooper Cash Consideration**"), which Cooper Cash Consideration shall be paid by Purchaser jointly to the Cooper Sellers, or to the Person jointly directed by the Cooper Sellers, at Closing via wire transfer of immediately available funds to such account(s) as the Cooper Sellers may jointly direct;

(ii)     hereby covenants and agrees with the Cooper Sellers that net cash flow from the Purchased Assets from and after the Closing shall be paid and credited as follows: Purchaser shall receive and be entitled to retain all net cash flow from the Purchased Assets until Purchaser has received such net cash flow in an amount equal to three (3) times the amount of Purchaser's initial equity investment in acquiring the Purchased Assets and making any initial capital improvements (provided, for purposes of this Section 2.05(f)(ii), such initial equity investment shall be deemed not to exceed Twenty-Five Million Dollars ($25,000,000)); the next available net cash flow from the Purchased Assets shall all be paid to jointly to the Cooper Sellers, or to the Person jointly directed by the Cooper Sellers, until the Cooper Sellers or such jointly designated Person have been paid an aggregate amount of Four Million Dollars ($4,000,000) (the "**Cooper Participation**"); and all remaining net cash flow from the Purchased Assets shall be retained by Purchaser and the Cooper Sellers shall have no further interest in any cash flows or profits from the Purchased Assets. Purchaser and the Cooper Sellers shall use good faith commercially reasonable efforts to agree to the form of a more definitive agreement on the Cooper Participation on or before the termination of the Due Diligence Period and the failure to agree to the form during the Due Diligence Period and enter into the same at Closing shall constitute the failure of a condition precedent for Purchaser and Cooper Sellers (however, the failure of a party to sign the agreed upon form at Closing creates a condition precedent for the other party only), in which case either Purchaser or Cooper Sellers may terminate this Agreement and the Deposit shall be returned to Purchaser; and

(iii)     assign two lifetime memberships in the new Equity Club described in Section 10.08(a) to Cooper Sellers, or other equivalent memberships (free and clear of any obligation to pay initiation fees, assessments or dues but subject to payment of normal fees paid by other members such as cart fees (but not green fees) and food and beverage charges) in the Club that may be designated for use by same.

(g)     The provisions of this Section 2.05 shall survive the Closing for one hundred eighty (180) days following the Closing Date.

2.06     <u>Liabilities.</u>

(a)     Assumed Liabilities. As of the Closing Date, Purchaser shall assume and agree to pay, discharge or perform, as applicable, only the Liabilities set forth on <u>Schedule 2.06(a)</u> and all rights,

2758048 v03

responsibilities, liabilities and obligations set forth in writing in the Assumed Contracts and Leases and the Licenses that are to be performed after the Closing Date (the "**Assumed Liabilities**") and the Assumed Cure Amounts, and no other Liabilities of the Sellers whatsoever.

(b)    Retained Liabilities. The Retained Liabilities shall remain the sole responsibility of, and shall be retained by, the Sellers. "**Retained Liabilities**" shall mean every Liability of the Sellers other than the Assumed Liabilities, including (in each instance, other than the Assumed Liabilities):

(i)    any Liability not set forth on Schedule 2.06(a);

(ii)    any Liability accrued on the Sellers' most recent financial statements;

(iii)    any Liability arising out of or relating to services or products of the Sellers to the extent provided or sold prior to the Effective Time;

(iv)    any Liability for Taxes incurred or related to a period on or prior to the Closing Date, including any Taxes arising as a result of the Sellers' operation of the Business or ownership of the Purchased Assets on or prior to the Closing Date;

(v)    any Liability under any Excluded Contracts and including any such Liability arising out of or relating to any maintenance contract, credit facilities, trade payables, indebtedness for borrowed money, amounts due to Affiliates or any security interest related thereto;

(vi)    any Liability arising under or relating to Environmental Law, including any Environmental Claims, in each case to the extent relating to a fact, circumstance, condition or activity existing or occurring prior to the Effective Time relating to the Sellers, their predecessors or Affiliates, the Hotel, the operation of the Business, or the leasing, ownership or operation of any Real Property, including any such Liabilities related to any Real Property set forth on Schedules 3.05(b) and 3.05(c);

(vii)    any Liability of any Seller or any ERISA Affiliate under the Employee Plans or other "employee benefit plan" (within the meaning of Section 3(3) of ERISA);

(viii)    any Liability, including any WARN Act liability, arising or related to time periods prior to the Effective Time in respect of any current or former employees of any Seller, or, relating to employment or termination of employment, including, relating to payroll, discrimination, harassment, workers' compensation or wrongful termination, and any WARN Act liability of the Sellers described in Section 5.05(g) hereof;

(ix)    any Liability with respect to any Employee Claims or claims for worker compensation benefits or unemployment benefits;

(x)    any Liability of any Seller to any Affiliate thereof, except to the extent of Assumed Liabilities with respect to Assumed Contracts and Leases;

(xi)    any Liability arising or related to time periods prior to the Effective Time to pay, indemnify, reimburse or advance amounts to any officer, director, employee, consultant or agent of any Seller or any Affiliate, or to make any severance, bonus, change of control, sales incentive or other similar payments to any director, officer, employee, consultant or agent of any Seller or any Affiliate; provided, however, that any Liability for (a) payments arising from or

2758048 v03

26

relating to the employment of any Transferred Employee after the Effective Time, and (b) severance payments arising from or relating to the termination of any Transferred Employee's employment after the Effective Time shall not be Retained Liabilities;

(xii) any Liability to distribute or otherwise apply all or any part of the consideration received hereunder;

(xiii) any Liability arising out of any Proceeding pending as of the Effective Time and any facts, circumstances, acts or omissions occurring prior to the Effective Time;

(xiv) any penalties, fines, settlements, interest, costs and expenses arising out of or incurred as a result of any actual or alleged violation by any Seller of any Legal Requirement prior to the Effective Time, whether or not set forth in the Disclosure Schedules except that any corrective work or improvements that are required to be made to the drainage and irrigations systems at the Hotel related to the failure of Company to comply with any Consumptive Use Well Water Permit, but not any penalties, fines or other punitive assessments levied on account of such non-compliance by the Company and related to the period prior to the Effective Time, shall specifically NOT be Retained Liabilities and shall constitute Assumed Liabilities to the extent there is any Liability associated therewith;

(xv) any Liability associated with any and all indebtedness for borrowed money of any Seller; and

(xvi) any Liability of any Seller based upon its respective acts or omissions occurring after the Effective Time.

2.07 Closing.

All documents and funds necessary to the completion of this transaction shall be placed in escrow with the Escrow Agent's offices at Fidelity National Title Group, 7077 Bonneval Road, Suite 110, Jacksonville, Florida 32216, in sufficient time to allow the closing (the "**Closing**") of this transaction to occur no later than 10:00 a.m. local time on the first Friday following the first (1st) Business Day after satisfaction or waiver of all conditions to the obligations of the parties hereto to consummate the transactions contemplated hereby (other than conditions with respect to actions the respective parties will take at the Closing itself) or such other date as Purchaser and Sellers may mutually determine (the "**Closing Date**"). The parties hereto shall use commercially reasonable efforts to consummate the transactions contemplated hereby on the first Friday following the fifth (5th) Business Day after the Bankruptcy Court enters the Confirmation Order.

2.08 Condition of Purchased Assets.

(a) Purchaser acknowledges that (i) assuming Purchaser does not terminate this Agreement in accordance with Article XI or pursuant to any other provision of this Agreement, Purchaser will be deemed to confirm as of the Closing Date that Purchaser has been given a reasonable opportunity to inspect and investigate the Hotel and all other Purchased Assets, all improvements thereon and all aspects relating thereto, including all of the physical, environmental and operational aspects of the Hotel and all other Purchased Assets, either independently or through agents and experts of Purchaser's choosing, and (ii) Purchaser will acquire the Hotel and all other Purchased Assets based solely upon Purchaser's own investigation and inspection thereof and the representations, warranties and covenants of Sellers expressly set forth in this Agreement and the Seller's Ancillary Agreements. SELLERS AND PURCHASER AGREE THAT, EXCEPT AS EXPRESSLY PROVIDED FOR IN THIS AGREEMENT

2758048 v03

AND THE SELLER'S ANCILLARY AGREEMENTS, (I) THE HOTEL AND ALL OTHER PURCHASED ASSETS SHALL BE SOLD AND PURCHASER SHALL ACCEPT POSSESSION OF THE HOTEL AND ALL OTHER PURCHASED ASSETS ON THE CLOSING DATE "AS IS," "WHERE IS," AND "WITH ALL FAULTS," WITH NO RIGHT OF SET-OFF OR REDUCTION IN THE PURCHASE PRICE; AND (II) SUCH SALE SHALL BE WITHOUT REPRESENTATION OR WARRANTY OF ANY KIND, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING ANY WARRANTY OF INCOME POTENTIAL, OPERATING EXPENSES, USES, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, AND SELLERS HEREBY DISCLAIM AND RENOUNCE ANY SUCH REPRESENTATION OR WARRANTY. PURCHASER FURTHER ACKNOWLEDGES AND AGREES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT AND THE SELLER'S ANCILLARY AGREEMENTS, (A) SELLERS SHALL BE UNDER NO DUTY TO MAKE ANY AFFIRMATIVE DISCLOSURE REGARDING ANY MATTER WHICH MAY BE KNOWN TO SELLERS OR THEIR OFFICERS, DIRECTORS, CONTRACTORS, AGENTS OR EMPLOYEES, AND (B) PURCHASER IS RELYING SOLELY UPON ITS OWN INSPECTION OF THE HOTEL AND ALL OTHER PURCHASED ASSETS AND NOT UPON ANY REPRESENTATIONS MADE TO IT BY ANY PERSON WHOMSOEVER ON ANY SELLER'S BEHALF.

(b) Except with respect to any Losses arising out of any Retained Liabilities and except as expressly provided for in this Agreement and the Seller's Ancillary Agreements, Purchaser hereby waives, releases and forever discharges each Seller and its stockholders, and its and their respective officers, directors and employees, from any and all Losses, whether known or unknown, which Purchaser has or may have in the future, arising out of or in connection with the Hotel and all other Purchased Assets, including the physical, environmental, governmental, economic or legal condition of the Hotel and all other Purchased Assets or the operation thereof. For the foregoing purposes, Purchaser hereby specifically waives the provisions of any Legal Requirement, the import of which is as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor. "

(c) Except with respect to any Losses arising out of any Assumed Liabilities and except as expressly provided for in this Agreement, each Seller hereby waives, releases and forever discharges Purchaser and its members, and its and their respective managers, officers, directors and employees, from any and all Losses, whether known or unknown, which each Seller has or may have in the future, arising out of or in connection with the Excluded Assets and the Retained Liabilities. For the foregoing purposes, each Seller hereby specifically waives the provisions of any Legal Requirement, the import of which is as follows:

> "A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

(d) The provisions of this Section 2.08 shall survive the Closing indefinitely.

(e) Each party acknowledges that it has carefully reviewed this Section 2.08 and discussed it with legal counsel and that this Section 2.08 is a material part of this Agreement.

2758048 v03

28

2.09    Tax Treatment of Deposit and Purchase Price.

(a)    Agreed Tax Treatment. Purchaser and Sellers shall execute and file all federal, state and local income tax returns in a manner consistent with this Section 2.09 and shall not take any position with respect to federal, state or local income taxes before any governmental authority or in any judicial proceeding that is inconsistent with any such income tax returns, except (i) pursuant to a final "determination" (as defined in Section 1313(a) of the Code) or (ii) in accordance with a written opinion of legal counsel to the effect that failing to take such consistent position would more likely than not subject such party to tax penalties. Except as expressly set forth in this Section 2.09, nothing in this Section 2.09 shall be deemed to modify any of the other provisions of this Agreement relating to the rights and obligations of the parties.

(b)    Bifurcation of Transaction for Tax Purposes. The transactions set forth in this Agreement shall be treated by the parties for tax purposes as a sale by Sellers to Purchaser, and a purchase by Purchaser from Sellers, of the Purchased Assets (the "**Asset Purchase**"). Sections 2.09(c), 2.09(d) and 2.09(e) below shall govern the tax treatment of the Asset Purchase.

(c)    Asset Purchase and Purchaser Payment. The aggregate "**consideration**" (as defined in Section 1060 of the Code and the Treasury Regulations thereunder, excluding for this purpose any required adjustments that are unique to Purchaser, on the one hand, or any or all of the Sellers, on the other hand) payable by Purchaser to Sellers in exchange for the Purchased Assets (collectively, the "**Aggregate Consideration**") shall consist of five (5) mutually exclusive components, as follows: (i) the Deposit (including interest) that is delivered to Sellers on the Closing Date pursuant to Section 2.05(c); (ii) the Assumed Cure Amounts; (iii) the Purchase Price less the Deposit and other adjustments in Section 2.05; (iv) the Cooper Cash Consideration that is delivered to or on behalf of the Cooper Sellers on the Closing Date pursuant to Section 2.05(f)(i); and (v) the Cooper Participation that is to be delivered to or on behalf of the Cooper Sellers pursuant to Section 2.05(f)(ii). At the date of Closing, Purchaser shall (i) pay, by wire transfer of immediately available funds to such account(s) as the Company may direct, an amount equal to the Purchase Price less the Deposit and other adjustments in Section 2.05 and (ii) pay, by wire transfer of immediately available funds to such account(s) as the Cooper Sellers may direct, an amount equal to the Cooper Cash Consideration.

(d)    Deposit. On the Closing Date, Purchaser shall be treated as making a cash payment to Sellers in the amount of the Deposit (including interest) as partial consideration for the Purchased Assets.

(e)    True-Up Payment. Any payment by the Company to Purchaser, or by Purchaser to the Company, within five (5) days following the True-Up pursuant to Section 2.05(c), shall be treated as a reduction or increase, respectively, in the Purchase Price.

2.10    Due Diligence Period.

(a)    Purchaser shall have the right, subject to the terms in Section 5.07 and other terms herein, commencing on the date of this Agreement and terminating at 5:00 p.m. on the earlier of June 15, 2010, or the day which is five (5) Business Days before the scheduled hearing in the Chapter 11 Case on the Sales Procedures Motion ("**Due Diligence Period**") to investigate the Purchased Assets to determine whether or not the same is satisfactory to Purchaser in its sole discretion.

(b)    The Purchaser shall have the right at any time during the Due Diligence Period to notify Company and Escrow Agent in writing that it has elected to terminate this Agreement if Purchaser

2758048 v03

for any reason determines that the Purchased Assets are not satisfactory to Purchaser. Upon receipt of such notice, the Escrow Agent shall immediately return to Purchaser the Initial Deposit.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Each Seller hereby represents and warrants to Purchaser as of the date hereof and as of the Closing Date (or as of such other date as expressly provided herein), as to the portion of the Purchased Assets owned by such Seller, as follows:

3.01    Organization.

Each Seller is duly incorporated or formed, as applicable, validly existing and in good standing under the laws of the state of its incorporation or formation and has all requisite power and authority and all necessary governmental approvals to own, lease and operate its properties and assets and to carry on and conduct its business as it is now being conducted except where the failure to have such approvals would not have a material adverse effect on Purchaser's ability to complete the transactions contemplated by this Agreement.

3.02    Power, Authorization and Non-Contravention.

(a)    Each Seller has the requisite corporate, trust or limited liability company power, has applicable, legal capacity and authority to: (i) carryon its business as now conducted; (ii) own, operate and lease its properties and assets in the manner in which its properties and assets are currently owned, operated and leased; and (iii) subject to entry of the Sale Procedures Order, the Sale Order and the Confirmation Order, enter into and perform its obligations under this Agreement and all Seller's Ancillary Agreements to which it is a party. The execution and delivery of this Agreement, the Seller's Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby have been duly authorized by all necessary corporate, limited liability company and stockholder or member or trust action on the part of each Seller.

(b)    No consent, approval, Order or authorization of, or registration, declaration or filing with any Governmental Authority or other Person, is required to be obtained or made by any Seller in connection with the execution and delivery of this Agreement, the transfer of the Purchased Assets to Purchaser, as applicable, or the consummation of the other transactions contemplated hereby, except for: (i) the Sale Procedures Order, the Sale Order and the Confirmation Order; (ii) the consents set forth on Schedule 3.02(b), but solely to the extent such consents, if any, are necessary pursuant to Section 365 of the Bankruptcy Code (as so modified, the "**Necessary Consents**"); and (iii) such other consents, authorizations, filings, approvals and registrations that if not obtained or made would not reasonably be expected to have a Material Adverse Effect.

(c)    Upon entry of the Sale Procedures Order, the Sale Order and the Confirmation Order, this Agreement and the Seller's Ancillary Agreements to which it is a party are, or when executed and delivered by any Seller and the other parties thereto will be, valid and binding obligations of such Seller (to the extent a party thereto) enforceable against such Seller in accordance with their respective terms, except as enforceability against such Seller may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors rights generally.

2758048 v03

30

3.03    No Violations; Compliance with Legal Authorizations; Governmental Authorizations.

(a)    Except as set forth on <u>Schedule 3.03(a)</u>, subject to receipt of the Necessary Consents, and upon entry of the Sale Procedures Order, the Sale Order and the Confirmation Order, neither the execution and delivery of this Agreement or any Sellers Ancillary Agreement to which it is a party, nor the consummation of the transactions provided for herein or therein will (i) conflict with, or (with or without notice or lapse of time, or both) constitute or result in a termination, Breach, impairment or violation of any provision of any Assumed Contract, excluding conflicts, terminations, Breaches, impairments or violations that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect; and/or (ii) result in a Breach, default or violation of any provisions of the organizational documents of any Seller, excluding Breaches, defaults or violations that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

(b)    Except as set forth on <u>Schedule 3.03(b)</u>: (i) to the Sellers' Knowledge, each Seller has been during its period of ownership of the applicable Purchased Assets, in material compliance with each Legal Requirement that is or was applicable to it or to the conduct of ownership, operation, management, leasing or use of any of the Purchased Assets; and (ii) to the Sellers' Knowledge, no event has occurred or circumstance currently exists that (with or without notice or lapse of time, or both) constitutes or will result in a material violation by any Seller of, or a material failure on the part of any Seller to comply with, any applicable Legal Requirement.

(c)    The Sellers maintain and hold all rights to all Governmental Authorizations that are necessary to permit the Sellers to lawfully conduct and operate the Business in all material respects and to own and use the Purchased Assets, in the manner consistent with the past practices of the Sellers. The Sellers have made available to Purchaser in the VDR (or in paper files) an accurate and complete copy of each such required Governmental Authorization.

(d)    Except as set forth on <u>Schedule 3.03(d)</u>, to the Sellers' Knowledge, Sellers have not received written notice from any Third Party or Governmental Authority alleging a violation by any Seller of any Encumbrance or Legal Requirement that has not been fully corrected or otherwise fully resolved excluding violations that would not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

3.04    Litigation.

(a)    Except as set forth on <u>Schedule 3.04</u>, there is no Proceeding pending against any Seller, nor, to the Sellers' Knowledge, is any Proceeding threatened against any Seller, before any Governmental Authority or arbitrator. There is no unsatisfied adverse Order of a Governmental Authority or arbitrator outstanding against any Seller. There is no Proceeding pending as to which any Seller has received notice that in any manner could prevent, enjoin, alter or materially delay any of the transactions contemplated by this Agreement or which may have lis pendens effect against the Real Property.

(b)    There is no pending, and no Seller has received written notice from any condemning authority of, nor to the Sellers' Knowledge is there, any threatened condemnation action affecting any portion of the Purchased Assets.

3.05    Title; Real Property.

(a)    Each Seller, as applicable, has good and marketable title to all of the Purchased Assets, or with respect to leased Purchased Assets, valid leasehold interests in, or with respect to licensed

2758048 v03

31

Purchased Assets, valid licenses to use, and at the Closing will deliver the Purchased Assets, free and clear of all Encumbrances (other than Permitted Encumbrances).

(b)     The Owned Real Property, as set forth on Schedule 3.05(b), is all the real property owned by the Sellers. The Sellers, as applicable, have good and marketable fee simple title to the Owned Real Property free and clear of all Encumbrances, other than Permitted Encumbrances.

(c)     Schedule 3.05(c) sets forth an accurate and complete list of all leases, subleases, licenses, concessions and other agreements (written or oral) (“**Leases**”), pursuant to which (i) any Seller holds a leasehold or subleasehold estate in, or is granted a license, concession, or other right to use or occupy, any land, buildings, improvements, fixtures or other interest in real property that are used in the operation of the Business (the “**Leased Real Property (Tenant)**”) or (ii) any Seller leases, or grants a license, concession or other right to use or occupy, a portion of the Owned Real Property to a Third Party, a Seller or an Affiliate thereof (the “**Leased Real Property (Landlord)**”), identifying in each case the lessor or lessee thereunder, the term thereof and the monthly base rent payable thereunder. Sellers have made available for review by Purchaser in the VDR an accurate and complete copy of each of the Leases (including any and all amendments thereof), and in the case of any oral Lease, a written summary of the terms of such Lease.

The Sellers have made available for review by Purchaser in the VDR an accurate and complete copy of each of the Material Seller's Contracts (including any and all amendments thereof and including a written summary of the terms of any oral Material Seller's Contract), and have used good faith commercially reasonable efforts to make available for review by Purchaser in the VDR all other Seller's Contracts. Except as indicated on Schedule 2.02(e) or as otherwise set forth Schedule 2.04(u) neither Company's stockholders nor any Affiliate thereof, other than the Sellers, is a party to any executory contract related to the Hotel or the operation of the Business.

(d)     Schedule 3.05(d) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets. The Intellectual Property Rights being conveyed hereunder include: (i) all registered and unregistered trademarks, service marks, trade dress, logos and trade names used in connection with the Hotel (including all registrations and applications therefor), together with all translations, adaptations, derivations, and combinations thereof and including all goodwill associated therewith and all applications, registrations, and renewals in connection therewith, and (ii) all copyrightable works, all copyrights, and applications, registrations, and renewals in connection therewith used in connection with the Hotel, except, in each case, as included in the Excluded Assets.

(e)     The Owned Real Property, including the Ancillary Properties, and the Leased Real Property (Tenant) (collectively, the “**Real Property**”) comprise all of the real property owned, occupied, leased, operated or used by the Sellers, and there are no other leases, subleases, licenses, concessions, or other occupancy agreements in effect, other than the Excluded Assets, with respect to the Owned Real Property or subleases with respect to the Leased Real Property (Tenant), other than the Leases.

3.06     Absence of Certain Changes or Events.

(a)     Excluding the effect of the filing and administration of the Chapter 11 Case, and actions taken consistent with the occupancy and booking levels of the Hotel in accordance with the terms and provisions of this Agreement, since the Petition Date, the Sellers have carried on the Business in the ordinary course substantially in accordance with the procedures and practices in effect on October 1, 2009.

2758048 v03

32

(b)     Except as set forth on Schedule 3.06, since the Petition Date, there has not been with respect to the Sellers:

(i)     any change, event, circumstance or effect that, by itself or in conjunction with all other such changes, whether or not arising in the ordinary course of business, has had or would reasonably be expected to have a Material Adverse Effect;

(ii)    any Encumbrance placed on any of the assets or properties of the Sellers, except Permitted Encumbrances;

(iii)   any Liability incurred by the Sellers, other than trade accounts payable, Liabilities incurred in connection with preparation for the Chapter 11 Case and other Liabilities arising in the ordinary course of business; or

(iv)    any purchase, license, sale or other disposition, or any agreement or other arrangement for the purchase, license, sale or other disposition, of any of the Purchased Assets, other than in the ordinary course of business and consistent with past practice.

3.07    Brokers.

Purchaser will not be responsible for any broker's, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement on account of any broker, investment banker or other Person retained by Sellers or any of their Affiliates. Sellers shall jointly and severally indemnify, defend, and hold Purchaser harmless from and against any and all Losses arising as a result of a Breach of this Section 3.07.

3.08    Tax Returns.

All privilege, gross receipts, excise, sales and use, personal property and franchise taxes payable with respect to the Hotel resulting from operations prior to the Effective Time have been or will be paid by Sellers prior to delinquency, and all Tax Returns for such taxes have been or shall be prepared and duly filed prior to delinquency.

3.09    Environmental Matters.

Other than as may be set forth in the reports described on Schedule 3.09, none of the Sellers have received written notice from any Governmental Authority or Third Party of any actual or potential violation of or failure to comply with any Environmental Laws with respect to the Hotel or Real Property which to Sellers' Knowledge remains uncorrected, or of any actual or threatened obligation to undertake or bear the cost of any Remediation with respect to the Hotel or Real Property which to Sellers' Knowledge remains unperformed.

3.10    Organizations Lists.

None of the Sellers is acting, directly or indirectly, for or on behalf of any Person named by the United States Treasury Department as a Specifically Designated National and Blocked Person, or for or on behalf of any Person designated in Executive Order 13224 as a Person who commits, threatens to commit, or supports terrorism. None of the Sellers is engaged in the transaction contemplated by this Agreement directly or indirectly on behalf of, or facilitating such transaction directly or indirectly on behalf of, any such Person.

2758048 v03

33

3.11    Access.

Vehicular and pedestrian access for reasonable direct ingress and egress to and from the Real Property is adequate to serve the current uses of the Real Property and such access is either through dedicated public rights-of-way or approved private roads for which the Purchaser, its successors and assigns, will have a perpetual, non-exclusive easement;

3.12    Zoning.

The Real Property are zoned sufficiently to allow its current use.

3.13    Utilities.

Adequate public utility service for electric, water and sewer service required for the current operation of the Real Property either are located on the Real Property or enter the Real Property through adjoining land and do so in accordance with valid public or private easements.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

The Purchaser hereby represents and warrants to Sellers on the date hereof and as of the Closing Date as follows:

4.01    Organization.

Purchaser is a limited liability company organized and validly existing under the laws of the State of Delaware.

4.02    Power, Consents; Absence of Conflicts.

Purchaser has the requisite power and authority to enter into and perform its obligations under this Agreement and all agreements to which Purchaser is or will be a party that are required to be executed pursuant to this Agreement (the "**Purchaser Ancillary Agreements**"). The execution, delivery and performance by Purchaser of this Agreement and the Purchaser Ancillary Agreements, and the consummation by Purchaser of the transactions contemplated by this Agreement and the Purchaser Ancillary Agreements:

(a)    are within Purchaser's limited liability company powers and are not in contravention of the terms of its certificate of organization or limited liability company agreement, each as amended to date, and have been duly authorized by all necessary company action;

(b)    except for the entry of a Sale Procedures Order, the Sale Order and the Confirmation Order or as otherwise expressly provided in this Agreement, do not require any approval or consent of, or filing with, any Governmental Authority;

(c)    do not conflict with or result in any breach or contravention of, any material agreement to which Purchaser is a party or by which it is bound; and

(d)    do not violate any Legal Requirement to which Purchaser may be subject.

2758048 v03

4.03    Binding Agreement.

This Agreement and the Purchaser Ancillary Agreements are (or upon execution will be) valid and legally binding obligations of Purchaser, enforceable against Purchaser in accordance with the respective terms hereof and thereof, except as enforceability against Purchaser may be restricted, limited or delayed by applicable bankruptcy or other laws affecting creditors' rights generally and except as enforceability may be subject to general principles of equity.

4.04    Brokers.

No Seller will be responsible for any broker's, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement on account of any broker, investment banker or other Person retained by Purchaser or any of its Affiliates. Purchaser shall indemnify, defend, and hold Sellers harmless from and against any and all Losses arising as a result of a Breach of this Section 4.04.

4.05    Sufficiency and Evidence of Funds.

Purchaser has sufficient funds available to pay the Initial Deposit immediately upon execution of this Agreement and the Purchase Price (less the Deposit), and to pay the Additional Deposit, the Assumed Cure Amounts and all other amounts required pursuant to Section 2.05 hereof when due and payable.  On the date of this Agreement, Purchaser shall deliver to Sellers reasonable evidence of its ability to pay the Deposit and Purchase Price (less the Deposit), the Assumed Cure Amounts and all other amounts required pursuant to Section 2.05 when due and payable.

## ARTICLE V

## COVENANTS OF SELLERS

5.01    Advice of Changes.

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, Sellers will promptly advise the Purchaser in writing (which may be pursuant to electronic mail to addressees designated by Purchaser in writing to Sellers) of the following, to the extent within the Sellers' Knowledge:

(a)    the discovery by Sellers of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that renders, or with the giving of notice or lapse of time or both would render, any representation or warranty by the Sellers contained in this Agreement untrue or inaccurate;

(b)    any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that renders, or with the giving of notice or lapse of time or both would render, any representation or warranty by Sellers contained in this Agreement, if made on or as of the date of such event or the Closing Date, untrue or inaccurate in any material respect;

(c)    any Breach of any covenant or obligation of Sellers pursuant to this Agreement or any Sellers Ancillary Agreement;

2758048 v03

(d)     any event, condition, fact or circumstance that would reasonably be expected to make the timely satisfaction of any of the conditions set forth in Article X impossible or unlikely;

(e)     the receipt of notification from a Governmental Authority or other Third Party alleging a violation of any Legal Requirement that is or was applicable to any Seller or to the conduct of ownership, operation, management, leasing or use of any of the Purchased Assets;

(f)     the receipt of notification from a Governmental Authority or other Third Party alleging a violation of any Governmental Authorization or the threatened revocation or limitation of any Governmental Authorization; and

(g)     any Material Adverse Effect.

In the event Sellers give notice to the Purchaser in writing of any matters set forth in clauses (a) through (g) of this Section, and any such matter would result in the failure of any condition to Purchaser's obligations under this Agreement being satisfied (each, a "**Terminable Breach**"), the parties shall promptly meet to discuss the Terminable Breach and Sellers, as applicable, shall have a period of thirty (30) days from the date Purchaser received notice from Sellers of the Terminable Breach during which to cure the Terminable Breach at Sellers' sole expense. If Sellers fail or elect (by giving notice to Purchaser) not to cure the Terminable Breach, then Purchaser shall have the right to either (a) waive such Terminable Breach without reduction of the Purchase Price, in which case Purchaser may not thereafter refuse to consummate the transactions as contemplated hereby or claim any failure of Sellers' obligations hereunder because of any failure to cure the Terminable Breach; or (b) terminate this Agreement by written notification to Sellers within ten (10) Business Days after Sellers' give notice to Purchaser of Sellers' failure, inability or election not to cure the Terminable Breach; or (2) if Sellers do not give Purchaser such a notice, twenty (20) Business Days after the expiration of Sellers' thirty (30) day curative period above, whereupon this Agreement shall terminate and the Escrow Agent shall promptly return the Deposit to Purchaser. If Purchaser does not so timely elect to terminate this Agreement, Purchaser shall be deemed to have waived such Terminable Breach and shall proceed to Closing.

5.02     Conduct of Business.

(a)     During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI, the Company Seller shall, subject to the effect of Force Majeure events and the effect of the filing and administration of the Chapter 11 Case, and except as set forth on Schedule 5.02(a) or as contemplated by this Agreement, or to the extent that Purchaser shall otherwise consent in writing, use good faith commercially reasonable efforts to carry on the Business in the usual, regular and ordinary course, in substantially the same manner as heretofore conducted, and otherwise in compliance with the provisions of this Agreement, and in compliance in all material respects with all applicable Legal Requirements.

(b)     During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI except as provided otherwise herein or as required by Order of the Bankruptcy Court (upon motion of a party other than any Seller or any Affiliate thereof) or as approved or recommended by the Purchaser in writing, no Seller will, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed:

(i)     except in the ordinary course of business consistent with the occupancy and booking levels of the Hotel, enter into, terminate, modify or negotiate the terms of any Assumed Contracts and Leases affecting any of the Purchased Assets;

2758048 v03

(ii)     acquire any assets for the Business outside the ordinary course of business or acquire for the Business (by merger, consolidation, or acquisition of equity interests, stock or assets or otherwise) any corporation, partnership, or other business organization or division thereof;

(iii)     remove, sell, transfer, assign or otherwise dispose of any of the Purchased Assets, or grant or suffer any Encumbrance on any of the Purchased Assets, except for Permitted Encumbrances, including, any Encumbrance relating to debtor-in-possession financing in the Chapter 11 Cases, other than the disposition of Tangible Personal Property and Inventories in the ordinary course of business;

(iv)     except in the ordinary course of business, bring, settle, compromise or waive any claim or legal right included in the Purchased Assets affecting the validity of or value of the Purchased Assets;

(v)     take any action inconsistent with this Agreement or with the consummation of the transactions contemplated hereby; or

(vi)     agree to do any of the things described in the preceding Sections 5.02(b)(i) through (v).

5.03     Necessary Consents.

If the assignment of any of the Purchased Assets requires the consent of any Third Party pursuant to Section 365 of the Bankruptcy Code or any other Necessary Consent, then Sellers will use good faith commercially reasonable efforts to obtain such consents and will take such other actions as may be necessary or appropriate for Sellers to allow the consummation of the transactions provided for herein and to facilitate and allow the Purchaser to carry on the operation of the Business after the Closing Date, including the provision of required notices, and such consents shall be in full force and effect as of the Effective Time.

5.04     Litigation.

Sellers will notify Purchaser in writing promptly after obtaining Sellers' Knowledge of any Proceeding by or before any Governmental Authority initiated or threatened against Sellers relating to the Business or the Purchased Assets or for the purpose or with the effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement.

5.05     Employment Matters.

(a)     Effective as of the Effective Time, Sellers shall terminate all employees at the Hotel ("**Hotel Employees**"). On the Closing Date, Company Seller shall pay the Hotel Employees for all compensation owing as of the Effective time, and consistent with past practices and existing policies, including base pay, commissions, incentive pay, vacation pay, sick pay, and similar compensation accruals.

(b)     Except as referenced in Section 5.05(g), Purchaser may rehire, but is not required to rehire, Hotel Employees terminated pursuant to Section 5.05(a).

(c)     Company Seller represents that, as of the Closing Date, all of the Hotel Employees are employed by the Company Seller and not by any other Seller, any Affiliate of any Seller,

or any Third Party (other than Third Party vendors shown on <u>Schedule 2.02(e)</u>, such as Vida Fitness LLC, the provider of services and employees for the Health and Fitness Center), and none of the Hotel Employees are governed by any collective bargaining agreement, and the Cooper Sellers have no employees engaged or employed in the operation of the Hotel or the Business.

(d)     The Company Seller agrees that, from and after the date hereof, Purchaser may offer employment, effective immediately following the Effective Time, to any Hotel Employees that are not represented by a labor organization. During the period from the date of this Agreement until the Closing, the Company Seller shall allow Purchaser to meet with and interview Hotel Employees not represented by a labor organization (either individually or in groups) during breaks, outside of scheduled work hours, or during scheduled work hours following reasonable prior notice to the management of the Hotel, provided that such meetings and interviews shall not interfere unnecessarily with normal operations of the Business. Any offers of employment by Purchaser will become effective immediately following the Effective Time and only if the Closing occurs. Only if the Closing occurs, any such Person who accepts such an offer of employment with Purchaser shall be a **"Transferred Employee"** and shall be employed by Purchaser on such terms and conditions as Purchaser and each such Transferred Employee may mutually agree. The Company Seller shall have no liability with respect to Purchaser's decision to offer or not offer employment to Hotel Employees, other than any applicable Retained Liabilities, and the Company Seller shall have no liability arising out of or relating to the employment of the Transferred Employees immediately following the Effective Time.

(e)     At Closing, Purchaser shall make available or establish such employee benefit plans, programs and policies for the benefit of the Transferred Employees and their eligible dependents as Purchaser shall elect to make available to the Transferred Employees.

(f)     The Company Seller shall promptly notify Purchaser if the Sellers obtain Sellers' Knowledge that any of the key personnel set forth on <u>Schedule 5.05(f)</u> (**"Key Personnel"**) intends to leave the Company's employ.

(g)     Purchaser shall, before the Closing, offer or cause to be offered employment to become a Transferred Employee (to be effective as of the Closing) to a sufficient number of Hotel Employees to avoid violation of the WARN Act [but without taking into account any terminations of Hotel Employees within the ninety (90) days prior to Closing which were not made in connection with the termination of all Hotel Employees as of the Effective Time pursuant to Section 5.05(a)]. No Hotel Employee shall be obligated to accept Purchaser's or Purchaser's agent's offer for employment. In the event that, following the Effective Time, Purchaser terminates any Transferred Employees in such a manner, or takes any other action, so as to cause the application of the WARN Act to the transactions described in this Agreement, then Purchaser shall be solely responsible for any WARN Act liability so incurred; provided that any WARN Act liability with respect to any employees whose employment was terminated or subject to any furloughs or other temporary cessation of employment prior to the Closing Date shall be the sole responsibility of the Company Seller. This Section 5.05(g) shall survive Closing indefinitely.

(h)     The parties hereto acknowledge and agree that all provisions contained in this Section 5.05 are included for the sole benefit of the parties hereto, and that nothing in this Agreement, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including any employee or former employee of the Company Seller (including the Transferred Employees), any participant in any employee benefit plan maintained by Purchaser or any of its Affiliates, or any dependent or beneficiary thereof, or (ii) to continued employment with Purchaser or any of its Affiliates.

2758048 v03

38

5.06    Satisfaction of Closing Conditions.

Upon the terms and subject to the conditions of this Agreement, Sellers will use good faith commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent that are set forth in Article IX and Article X, to the extent within Sellers' control, on or before the Termination Date. Subject to the terms and conditions of this Agreement, Sellers will use good faith commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated and, without limiting the generality of the foregoing, except as set forth on Schedule 5.06, to obtain all Necessary Consents and required authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on their part in order to effect the transactions contemplated hereby. Nothing in this Section 5.06 shall in any way modify or amend any conflicting terms and conditions set forth in Article IX and Article X.

5.07    Access to Information.

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI subject to the terms and conditions hereof relating to the confidentiality and use of confidential and proprietary information, and subject to compliance with applicable Legal Requirements, Sellers will provide Purchaser and its representatives and agents (collectively, "**Purchaser Representatives**"), upon reasonable prior notice, with reasonable access, during regular business hours, to the Hotel and other Real Property, files, books, records and offices of the Sellers, including any and all Requested Information and other information relating to Taxes, commitments, Seller's Contracts, licenses, real, personal and intangible property (including any Intellectual Property Rights, but excluding any Confidential Materials), and financial condition (collectively, "**Inspection Activities**"), subject to the following conditions:

(a)    All Inspection Activities shall be at the sole cost and expense of Purchaser and at Purchaser's sole risk;

(b)    In undertaking the Inspection Activities, Purchaser shall (and shall cause Purchaser Representatives to) comply with all applicable Legal Requirements;

(c)    At the Company's option, Purchaser Representatives shall be accompanied by a representative of the Company during any such entry upon the Hotel or any other Real Property;

(d)    Purchaser agrees that all Inspection Activities shall be subject to the rights of tenants of the Hotel, and shall be conducted in a manner not unreasonably disruptive to tenants, guests, or invitees at the Hotel or otherwise to the operation of the Hotel or any other Real Property;

(e)    Purchaser Representatives shall not make any contact or communication with any tenant or employees at the Hotel without reasonable prior notice to the Company and without the prior consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), and shall not make any contact or communications with Hotel guests;

(f)    Purchaser shall not make any contact or communication with any Governmental Authority regarding the Hotel or any other Real Property without reasonable prior written notice to the Company;

(g)    Purchaser shall indemnify, defend, and hold Sellers harmless from and against any and all Losses arising from any Inspection Activities undertaken by Purchaser, any Purchaser Representative or any other party acting at the direction of or with the authorization of Purchaser;

2758048 v03

39

(h)     Prior to entry upon any Real Property, Purchaser shall provide the Company with copies of certificates of insurance evidencing comprehensive general liability insurance policies (naming the Company as an additional insured) which shall be maintained by Purchaser in connection with its Inspection Activities, with limits, coverage and insurers under such policies as are reasonably satisfactory to the Company;

(i)     In no event shall Purchaser make any intrusive physical testing (environmental, structural or otherwise) at the Real Property (such as soil borings, water samplings or the like) without the prior consent of the Company, which consent shall not be unreasonably withheld, conditioned or delayed (and Purchaser shall in all events promptly return the Real Property to its prior condition and repair thereafter) and which may be further conditioned upon, among other things, the approval by the Company of the following: (i) the insurance coverage of the contractor who will be conducting such testing; (ii) the scope and nature of such testing to be performed by such contractor; and (iii) a written confidentiality agreement by such contractor in form reasonably satisfactory to the Company. In addition, Purchaser shall be responsible for and pay any and all liens by contractors, subcontractors, materialmen, or laborers performing the inspections or any other work for Purchaser Representatives on or related to the Hotel or any other Real Property;

(j)     Before the Closing, Purchaser shall keep all information or data received or discovered in connection with any of the Inspection Activities strictly confidential, except for disclosures to representatives, investors, lenders, counsel and agents, provided such disclosures are on an as needed basis for Purchaser's acquisition of the Purchased Assets, and such persons are instructed to keep the information strictly confidential, except for such disclosures that are necessary to comply with applicable Legal Requirements or to enforce this Agreement. The provisions of this Section 5.07 shall survive any termination of this Agreement indefinitely.

5.08   Casualty.

(a)     If prior to Closing, (i) condemnation proceedings are commenced against all or any portion of the Hotel, and such proceedings do not materially adversely affect the continued operation of the Business in substantially the same manner as the Business has been historically operated, or (ii) the Hotel is damaged by fire or other casualty to the extent that the cost of repairing such damage is reasonably estimated by the Company and Purchaser, each acting reasonably and in good faith, to be One Million Dollars ($1,000,000) or less, then this Agreement shall continue in full force and effect and the Purchase Price shall not be reduced except as hereinafter set forth, but Purchaser shall be entitled to an assignment of all of the proceeds payable to Sellers of fire or other casualty insurance (other than those proceeds expended by or on behalf of Sellers prior to Closing to restore the Hotel, as applicable), all business interruption insurance proceeds (if any) payable with respect to the period from and after Closing, and all condemnation awards payable to Sellers (other than any portion of the award in respect of income lost prior to Closing or expended by or on behalf of Sellers prior to Closing to restore the Hotel, as applicable, or in connection with the collection of the award), as the case may be, and none of Sellers shall have any obligation to repair or restore the Hotel, as applicable; provided, however, that in the case of any insured casualty to the Hotel, the Purchase Price shall be reduced by the deductible applied by the applicable Seller's insurer with respect to such fire or casualty and not paid by such Seller prior to Closing;.

(b)     If prior to Closing, (i) condemnation proceedings are commenced against all or any material portion of the Hotel or the Resort Operations and such proceedings are not covered by Section 5.08(a) or (ii) the Hotel is damaged by fire or other casualty and such damage is not covered by Section 5.08(a), Purchaser shall have the right, upon notice in writing to the Company delivered within twenty (20) days after the Company gives Purchaser notice of such matter as described in this Section

2758048 v03

5.08(a), to terminate this Agreement, whereupon this Agreement shall terminate, Escrow Agent shall return the Deposit to Purchaser and neither party to this Agreement shall thereafter have any further rights or liabilities under this Agreement other than those that expressly survive termination of this Agreement. If Purchaser does not timely elect, or is not entitled, to terminate this Agreement as set forth above, the Purchase Price shall not be reduced except as hereinafter set forth, but Purchaser shall be entitled to an assignment of all of the proceeds payable to Sellers of fire or other casualty insurance (other than those proceeds expended by or on behalf of Sellers prior to Closing to restore the Hotel, as applicable), all business interruption insurance proceeds (if any) payable with respect to the period from and after Closing, and all condemnation awards payable to Sellers (other than any portion of the award in respect of income lost prior to Closing or expended by or on behalf of Sellers prior to Closing to restore the Hotel, as applicable, or in connection with the collection of the award), as the case may be, and none of Sellers shall have any obligation to repair or restore the Hotel, as applicable; provided, however, that in the case of any uninsured casualty to the Hotel, the Purchase Price shall be reduced by cost and expense necessary to restore the Hotel and repair the damage; and provided further, that in the case of any insured casualty to the Hotel, the Purchase Price shall be reduced by the "deductible" applied by the Seller's insurer with respect to such fire or casualty and not paid by such Seller prior to Closing.

(c)     If necessary to allow Purchaser the full twenty (20) day period described in Section 5.08(a), the Closing Date shall be automatically extended until three (3) Business Days after Purchaser has made, or has or is deemed to have waived, its election pursuant to Section 5.08(a).

5.09    Corporate Name Changes.

Promptly following the Closing Date, each Seller other than Realty that has the words "Amelia Island" in its corporate name shall change its corporate name to delete the words "Amelia Island," or any word confusingly similar thereto, from such corporate name, and shall promptly request the Bankruptcy Court to cause its new name to be used in all filings and for all other purposes relating to the Chapter 11 Case. This provision shall survive Closing.

## ARTICLE VI

## COVENANTS OF PURCHASER

6.01    Advice of Changes.

During the period from the date of this Agreement until the earlier to occur of (a) the Effective Time and (b) the termination of this Agreement in accordance with the provisions of Article XI Purchaser will promptly advise the Company in writing of: (i) the discovery by Purchaser of any event, condition, fact or circumstance occurring on or prior to the date of this Agreement that, to Purchaser's Knowledge, would render any representation or warranty by Purchaser contained in this Agreement untrue or inaccurate in any material respect; (ii) any event, condition, fact or circumstance occurring subsequent to the date of this Agreement that, to Purchaser's Knowledge, would render any representation or warranty by Purchaser contained in this Agreement, if made on or as of the date of such event or the Closing Date (provided that the representations and warranties that are confined to a specific date shall speak only as of such date), untrue or inaccurate in any material respect; (iii) any Breach, within Purchaser's Knowledge, of any covenant or obligation of the Purchaser pursuant to this Agreement or any Purchaser Ancillary Agreement; (iv) any event, condition, fact or circumstance that, in Purchaser's Knowledge, will make the timely satisfaction of any of the conditions set forth in Article IX or Article X impossible or unlikely; and (v) any material adverse effect, within Purchaser's Knowledge, on Purchaser's ability to consummate the transactions contemplated hereunder.

2758048 v03

6.02    <u>Litigation.</u>

Purchaser will notify the Company in writing promptly after learning, to Purchaser's Knowledge, of any Proceeding threatened or pending for the purpose or with the probable effect of enjoining or preventing the consummation of any of the transactions contemplated by this Agreement, or that would be reasonably expected to have a material adverse effect on Purchaser's ability to consummate the transactions contemplated hereunder.

6.03    <u>Surveying and Creation of Legal Description of the Office Complex Building 1 Parcel.</u>

Prior to the Effective Time, Purchaser, at Purchaser's sole cost and expense, shall survey that portion of the Ancillary Properties depicted on <u>Schedule 2.01(a)</u> as the Office Complex Building 1 Parcel and prepare a new legal description of the Office Complex Building 1 Parcel (the "**Office Complex Building 1 Parcel Legal**"). Upon preparation of the Office Complex Building 1 Parcel Legal, and subject to compliance with applicable subdivision, platting and zoning Legal Requirements, the legal description currently set forth for the Office Complex Building 1 Parcel on <u>Schedule 2.01(a)</u> shall be replaced by the Office Complex Building Parcel 1 Legal. Realty will reasonably cooperate with Purchaser in establishing and preparing the Office Complex Building 1 Parcel Legal, and in executing and filing any subdivision plats therefor required by Legal Requirements.

6.04    <u>Satisfaction of Conditions Precedent.</u>

Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to satisfy or cause to be satisfied all of the conditions precedent that are set forth in Article IX and Article X, to the extent within Purchaser's control, on or before the Termination Date. Upon the terms and subject to the conditions of this Agreement, Purchaser will use commercially reasonable efforts to cause the transactions contemplated by this Agreement to be consummated, and, without limiting the generality of the foregoing, to obtain all consents and authorizations of Third Parties and to make all filings with, and give all notices to, Third Parties that may be necessary or reasonably required on its part in order to effect the transactions provided for herein. Nothing in this Section 6.04 shall in any way modify or amend any conflicting terms and conditions set forth in Article IX and Article X.

6.05    <u>Employee Matters.</u>

Purchaser shall perform its obligations stated in Section 5.05(g).

**ARTICLE VII**

**ADDITIONAL COVENANTS**

7.01    <u>Further Assurances.</u>

Sellers agree that if, at any time before or after the Effective Time, Purchaser considers or is advised that any further deeds, assignments, assurances or other actions are reasonably necessary to vest, perfect or confirm Purchaser's acquisition and assumption of the Purchased Assets and Assumed Liabilities, Sellers shall, at Purchaser's request and expense, execute and deliver all such proper deeds, assignments and assurances and do all other things reasonably necessary to vest, perfect or confirm title to such property or rights in Purchaser and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement. In addition, from and after the Closing Date, Sellers agree that they will (i) remit to Purchaser all checks or payments received by them to which Purchaser is entitled in

2758048 v03

connection with Purchaser's purchase of the Purchased Assets or assumption of the Assumed Liabilities and (ii) collect any and all insurance proceeds arising from or relating to the Purchased Assets or the Assumed Liabilities prior to the Effective Time and remit such sums directly to Purchaser, subject to the Company's use of any such proceeds in accordance with the provisions of Section 5.08 hereof. Purchaser agrees that if, at any time before or after the Effective Time, Sellers consider or are advised that any further instruments of assumption or assurances are reasonably necessary or desirable to confirm Purchaser's assumption of the Assumed Liabilities, Purchaser shall, at the Sellers' request and expense, execute and deliver all such proper instruments and assurances and do all other things reasonably necessary to confirm Purchaser's assumption of the Assumed Liabilities, and take all such other lawful and reasonably necessary action to carry out the purposes of this Agreement. In addition, from and after the Closing Date, Purchaser agrees that it will remit to Sellers all checks or payments received by it to which Sellers are entitled in connection with the Purchased Assets or the Business with respect to periods on or prior to the Closing Date.

7.02    Confidentiality.

The Confidentiality Agreement dated March 4, 2010, between Purchaser and Company (the **"Confidentiality Agreement"**) shall be deemed incorporated herein as if set forth in full and all documents, materials and other information that Purchaser shall have obtained regarding the Business and Sellers during the course of the negotiations leading to the consummation of the transactions contemplated hereby (whether obtained before or after the date of this Agreement), the investigation provided for herein and the preparation of this Agreement and other related documents shall be deemed to be provided pursuant to such Confidentiality Agreement and shall be deemed Confidential Information (as such term is defined in the Confidentiality Agreement). After the Closing, Purchaser may use or disclose any Confidential Information included in the Purchased Assets or otherwise reasonably related to the Purchased Assets or the business conducted therewith.

7.03    Liquor License.

(a)    On or before ten (10) days prior to the effective date of the Company's Plan, Purchaser, at its sole cost and expense, shall make all necessary applications for, and shall thereafter diligently pursue, issuance of all licenses and approvals required under any Legal Requirements for the continued sale of alcoholic beverages at the Hotel from and after the Closing Date (including temporary permits, to the extent available) consistent with the practices and procedures in effect as of the date hereof (collectively, **"Liquor Licenses"**). Purchaser shall keep the Company informed of the status of such applications, and shall promptly respond to the Company's inquiries regarding the status of the same.

(b)    If the Liquor Licenses have not been issued as of the date that Closing is otherwise required to occur under this Agreement, then at Closing the Company shall enter into an interim liquor agreement (**"Interim Liquor Agreement"**) that will permit Purchaser to continue the sale of alcoholic beverages at the Hotel from and after the Closing Date consistent with the practices and procedures in effect as of the date hereof, provided that the Interim Liquor Agreement is, in the judgment of the Company and Purchaser, each acting reasonably and in good faith, permitted by applicable Legal Requirements and local custom or practice. The Interim Liquor Agreement shall (i) be in form and substance reasonably satisfactory to the Company and Purchaser, (ii) provide for the indemnification by Purchaser of the Sellers and their Affiliates and their respective directors, officers and employees with respect to all liabilities related to the sale or consumption of alcoholic beverages at the Hotel from and after the Closing Date, and (iii) expire on the earlier to occur of issuance of the Liquor Licenses or the date that is one hundred eighty (180) days after the Closing Date as reasonably extended by the mutual agreement of the parties.

2758048 v03

43

### 7.04  Checked Baggage.

On the Closing Date, representatives of the Company and Purchaser shall make a written inventory of all baggage and similar items left in the care of the Hotel (collectively, "**Inventoried Baggage**"). Purchaser shall be responsible for, and shall indemnify the Sellers and their Affiliates and their respective directors, officers and employees, against, any Losses incurred by any of them with respect to any theft, loss or damage to any Inventoried Baggage from and after the time of such inventory, and any other baggage or similar items left in the care of the Hotel on or after the Effective Time which was not inventoried. The Company shall be responsible for, and shall indemnify the Purchaser against, any Losses incurred by Purchaser with respect to any theft, loss or damage to any Inventoried Baggage prior to the time of such inventory, and any other baggage or similar items left in the care of the Hotel prior to the Closing Date which was not inventoried.

### 7.05  Safe Deposit Boxes.

On or before the Closing Date, the Company shall notify all guests who are then using a safe deposit box at the Hotel advising them of the pending change in the management of the Hotel and requesting them to conduct an inventory and verify the contents of such safe deposit box on the Closing Date. All inventories by such guests shall be conducted under, to the extent practicable, the joint supervision of representatives of the Company and Purchaser. At Closing, all safe deposit boxes which are then in use but not yet inventoried by the depositor shall be opened in the presence of representatives of the Company and Purchaser, and the contents thereof shall be inventoried. Following the inventory of each safe deposit box, the Company shall deliver to Purchaser all keys, receipts and agreements for such box. Purchaser shall be responsible for, and shall indemnify the Sellers and their Affiliates and their respective directors, officers and employees, against, any Losses incurred by any of them with respect to any theft, loss or damage to the contents of any safe deposit box from and after the time such safe deposit box is inventoried. The Company shall be responsible for, and shall indemnify Purchaser against, any Losses incurred by Purchaser with respect to any theft, loss or damage to the contents of any safe deposit box prior to the time such safe deposit box is inventoried. The Purchaser shall be responsible for, and shall indemnify the Company and Sellers against, any Losses incurred by the Company and Sellers with respect to any theft, loss or damage to the contents of any safe deposit box after the time such safe deposit box is inventoried.

### 7.06  Consulting/Employment Arrangements.

At Closing, Purchaser shall enter into the Consulting Services Agreement ("**CSA**") with Jack B. Healan, Jr. upon the essential terms, and employment arrangements with certain other Key Personnel of the Company, as described on Schedule 7.06. Purchaser and the Jack B. Healan, Jr. shall use a good faith commercially reasonable efforts to agree to the form of a CSA on or before the termination of the Due Diligence Period and the failure to agree to the form during the Due Diligence Period and enter into the same at Closing shall constitute the failure of a condition precedent for Purchaser and Company Seller (however, the failure of a party to sign the agreed upon form at Closing creates a condition precedent for the other party only), in which case either Purchaser or Company Seller may terminate this Agreement and the Deposit shall be returned to Purchaser.

2758048 v03

# ARTICLE VIII

## BANKRUPTCY PROCEDURES, ETC.

8.01    Filing of Sale Procedures Motion.

Promptly following, but no later than five (5) Business Days after the date of this Agreement, Company shall file the Sale Procedures Motion, a Disclosure Statement with the Company's Plan attached thereto as an exhibit ("**Disclosure Statement**"), and prior to the hearing on the Disclosure Statement, a motion requesting an order approving the Disclosure Statement and the form and manner of soliciting votes on the Company's Plan, and such other motions as may be necessary from time to time to implement the transactions contemplated by this Agreement.

8.02    Other Filings.

Based upon the current facts known to each party, other than those documents and filings specifically listed herein, no Other Filings (as hereinafter defined) are required by such party in order for such party to consummate the transactions contemplated by this Agreement. Notwithstanding the foregoing, in the event that Other Filings are required, as promptly as practicable after the date of this Agreement, each of Sellers and Purchaser will prepare and file any other filings required to be filed by such party under any Legal Requirements applicable to such party and relating to the transactions contemplated by this Agreement (the "**Other Filings**"). Sellers and Purchaser each shall promptly supply the other with any information that may be required in order to effectuate any filings pursuant to this Section 8.02.

8.03    Assumed Contracts and Leases; Rejected Contracts and Leases.

(a)    Assumed Contracts and Leases.  Except as set forth in Section 8.03(b), and subject to the approval of the Bankruptcy Court and pursuant to the Executory Contract and Unexpired Lease Assumption and Assignment Order and Confirmation Order, the Assumed Contracts and Leases will be assumed by Company and assigned to Purchaser on the Closing Date in accordance with Section 365 of the Bankruptcy Code. In the appropriate motion, Company will seek authority to assume and assign the Assumed Contracts and Leases to Purchaser in accordance with Sections 365 and 1123 of the Bankruptcy Code. All Assumed Contracts and Leases as set forth on Schedule 2.02(e), as amended as of the Closing Date, shall be assigned to and assumed by Purchaser at the Closing. The final determination of which Company's Contracts and Leases shall be Assumed Contracts and Leases shall be within the sole discretion of Purchaser. At the Closing, the Cure Amounts shall be paid in accordance with the provisions of Section 2.05(d).

(b)    Rejected Contracts and Leases.  Schedule 8.03(b) will be delivered by Sellers on or prior to the Schedule Delivery Date and will contain an initial, non-exclusive schedule of Seller's Contracts and Leases that Sellers propose not be assigned to Purchaser ("**Rejected Contracts and Leases**"). On or prior to the day that is three (3) Business Days prior to the Closing Date, Purchaser may, by written notice to Sellers, (i) designate additional Seller's Contracts and Leases from Schedule 2.02(e) that will not be assigned to Purchaser and added to the Rejected Contracts and Leases, and (ii) designate Seller's Contracts and Leases on Schedule 8.03(b) as Assumed Contracts and Leases.  Upon any such designation, Schedule 8.03(b) and Schedule 2.02(e) shall be amended accordingly.  Only Seller's Contracts listed on Schedule 2.02(e) as amended, as of three (3) Business Days prior to the Closing Date, shall be assumed and assigned to Purchaser. After the Effective Time, Sellers shall have the right in their discretion to reject any Seller's Contract other than any Assumed Contract.

2758048 v03

8.04    Bankruptcy Court Approval.

(a)    Company shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Sale Procedures Order approving the Break-Up Fee and Expense Reimbursement, Sale Order and the Confirmation Order which, among other things, will contain findings of fact and conclusions of law (i) finding that this Agreement was proposed by the parties in good faith and represents the highest and/or best offer for the Purchased Assets; (ii) finding that Purchaser is a good faith purchaser under Section 363(m) of the Bankruptcy Code; (iii) authorizing and directing Company to consummate the transactions contemplated by this Agreement and sell only the Purchased Assets to Purchaser pursuant to this Agreement and Sections 363, 365 and 1123 of the Bankruptcy Code, free and clear of all claims, liens and interests within the meaning of Sections 363(f) and 1123(a)(5)(D) of the Bankruptcy Code; (iv) approving the assignment and assumption of the Assumed Contracts and Leases; and (v) authorizing and directing Company to execute, deliver, perform under, consummate and implement, this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing.

(b)    Sellers shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Executory Contract and Unexpired Lease Assumption and Assignment Order.

(c)    Sellers shall promptly make any filings, take all actions, and use their commercially reasonable efforts to obtain approval of the Confirmation Order and any and all other approvals and Orders necessary or appropriate, or as otherwise reasonably requested by Purchaser, for consummation of the transactions contemplated by this Agreement, subject to their obligations to comply with any Order of the Bankruptcy Court and the Bankruptcy Code.

(d)    In the event an appeal is taken, or a stay pending appeal is requested, from the Sale Order, the Executory Contract and Unexpired Lease Assumption and Assignment Order, or the Confirmation Order, Company shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser within one (1) Business Day a copy of the related notice of appeal or order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from any of such Orders.

(e)    Purchaser shall cooperate in providing such information and evidence as is reasonably necessary to obtain the Orders described in this Section 8.04.

8.05    Certain Tax Matters.

(a)    Cooperation. Purchaser and Sellers shall, and shall cause their respective Affiliates, officers, employees, agents, auditors and representatives reasonably to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the conduct of any audit by any taxing authority, and the prosecution of any defense or claim, suit or proceeding relating to any Tax. Purchaser and Sellers shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

(b)    Transfer Taxes. It is anticipated that the Bankruptcy Code exempts this transaction from Florida Documentary Stamps on the deed conveying the Real Property to Purchaser. However, if such Florida Documentary Stamp taxes on such deed are due, Sellers shall pay them, and shall pay all Florida Documentary Stamp taxes on the deeds conveying the Ancillary Properties to the Company. Notwithstanding Section 8.05(c), except as hereinafter provided, any sales, use, purchase,

2758048 v03

46

transfer, franchise, deed, fixed asset, stamp, documentary stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges that are not exempted by the Bankruptcy Code (including any penalties and interest) (collectively, "**Transfer Taxes**") which may be payable, if any, by reason of the transfer of the Purchased Assets shall be timely paid by Sellers when due, and Sellers shall file all necessary Tax Returns and other documentation with respect to all such Transfer Taxes, and, if required by applicable Legal Requirements, Purchaser shall join in the execution of any such Tax Returns and other documentation. Sellers shall prepare and file in a timely manner, all applicable forms and returns necessary to allow the transfer of the Purchased Assets to Purchaser on the Closing Date to be exempt, to the extent possible under applicable Legal Requirements, from the payment of Transfer Taxes.

 (c) <u>Apportionment of Taxes</u>. Except as provided in Section 8.05(b):

  (i) Sales and use Taxes with respect to the Purchased Assets relating to a Straddle Period shall be apportioned in the following manner: the amount of sales and use Taxes allocated to the Pre-Closing Tax Period or Post-Closing Tax Period included in the Straddle Period shall be determined by closing the books of the Sellers as of the close of business on the Closing Date and by treating each of such Pre-Closing Tax Period and Post-Closing Tax Period as a separate taxable period.

  (ii) Property Taxes relating to a Straddle Period shall be apportioned in the following manner: the amount of Property Taxes allocated to the Pre-Closing Tax Period included in a Straddle Period shall be equal to the total amount of such Property Taxes for the Straddle Period multiplied by a fraction, the numerator of which is the number of days in the Pre-Closing Tax Period included in the Straddle Period and the denominator of which is the total number of days in the Straddle Period. The amount of Property Taxes attributable to the Post-Closing Tax Period included in a Straddle Period shall be equal to the total amount of Property Taxes for the Straddle Period less the amount of Property Taxes attributable to the Pre-Closing Tax Period included in the Straddle Period. If the bills for the Property Taxes for the Straddle Period have not been issued prior to the Effective Time, such Property Taxes shall be prorated based upon the bills for Property Taxes issued for the previous year, with known changes, if any; provided, however, that Sellers and Purchaser shall reprorate the Property Taxes based upon the maximum available discount amount when the actual amount becomes known and each party shall promptly reimburse the other according to the reproration. Property Taxes for 2009 and any and all interest, penalties or other late charges related thereto shall be paid by the Company or Compass and PRIAC at or prior to Closing.

  (iii) Sellers shall be liable for (and shall promptly reimburse Purchaser to the extent Purchaser shall have paid) that portion of sales, use and Property Taxes relating to, or arising in respect of, Pre-Closing Tax Periods.

8.06 <u>Break-Up Fee and Expense Reimbursement; Deposit.</u>

 (a) Notwithstanding any other provision, in this Agreement, no Break-Up Fee, as defined below, or Expense Reimbursement, as defined below, is due to Purchaser, until both (i) the expiration of the Due Diligence Period and Purchaser's Deposit (Initial Deposit and Additional Deposit) becoming nonrefundable and (ii) the Bankruptcy Court's issuance of the Sale Procedures Order.

 (b) The Company agrees that, if (A) (i) the Sellers shall terminate this Agreement because of a "Successful Bid" received from another purchaser is accepted at the Bankruptcy Court Auction pursuant to the Sale Order, (ii) the Bankruptcy Court fails to approve the sale to Purchaser

2758048 v03

pursuant to this Agreement because a "Superior Bid" is received by the Bankruptcy Court, (iii) the Purchaser terminates this Agreement as a result of Sellers' Breach of this Agreement pursuant to Section 11.01(a)(ii), or (iv) the Purchaser terminates this Agreement pursuant to Section 11.01(a)(iv), and (B) within eight months following such termination of the Agreement or failure to obtain Bankruptcy Court approval, the Sellers consummate a Sale Transaction with a third party at a price greater than the Purchase Price under this Agreement (a "**Topping Transaction**"), then the Company will pay Purchaser, in cash, an amount equal to one percent (1%) of the Purchase Price (the "**Break-Up Fee**") from the cash proceeds of such transaction.

In the event Purchaser becomes entitled to the Break-Up Fee under this Section 8.06, then upon presentation of a statement setting forth with specificity the nature and amount thereof, the Company shall reimburse Purchaser for reasonable out-of-pocket expenses actually incurred by Purchaser in connection with this Agreement and the transactions contemplated herein, including without limitation legal fees and third party consulting fees related to Purchaser's due diligence examination, in cash in an aggregate amount not to exceed Five Hundred Thousand Dollars ($500,000) (the "**Expense Reimbursement**"). Additionally, in the event Purchaser terminates this Agreement pursuant to Section 11.01(a)(ii) and there is no Topping Transaction, Section 11.01(a)(iii), or Section 11.01(a)(iv) and there is no Topping Transaction, the Company shall pay Purchaser the Expense Reimbursement (but not the Break-Up Fee) within ten (10) days following termination. (Under no circumstance shall Purchaser receive more than one Expense Reimbursement.)  In the event of a termination of this Agreement by Sellers pursuant to Section 11.01(a)(ii) as a result of a Breach by Purchaser, the Company shall be entitled to retain the Deposit as liquidated damages, with such retention serving as the sole and exclusive remedy of Sellers for any termination thereof.

(c)     Survival.  The provisions of this Section 8.06 survive the Closing or the earlier termination of this Agreement.

## ARTICLE IX

## CONDITIONS TO OBLIGATIONS OF SELLERS

Sellers' obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (anyone or more of which may be waived by Sellers, but only in writing signed on behalf of Sellers):

9.01    Accuracy of Representations and Warranties; Performance of Covenants.

Each of the representations and warranties of Purchaser set forth in Article IV of this Agreement shall be true and correct at and as of the Closing Date, with the same force and effect as if made as of the Closing Date (other than such representations and warranties as are made as of another date, which shall be true and correct as of such date), except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to materiality or material adverse effect set forth therein) would not have a material adverse effect on Purchaser's ability to perform its obligations under this Agreement. Purchaser shall have performed and complied in all material respects with all of its covenants, agreements and conditions required to be performed, satisfied or complied with by it hereunder on or prior to the Closing.

9.02    Compliance with Law.

There shall be no Order by any Governmental Authority that would prohibit or render illegal the transactions contemplated by this Agreement.

2758048 v03

48

9.03    Government Consents.

There shall have been obtained at or prior to the Closing Date such Governmental Authorizations from, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by, any Governmental Authority having jurisdiction over the parties hereto and the actions herein proposed to be taken.

9.04    Bankruptcy Orders.

The Bankruptcy Court shall have entered the Sale Procedures Order, the Order approving the Disclosure Statement and form and manner of soliciting votes on the Company's Plan, the Sale Order, the Executory Contract and Unexpired Lease Assumption and Assignment Order, and the Confirmation Order, and such orders shall not have been appealed, rescinded, reversed, modified or stayed and the time period allowing for such action have expired.

9.05    Other Deliveries.

Purchaser shall have delivered or caused to be delivered the following to the Company, Cooper Sellers and Jack B. Healan, Jr., as applicable:

(a)    the Assumed Cure Amounts and the Deposit;

(b)    an assumption agreement, duly executed by Purchaser, in form and substance reasonably acceptable to Purchaser and Sellers, pursuant to which Purchaser shall assume the payment and performance of the Assumed Liabilities;

(c)    an assignment and assumption agreement, duly executed by Purchaser, in form and substance reasonably acceptable to Purchaser and Sellers, pursuant to which Sellers shall assign and convey and Purchaser shall accept and assume the Assumed Contracts and Leases (the "**Assumed Contracts and Leases Assignment**");

(d)    any Interim Liquor Agreement to the extent required pursuant to Section 7.03(b), duly executed by Purchaser;

(e)    copies of resolutions duly adopted by the board of directors or members and manager of Purchaser authorizing and approving Purchaser's execution and delivery of this Agreement and consummation of the transactions contemplated by this Agreement, certified as true and in full force and effect as of the Closing Date by an appropriate officer of Purchaser;

(f)    certificates of the duly authorized President or a Vice President of Purchaser certifying the fulfillment of the conditions set forth in Section 9.01;

(g)    certificates of incumbency for the officer(s) of Purchaser executing this Agreement and other Closing documents, dated as of the Closing Date;

(h)    a final list of Hotel Employees who will become Transferred Employees as of the Closing Date;

(i)    a settlement statement prepared by Escrow Agent reflecting the payment of the Deposit and Purchase Price and all adjustments and prorations and the payment of the Cooper Cash Consideration pursuant to this Agreement;

2758048 v03

(j)     such other documents and instruments as are customary and as may be reasonably requested by Escrow Agent to effectuate the transactions contemplated by this Agreement;

(k)     certification that Purchaser is not a foreign Person, dated as of the Closing Date and in the form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code so that Sellers are exempt from withholding any portion of the Purchase Price thereunder;

(l)     the agreement for the Cooper Participation;

(m)     the CSA with Jack B. Healan, Jr. and an assignment to Jack B. Healan, Jr. of one (1) lifetime membership in the new Equity Club described in Section 10.08(a), or another equivalent membership (free and clear of any obligation to pay initiation fees, assessments or dues but subject to payment of normal fees paid by other members such as cart fees (but not green fees) and food and beverage charges) in the Club that may be designated for use by same; and

(n)     an assignment to S. Norman Bray of one (1) lifetime membership in the new Equity Club described in Section 10.08(a), or another equivalent membership (free and clear of any obligation to pay initiation fees, assessments or dues but subject to payment of normal fees paid by other members such as cart fees (but not green fees) and food and beverage charges) in the Club that may be designated for use by same.

9.06     Club Transaction.

The Club Transactions in Section 10.08 being successfully completed by the Club and the Bankruptcy Court pursuant Section 10.08.

9.07     Compass/PRIAC Releases and Other Lender Releases.

Cooper Sellers, Company Seller and Escrow Agent shall have received prior to Closing Conditional Release Letters from PRIAC Realty Investments, LLC ("**PRIAC**") and Compass Bank ("**Compass**") for the release of mortgages and guaranties related to the Ancillary Assets and the assets of AIM. Cooper Sellers and Company Seller shall have received the Compass/PRIAC Releases and Other Lender Releases at Closing.

9.08     Office Complex Building 1.

The Office Complex Building 1 Parcel shall have been legally subdivided to create the new Office Complex Building 1 Parcel Legal pursuant to Section 6.03, and the new Office Complex Building 1 Parcel and the improvements thereon shall be in compliance with the zoning Legal Requirements applicable thereto.

## ARTICLE X

## CONDITIONS TO OBLIGATIONS OF PURCHASER

Purchaser's obligations hereunder are subject to the fulfillment or satisfaction, on and as of the Closing, of each of the following conditions (anyone or more of which may be waived by Purchaser, but only in a writing signed on behalf of Purchaser):

2758048 v03

10.01    Accuracy of Representations and Warranties; Performance of Covenants.

Each of the representations and warranties of the Sellers set forth in Article III shall be true and correct at and as of the Closing Date, with the same force and effect as if made as of the Closing Date, except where the failure of such representations and warranties to be so true and correct (without giving effect to any limitation as to materiality or Material Adverse Effect set forth therein) either individually or in the aggregate would not have a Material Adverse Effect. Sellers shall have performed and complied in all material respects with all of their covenants, agreements and conditions required to be performed, satisfied or complied with by them hereunder on or prior to the Closing.

10.02    Compliance with Law.

There shall be no Order by any Governmental Authority that would prohibit or render illegal the transactions contemplated by this Agreement.

10.03    Government Consents; No Injunction.

There shall have been obtained at or prior to the Closing Date such Governmental Authorizations from, and there shall have been taken such other actions, as may be required to consummate the sale of Purchased Assets by, any Governmental Authority having jurisdiction over the parties and the actions herein proposed to be taken.

10.04    Third-Party Consents; Assignments; Other Documents.

If the assignment of any of the Purchased Assets requires the consent of any Third Parties pursuant to Section 365 of the Bankruptcy Code or otherwise, then Sellers shall have obtained, and Purchaser shall have received from Sellers, duly executed copies of all Necessary Consents.

10.05    Bankruptcy Orders.

(a)    By no later than forty (40) days after the date of this Agreement, the Company shall use its best efforts to cause the Bankruptcy Court to issue the Sale Procedures Order and such Order shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action has expired.

(b)    By no later than one hundred twenty (120) days after the date of this Agreement, the Company shall have caused the entry of the Executory Contract and Unexpired Lease Assumption and Assignment Order and the Confirmation Order and such Orders shall not have been rescinded, reversed, modified or stayed and the time period allowing for such action has expired.

10.06    Title Insurance and Survey.

(a)    Purchaser has received the existing surveys ("**Existing Surveys**") on the Owned Real Property and Leased Real Property shown on Schedule 10.06(a). If Purchaser elects, at Purchaser's sole cost and expense, to obtain new or updated surveys (collectively, the "**Survey**") of the Owned Real Property or Leased Real Property, such Survey shall not reveal any matters or deficiencies, not already shown in the Existing Surveys or the Commitment, as defined below, that individually or in the aggregate reasonably would be expected to result in a Material Adverse Effect.  The Escrow Agent, acting as title insurance company issuing the Commitment, will not remove the survey exception without a new survey.

2758048 v03

51

(b)     Purchaser has received the commitment for an owner's title insurance policy issued by the Escrow Agent with respect to the Owned Real Property and Leased Real Property attached as Schedule 10.06(b) ("**Commitment**"), pursuant to which the Escrow Agent has agreed to issue such policy insuring Purchaser. All requirements in Schedule B-Section 1 of the Commitment shall be removed on the Closing Date except for the survey exception and the Commitment shall be dated as of the Closing Date and modified as of the Closing Date to show fee simple title to the Owned Real Property and leasehold title to the Leased Real Property to be vested in Purchaser without any changes to the Commitment that individually or in the aggregate reasonably would reasonably be expected to result in a Material Adverse Effect (the Commitment as modified on the Closing Date as required herein shall be referred to as the "**Marked Commitment**"). Purchaser shall pay for the search fee for the Commitment and for the premium for the owner's title insurance policy to be issued pursuant to the Marked Commitment. Purchaser is aware that Commitment is only insuring a transaction complying with Section 10.08(a). The title company acting as the Escrow Agent and issuing the Commitment is not obligated to insure a transaction complying with Section 10.08(b) but may do so, at its sole election, at a later time, provided the title company's refusal to insure a transaction complying with Section 10.08(b) shall constitute the failure of a condition precedent for Purchaser, in which case Purchaser may terminate this Agreement and the Deposit shall be returned to Purchaser.

10.07    Other Deliveries.

Sellers and Jack B. Healan Jr., as applicable, shall have delivered or caused to be delivered to Purchaser the following:

(a)     deeds containing special warranties of title and, where applicable, assignments of lease, in form and substance reasonably acceptable to Purchaser, duly executed by the Sellers in recordable form, conveying to Purchaser good and marketable fee title to the Owned Real Property, in each case free and clear of all Encumbrances other than Permitted Encumbrances;

(b)     assignments, in form and substance reasonably acceptable to Purchaser and duly executed by the Sellers, conveying valid leasehold title to the Leased Real Property (Tenant);

(c)     any Seller's title to any motor vehicles included among the Purchased Assets and bills of sale and assignment, duly executed by the Sellers, in form and substance reasonably acceptable to Purchaser, conveying to Purchaser good and valid title to all Purchased Assets other than the Real Property, free and clear of all Encumbrances other than Permitted Encumbrances, which bill of sale and assignment shall include an itemized inventory of all firearms including the description and serial numbers of all such firearms;

(d)     the Assumed Contracts and Leases Assignment, duly executed by the Sellers;

(e)     any Interim Liquor Agreement to the extent required pursuant to Section 7.03(b), duly executed by the Company;

(f)     certification that each Seller is not a foreign Person, dated as of the Closing Date and in the form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code;

(g)     certificates of the duly authorized President or Vice President or similar officer of each Seller certifying the fulfillment of the conditions set forth in Section 10.01;

2758048 v03

(h)     certificates of incumbency or evidence of appropriate power of attorney for the respective directors or officers of each Seller executing this Agreement, the Seller's Ancillary Agreements and other Closing documents, dated as of the Closing Date;

(i)     certificates of such trust authorizations, approvals and incumbencies of the Cooper Trusts to evidence the power and authority of the Cooper Trusts to, and the Cooper Trusts' approval and authorization, to execute this Agreement and the applicable Seller's Ancillary Agreements, dated as of the Closing Date;

(j)     a settlement statement prepared by Escrow Agent reflecting the payment of the Deposit and Purchase Price and all adjustments and prorations and the payment of the Cooper Cash Consideration pursuant to this Agreement;

(k)     possession of the Hotel and all Purchased Assets;

(l)     originals (to the extent in any Seller's possession) or copies of all Assumed Contracts and the all Records relating to the Purchased Assets to be transferred to Purchaser hereunder, all Miscellaneous Hotel Assets relating to the Purchased Assets, and all keys, combinations, codes and passwords for access to the Purchased Assets;

(m)     such other documents and instruments as are customary and as may be reasonably requested by Escrow Agent to effectuate the transactions contemplated by this Agreement, including, without limitation, customary title affidavits; and

(n)     the agreement for the Cooper Participation; and

(o)     the CSA for Jack B. Healan, Jr.

10.08   Club Transactions.

The Bankruptcy Court (and the Club Members shall vote for the Plan A transaction in Section 10.08(a)) shall approve pursuant to a final and non-appealable order:

(a)     Approve the ability of the Club and the Purchaser to establish after the effective date of the Company's Plan a new Equity Club (a/k/a Plan A) pursuant to the terms and conditions of the Club Transfer Agreement and Access and Use Agreement attached as Schedule 10.08(a) which if established would be substituted for the Club member's rights established by the NDA and that certain Riverstone Agreement dated December 11, 1998 (the "**Existing Membership Reservation Agreement**"), result in the cancellation and release of the NDA, and result in the rejection of the Existing Membership Reservation Agreement in the Chapter 11 Case. Plan A is subject to approval by the Club members and if such does not occur, the alternative is Plan B below. Plan A shall specifically reserve to Purchaser four (4) lifetime memberships in the new Equity Club (or other equivalent memberships [free and clear of any obligation to pay initiation fees, assessments or dues but subject to payment of normal fees paid by other members such as cart fees (but not green fees) and food and beverage charges] in the Club that may be designated for such use), which shall be assigned at Closing to Cooper Sellers (2 memberships), Jack B. Healan, Jr., and S. Norman Bray.

(b)     Establish a New Non-Equity Club (a/k/a Plan B) that provides for the property interest of the Club members and Purchaser as shown on Schedule 10.08(b). The terms of the New Non-Equity Plan as dictated by the Bankruptcy Court shall be similar to the those in the NDA, but specifically shall not include a refund obligation relating to any Club Member Refund Rights. The Existing

2758048 v03

53

Membership Reservation Agreement will also be rejected in the Chapter 11 Case under the New Non-Equity Plan.

Notwithstanding any other provision in this Agreement, the definition of Purchased Assets and the warranties of title on the Purchased Assets are to be adjusted to take into consideration the requirements of the alternatives in Sections 10.08(a) and 10.08(b). Purchaser shall use good faith commercially reasonable efforts to agree with the Club and PRIAC on the form of the agreements required for both alternatives Sections 10.08(a) and 10.08(b) on or before the termination of the Due Diligence Period and the failure to agree to the forms during the Due Diligence Period and enter into the same at Closing shall constitute the failure of a condition precedent for Purchaser and Sellers, in which case either Purchaser or Sellers may terminate this Agreement and the Deposit shall be returned to Purchaser.

10.09   Office Complex Building 1.

The Office Complex Building 1 Parcel shall have been legally subdivided to create the new Office Complex Building 1 Parcel Legal pursuant to Section 6.03, and the new Office Complex Building 1 Parcel and the improvements thereon shall be in compliance with the zoning Legal Requirements applicable thereto.

10.10   Compass/PRIAC Releases and Other Lender Releases.

Cooper Sellers, Company Seller and Escrow Agent shall have received prior to Closing Conditional Release Letters from PRIAC and Compass for the release of mortgages and guaranties related to the Ancillary Assets and the assets of AIM. Cooper Sellers and Company Seller shall have received the Compass/PRIAC Releases and Other Lender Releases at Closing.

## ARTICLE XI

## TERMINATION; REMEDIES

11.01   Termination of Agreement.

(a)     Notwithstanding anything herein to the contrary, this Agreement may be terminated, and the transactions contemplated by this Agreement abandoned, upon notice by the terminating party to the other parties:

(i)      at any time before the Closing, by mutual written consent of Purchaser and Sellers;

(ii)     at any time before the Closing, by Purchaser on the one hand, or Sellers on the other hand, (1) in the event of a Breach (including a Terminable Breach under Section 5.01) of this Agreement by the non-terminating party that remains uncured following thirty (30) days' notice from the terminating party of such Breach and that would result in the failure of any condition to the terminating party's obligations under this Agreement being satisfied or (2) if the satisfaction of any condition to such party's obligations under this Agreement has failed to be timely performed or becomes impossible or impracticable with the use of commercially reasonable efforts and the failure of such condition to be satisfied is not the result of a Breach by the terminating party;

2758048 v03

(iii)    at any time following the date that is one hundred eighty (180) days following the date hereof (the "**Termination Date**"), by either party if the transactions contemplated by this Agreement have not been consummated on or before such date; provided, however, that the right to terminate this Agreement pursuant to this Section 11.01(a)(iii) shall not be available to a party if such party is in Breach of Section 5.06 or Section 6.04, as applicable; or

(iv)    by Purchaser: (1) if the Bankruptcy Court approves, in accordance with the Sale Order, a purchase agreement by a purchaser other than Purchaser; (2) if Sellers file with the Bankruptcy Court a Stand-Alone Plan; or (3) if the Chapter 11 Case is converted to Chapter 7 of the Bankruptcy Code and the Bankruptcy Court approves a sale by the Chapter 7 Trustee pursuant to a purchase agreement by a purchaser other than Purchaser.

(b)    If this Agreement is validly terminated pursuant to this Section 11.01, this Agreement will be null and void, and there will be no Liability on the part of any party (or any of such party's shareholders, Affiliates and its and their respective officers, directors, trustees, employees, agents, consultants or other representatives) except for the obligations of such party hereunder that expressly survive the termination of this Agreement.

(c)    If this Agreement is terminated for any reason, other than a termination by Sellers pursuant to Section 11.01(a)(ii) as a result of a Breach by Purchaser, then (i) Escrow Agent shall immediately return the Deposit to Purchaser and (ii) the provisions of Section 8.06 apply.

(d)    If this Agreement is terminated by Sellers pursuant to Section 11.01(a)(ii) as a result of a Breach by Purchaser, the Escrow Agent shall deliver the Deposit to the Company.

(e)    To the extent Purchaser is entitled to receive the Break-Up Fee and/or the Expense Reimbursement pursuant to Section 8.06 hereof, the Company shall pay to Purchaser the Break-Up Fee and/or Expense Reimbursement by wire transfer of immediately available funds to an account designated by Purchaser upon the consummation of, and from the deposit or cash proceeds of, the Topping Transaction, or within the time period following termination, as applicable, referred to in Section 8.06.

(f)    Upon any termination of this Agreement, receipt of the Break-Up Fee, Expense Reimbursement and/or the Deposit, as applicable, pursuant to this Section 11.01 and Section 8.06 herein shall be the sole and exclusive remedy of the party receiving such amounts for any termination hereof.

(g)    The provisions of this Article XI shall survive the termination of this Agreement indefinitely.

## ARTICLE XII

## PRORATIONS

12.01   <u>Prorations Generally.</u>

(a)    Except as otherwise expressly set forth in this Article XII, all items of income and expense of the Sellers with respect to the period prior to the Apportionment Time shall be for the account of the Sellers, and all items of income and expense of the Sellers with respect to the period after the Apportionment Time shall be for the account of Purchaser but only with respect to the Purchased Assets and Assumed Liabilities. Except as otherwise expressly set forth in this Article XII, all prorations

2758048 v03

shall be on an accrual basis in accordance with GAAP, and based on the actual number of days in the applicable period.

(b)     Within ninety (90) days following the Closing Date, Purchaser shall prepare and issue the final accounting of all income and expenses described in this Article XII as of the Apportionment Time ("**Final Accounting**"). Purchaser and the Company shall each have the right to have their respective accountants reasonably review drafts of the Final Accounting such that the Final Accounting accurately reflects the operations of the Business as of the Apportionment Time and review all books of control and account pertaining to the Final Accounting. If Purchaser and the Company are not able to agree on the Final Accounting, then the dispute shall be resolved in accordance with the dispute resolution procedures set forth in Section 12.01(d) and (e) hereof. A final determination of all income and expenses ("**True-Up**") shall occur on the date that is sixty (60) days after the Final Accounting has been agreed to, and following the True-Up, as set forth in, and subject to, Section 2.05(c) hereof, the Company or Purchaser, as the case may be, shall pay to the other the amount required by the True-Up. The True-Up shall be final and except as otherwise expressly set forth in this Agreement there shall be no further adjustment between the Company and Purchaser for income and expenses.

(c)     Within thirty (30) days after the date of this Agreement, Sellers shall provide Purchaser with a written estimate and itemization as of the date of this Agreement of the following:

(i)     Accounts Receivable;

(ii)     deposits made by or on behalf of the Sellers as security under any Assumed Contract, utility, public service or other arrangement;

(iii)     prepaid expenses under Seller's Contracts and with respect to prepaid fees for assignable permits;

(iv)     charges and credit, if any, for water, sewer, fuel, electricity, gas and other utilities;

(v)     deposits or advance payments in respect of the occupancy or use of rooms, suites, banquet and meeting rooms, convention facilities and other facilities in the Hotel, or catering, food service and other services performed at the Hotel; and

(vi)     all accounts payable owing for goods and services furnished.

(d)     If either party disagrees with the calculations set forth in the Final Accounting, then the other party shall, within ten (10) days after receipt of the Final Accounting, deliver a notice (an "**Objection Notice**") to other party setting forth the party's calculation of the Final Accounting or the reasons for the party's disagreement. Purchaser and the Company will attempt in good faith to resolve any disagreements as to the calculation of the Final Accounting. If Purchaser and the Company do not obtain a final resolution regarding the calculation of the Final Accounting within ten (10) days after one party has received the Objection Notice (the "**Resolution Period**"), then the parties shall determine all amounts remaining in dispute pursuant to Section 12.01(e).

(e)     If the parties are unable to obtain a final resolution regarding the calculation of the Final Accounting before the expiration of the Resolution Period, then the Final Accounting shall be determined in accordance with the following procedures:

2758048 v03

(i)     Within ten (10) days after the expiration of the Resolution Period, the Company and Purchaser shall each select a nationally recognized accounting firm and, if required by its accounting firm, execute a reasonable engagement letter. Purchaser and the Company shall each provide to the accounting firms the detailed calculation of the Final Accounting and all other relevant materials used by such party in its determination of the Final Accounting. Purchaser and the Company will reasonably cooperate with the accounting firms during their engagement;

(ii)    Within a commercially reasonable period after their selection, each accounting firm shall provide to the Purchaser and the Company a written determination of the Final Accounting; provided, however, that each accounting firm shall endeavor to provide such written determination within thirty (30) days of its selection, and in no event shall such determination be made later than sixty (60) day after its selection. The party appointing each accounting firm shall be obligated, promptly after receipt of the written determination prepared by the accounting firm by such party, to deliver a copy of the written determination to the other parties to this Agreement. In making its determination, each accounting firm shall (A) be bound by the terms and conditions of this Agreement, including, the definition of Final Accounting and the terms of this Section 12.01, and (B) not assign any value with respect to a disputed amount that is greater than the highest value for such amount claimed by either Purchaser or the Company or that is less than the lowest value for such amount claimed by either Purchaser or the Company.

(iii)   If the Final Accounting determined by the accounting firm designated by the Company is within two percent (2%) of the Final Accounting determined by the accounting firm designated by the Purchaser, then the Final Accounting determined by the accounting firm designated by the Company will be conclusive and binding upon Purchaser and the Company.

(iv)    If the Final Accounting determinations of the two accounting firms vary by more than two percent (2%), then an Audit Firm shall be selected by the initial two accounting firms within ten (10) days after the initial two determinations of the Final Accounting have been delivered to the parties. If an Audit Firm is appointed, the Audit Firm shall review the reports of the initial two accounting firms and shall select the one of the initial two reports that the Audit Firm determines more accurately reflects the Final Accounting in accordance with the terms and conditions of this Agreement, including, the definition of Final Accounting and the terms of this Section 12.01. The Audit Firm shall promptly deliver a written report of its determination to each of the parties to this Agreement.

(v)     Each of Purchaser and the Company shall be entitled to make a presentation to the Audit Firm only regarding the items and amounts that Purchaser and the Company are unable to resolve. All presentations to or communications with the Audit Firm shall be made in such a fashion that all parties to this Agreement receive copies of any written communications or materials. Neither Purchaser nor any Seller, nor any of their respective Affiliates or representatives, shall have any substantive, oral ex parte communications with the Audit Firm.

(vi)    Absent fraud or manifest error, the determination of the Audit Firm will be conclusive and binding upon Purchaser and the Company.

(vii)   The expenses of each of the first two accounting firms appointed under this Section 12.01(e) shall be borne by the party appointing such accounting firm. The expenses of the Audit Firm appointed under this Section 12.01(e) shall be paid one-half (1/2) by Purchaser and one-half (1/2) by the Company.

2758048 v03

57

12.02    Rules for Specific Items of Income and Expense.

(a)    The Company shall receive a credit for all cash in the cash registers, vaults, safes (other than that belonging to guests), petty cash boxes, vending machines and coin-operated devices at the Hotel as of the Apportionment Time.

(b)    The final night's room revenue (revenue from rooms occupied on the evening preceding the Closing Date), any taxes thereon, and any in-room telephone, movie and similar charges for such night, shall be allocated to the Company.

(c)    The final night's revenue from food, beverage and other restaurant, bar and similar revenue, and taxes thereon, to the closing hours of facility operations which commenced on the day prior to the Closing Date shall be allocated to the Company.

(d)    The Company shall receive a credit for, and Purchaser shall purchase from the Company, the Guest Ledger. Such credit shall equal the amount of the Guest Ledger, less credit card charges, travel company charges and similar commissions.

(e)    Except as set forth in Section 12.02(d), all Accounts Receivable for all periods prior to the Apportionment Time shall remain the property of the Company. For One Hundred Eighty (180) days following the Closing Date, Purchaser shall use commercially reasonable efforts (in no event to include bringing legal action or engaging a collection agent) to collect in the ordinary course of business all such Accounts Receivable (other than Accounts Receivable from credit card companies that shall be collected directly by the Company). With regard to any collection made from any Person that is indebted to the Hotel with respect to Accounts Receivable incurred both prior to and from and after the Apportionment Time, such collection shall be applied to the oldest Accounts Receivable first, unless such payment is specifically designated as being payment for newer Accounts Receivable. Periodically (but no less frequently than monthly), Purchaser shall submit to the Company all amounts received in respect of such Accounts Receivable, together with an itemization of such Accounts Receivable.

(f)    The Company shall receive a credit (based upon the original net invoice price paid, net of non-invoiced allowances, rebates or other discounts received by the Company) for all full, unopened Consumables at the Hotel as of the Apportionment Time, in quantities not in excess of amounts historically maintained by the Company in the ordinary course of the Business. For this purpose, an individual container shall not be considered opened if the container itself is not opened but the crate, box or pallet including such container and other similar containers shall have been opened. The amount of such credit shall be based on an actual inventory of such Consumables by the Company's and Purchaser's representatives.

(g)    The Company shall receive a credit for all deposits made by or on behalf of the Company as of the Apportionment Time as security under any Assumed Contract, utility, public service or other arrangement to the extent the same remains on deposit for the benefit of Purchaser.

(h)    The Company shall receive a credit for prepaid expenses as of the Apportionment Time under Assumed Contracts and Leases and with respect to prepaid fees for assignable permits.

(i)    Rent and all other amounts actually received from tenants under any space leases or licenses shall be apportioned between the Company and Purchaser as of the Apportionment Time. If any arrearage exists under any space lease or license as of the Closing Date, any amounts collected on or after the Closing Date with respect to such space lease or license shall be applied first to amounts then due and payable under such space lease or license with respect to the period from and after the Closing

2758048 v03

Date, and thereafter to any amounts then due and payable under such space lease or license with respect to periods prior to the Closing Date.

(j)     All sales, use, rooms, occupancy, excise and similar Taxes, personal property Taxes, ad valorem real estate Taxes, and other Taxes, levies and assessments (other than sales and use taxes payable in respect of the transfer of any Purchased Assets to Purchaser, which shall be paid by Seller) shall be apportioned between the Company and Purchaser as of the Apportionment Time. If the exact amount of such Taxes cannot be determined at Closing, such apportionment shall be based upon the Company's and Purchaser's reasonable estimates of such Taxes, subject to readjustment upon the later of (i) the True-Up and (ii) the date that actual taxes can be determined. For so long as any portion of the Purchase Price remains outstanding (e.g., Retained Deposit), Purchaser shall receive a credit against the then-outstanding portion of the Purchase Price for all liabilities incurred by Purchaser resulting from audits by any Governmental Authority for sales, use, rooms, occupancy and similar Taxes arising from the operations of the Hotel during the period prior to the Effective Time; provided, however, that the Company, or any Affiliate of the Company, shall have the opportunity to participate in the defense of any such audit, and Purchaser shall not agree to settle any such audit without the Company's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

(k)     All amounts owed by, or to be paid to, the Sellers under the Assumed Contracts and Leases shall be apportioned between the Company and Purchaser as of the Apportionment Time.

(l)     Charges and credit, if any, for water, sewer, fuel, electricity, gas, and other utilities shall be apportioned between the Company and Purchaser as of the Apportionment Time.

(m)     Purchaser shall receive a credit for all deposits or advance payments received by the Company prior to the Closing Date in respect of the occupancy or use, after the Apportionment Time, of rooms, suites, banquet and meeting rooms, convention facilities and other facilities in the Hotel, or catering, food service and other services performed at the Hotel.

(n)     Purchaser shall receive a credit for all accounts payable owing for goods and services furnished prior to the Apportionment Time. Purchaser shall pay all accounts payable relating to goods and services for which orders have been placed but, as of the Apportionment Time, such goods and services have not yet been delivered or provided.

12.03   Interest.

If either the Company or Purchaser shall fail to pay any amount due pursuant to this Article XII and Section 8.05(c) by the date the same is due and payable, interest shall accrue on the unpaid portion from the due date therefor at the rate of 10% per annum until paid in full.

12.04   Revenue Contracts and Reservations.

From and after Closing, Purchaser shall use commercially reasonable efforts to honor all revenue contracts and reservations relating to the Hotel that have been entered into as of the Closing Date.

12.05   Survival.

This Article XII shall survive Closing indefinitely.

2758048 v03

# ARTICLE XIII

## SELLERS' AGENT

13.01    Appointment and Reliance.

Each Seller hereby irrevocably appoints the Company as its agent (the "**Agent**") for the purpose of performing and consummating the transactions contemplated by this Agreement and Seller and Purchaser Ancillary Agreements. The Agent is hereby authorized and directed to perform and consummate on behalf of the Sellers all of the transactions contemplated by this Agreement and the Ancillary Agreements. Purchaser shall be entitled to rely, without inquiry, upon instructions from, actions taken and documents executed or delivered by the Agent on behalf of the Sellers as if such instructions, actions or documents were made, taken, executed or delivered directly by the Sellers and shall have no liability to the Sellers for any action taken in accordance with such instructions or actions, or in reliance on such documents.

13.02    Authority and Limitation of Liability.

Not by way of limiting the authority of the Agent, each and all of the Sellers, for themselves and their respective successors and assigns, hereby authorize the Agent to:

(a)    waive any provision of this Agreement which the Agent deems necessary or desirable;

(b)    execute and deliver on the Sellers' behalf all documents and instruments which may be executed and delivered pursuant to this Agreement, excluding any deeds or conveyances of title, which shall not be signed by Agent on any Seller's behalf;

(c)    calculate, negotiate and agree to and receive or pay or credit or debit any adjustments to the Purchase Price, including pursuant to the True-Up and proration provisions set forth in Article XII;

(d)    make and receive notices and other communications pursuant to this Agreement and service of process in any legal action or other proceeding arising out of or related to this Agreement and any of the transactions contemplated hereunder;

(e)    (i) contest, negotiate, defend compromise or settle any dispute, claim, action, suit or proceeding (collectively, "**Actions**") related to this Agreement or any of the transactions hereunder through counsel selected by the Agent and solely at the cost, risk and expense of the Sellers, (ii) authorize a reduction of the Purchase Price, as the case may be, in satisfaction of any indemnification amounts owned pursuant to the terms herein, (iii) agree to, negotiate, enter into settlements and compromises of, and demand arbitration and comply with orders of courts and awards of arbitrators with respect to such indemnification obligations or Actions, (iv) resolve any Actions arising from the Sellers' indemnification obligations hereunder, and (v) take any actions in connection with the resolution of any dispute relating hereto or to the transactions contemplated hereby by arbitration, settlement or otherwise;

(f)    appoint or provide for successor agents;

(g)    select, retain, hire and consult with legal counsel, independent public accountants and other experts, solely at the cost and expense of the Sellers;

2758048 v03

(h)     pay expenses incurred which may be incurred by or on behalf of the accountants and other experts, solely at the cost and expenses of the Sellers; and

(i)     take or forego any or all actions permitted or required of any Seller or necessary in the judgment of the Agent for the accomplishment of the foregoing and all of the other terms, conditions and limitations of this Agreement.

Each Seller agrees that the Agent shall have no liability to the Sellers, jointly or severally, for any act or omission by the Agent as permitted under this Section 13.02, excepting only actions taken in bad faith, and each Seller hereby irrevocably waives and releases any claims it may have against the Agent for its acts and omissions hereunder other than any actions taken in bad faith.

EACH SELLER UNDERSTANDS AND ACKNOWLEDGES THAT IT IS: (A) AUTHORIZING THE AGENT TO ACT FOR THE SELLERS, COLLECTIVELY AND INDIVIDUALLY, WITH BROAD POWERS; AND (B) AGREEING THAT THE AGENT WILL NOT BE LIABLE TO THE SELLERS, COLLECTIVELY OR INDIVIDUALLY, UNLESS THE AGENT ACTS IN BAD FAITH.

13.03   Disputes.

Any Action or Proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to the Sellers under this Agreement may be asserted, brought, prosecuted or maintained only by the Agent. Any Proceeding, whether in law or equity, to enforce any right, benefit or remedy granted to Purchaser under this Agreement, including without limitation any right of indemnification provided herein, may be asserted, brought, prosecuted or maintained by Purchaser against the Sellers or the Agent by service of process on the Agent and without the necessity of serving process on, or otherwise joining or naming as a defendant in such Action or Proceeding, any Seller. With respect to any matter contemplated by this Section 13.03, the Sellers shall be bound by any determination in favor of or against the Agent or the terms of any settlement or release to which the Agent shall become a party.

**ARTICLE XIV**

**MISCELLANEOUS**

14.01   Entire Agreement.

This Agreement, the Ancillary Agreements and the Disclosure Schedules hereto constitute the entire understanding and agreement of the parties hereto with respect to the subject matter hereof and supersede all prior and contemporaneous agreements or understandings, inducements or conditions, express or implied, written or oral, between the parties with respect to the subject matter hereof. The express terms hereof control and supersede any course of performance or usage of trade inconsistent with any of the terms hereof.

14.02   Assignment; Binding Upon Successors and Assigns.

The rights and obligations of any party under this Agreement shall not be assignable by such party hereto without the prior written consent of the others, except that: the Sellers may, without the consent of any other party, assign all of their rights, title and interests in and to this Agreement (including the Sellers' right to receive the Purchase Price, and any and all other documents delivered to the Sellers pursuant to this Agreement, (i) to any Affiliate (as of the date of this Agreement) of any Seller, and (ii) to any liquidating trust(s); or (b) Purchaser may, without the consent of any other party, assign all of its

2758048 v03

right, title and interest in and to this Agreement (including Purchaser's right to receive the Purchased Assets, and any and all other documents delivered to Purchaser pursuant to this Agreement), to any Affiliate (as of the date of this Agreement) of Purchaser. Each party shall provide prompt notice to the other parties of any such assignment made pursuant to this Section. To the extent permitted by applicable Legal Requirements, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

14.03    No Third Party Beneficiaries.

No provisions of this Agreement are intended, nor will be interpreted, to provide or create any third party beneficiary rights or any other rights of any kind in any client, customer, affiliate, stockholder, partner, employee of any party hereto or any other Person unless specifically provided otherwise herein, and, except as so provided, all provisions hereof will be personal solely between the parties to this Agreement.

14.04    No Joint Venture.

Nothing contained in this Agreement will be deemed or construed as creating a joint venture or partnership between the parties hereto. No party is by virtue of this Agreement authorized as an agent, employee or legal representative of any other party. No party will have the power to control the activities and operations of any other, and the parties' status is, and at all times will continue to be, that of independent contractors with respect to each other. No party will have any power or authority to bind or commit any other. No party will hold itself out as having any authority or relationship in contravention of this Section 14.04. The provisions of this Section 14.04 are qualified in their entirety by reference to Article XIII.

14.05    Severability.

If any provision of this Agreement, or the application thereof, is for any reason held to any extent to be invalid or unenforceable, the remainder of this Agreement and application of such provision to other persons or circumstances will be interpreted so as reasonably to affect the intent of the parties hereto. The parties further agree to replace such unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the extent possible, the economic, business and other purposes of the invalid or unenforceable provision.

14.06    Section Headings.

A reference to an Article, Section or Schedule will mean an Article or Section in, or a Schedule to, this Agreement, unless otherwise explicitly set forth. The titles and headings in this Agreement are for reference purposes only and will not in any manner limit the construction of this Agreement. For the purposes of such construction, this Agreement will be considered as a whole.

14.07    Amendment, Extension and Waivers.

At any time prior to the Effective Time, Purchaser and Sellers may, to the extent legally allowed: (a) extend the time for performance of any of the obligations of the other party; (b) waive any inaccuracies in the representations and warranties made to such party contained herein or in any document delivered pursuant hereto; and (c) waive compliance with any of the agreements, covenants or conditions for the benefit of such party contained herein. Any term or provision of this Agreement may be amended. Any agreement to any amendment, extension or waiver will be valid only if set forth in writing and signed by the party to be bound. The waiver by a party of any Breach hereof or default in the

2758048 v03

62

performance hereof will not be deemed to constitute a waiver of any other default or any succeeding Breach or default. The failure of any party to enforce any of the provisions hereof will not be construed to be a waiver of the right of such party thereafter to enforce such provisions, except as otherwise expressly set forth herein. This Agreement may be amended by the parties hereto at any time.

### 14.08   Survival of Representations, Warranties and Covenants.

All representations, warranties and covenants in this Agreement or in any Ancillary Agreement shall expire on, and be terminated and extinguished at, the Effective Time, other than covenants that by their express terms are to survive after the Effective Time or except as otherwise expressly set forth herein.

### 14.09   Public Announcement.

Except to the extent required to comply with the provisions of this Agreement, no party hereto shall issue any press release or otherwise make any statements to any Third Party with respect to this Agreement or the transactions contemplated hereby other than with the prior written consent of the other parties, which consent shall not be unreasonably withheld, conditioned or delayed. Prior to the issuance of any announcement of this Agreement and the transactions contemplated hereby by any party, such party will consult with the other parties regarding the content of such announcement and obtain such other parties' reasonable approval of any related and proposed press release. Notwithstanding the foregoing, any party may issue such announcements, and make such other disclosures regarding this Agreement or the transactions contemplated hereby, as it determines are required under applicable Legal Requirements or any listing or trading agreement concerning its publicly traded securities.

### 14.10   Governing Law.

The validity of this Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties to this Agreement will be exclusively governed by and construed in accordance with the internal laws of the State of Florida as applied to agreements entered into solely between residents of and to be performed entirely in the State of Florida, without reference to that body of law relating to conflicts of law or choice of law.

### 14.11   Jurisdiction; Venue; Waiver of Jury Trial.

(a)      Each of the parties to this Agreement hereby agrees that the Bankruptcy Court, shall have exclusive jurisdiction to hear and determine any claims or disputes between the parties hereto pertaining directly or indirectly to this Agreement, and all documents, instruments and agreements executed pursuant hereto or thereto, or to any matter arising herefrom (unless otherwise expressly provided for herein or therein). To the extent permitted by applicable Legal Requirement, each party hereby expressly submits and consents in advance to such jurisdiction in any action or proceeding commenced by any of the other parties hereto in such court, and agrees that service of summons and complaint or other process or papers may be made by registered or certified mail addressed to such party at the address to which notices are to be sent pursuant to this Agreement. Each of the parties waives any claim that such court is an inconvenient forum or an improper forum based on lack of venue. The choice of forum set forth in this Section 14.11 shall not be deemed to preclude the enforcement of any judgment obtained in such forum or the taking of any action to enforce the same in any other appropriate jurisdiction.

(b)      EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENT, ANY RIGHT IT MAY HAVE TO A

2758048 v03

TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY HERETO (1) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (2) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 14.11.

14.12    Costs and Attorneys' Fees.

In the event of any litigation or dispute between the parties arising out of or in any way connected with this Agreement, resulting in any litigation, then the prevailing party in such litigation shall be entitled to recover its costs of prosecuting and/or defending same, including, without limitation, reasonable attorneys' fees at trial and all appellate levels. The provisions of this Section 14.12 shall survive the termination of this Agreement.

14.13    Notices.

Any notice or other communication required or permitted to be given under this Agreement will be in writing, will be delivered personally, by facsimile (confirmed on the date the facsimile is sent by one of the other methods of giving notice provided for in this Section) or by nationally recognized overnight delivery service, and will be deemed given upon actual delivery or upon the date of rejection as indicated in the return receipt therefor, addressed as follows:

If to Purchaser:

Noble Hospitality Fund Acquisitions, LLC
1100 Monarch Tower
3424 Peachtree Road, N.E.
Atlanta, GA 30326
Attention: Mark K. Rafuse
Facsimile: (404) 262-9244

with copies to (which will not constitute notice):

Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326
Attention: G. Brian Butler
Facsimile: (404) 365-9532

If to any Seller:

Amelia Island Company
6800 First Coast Highway
Fernandina Beach, FL 32034
Attention: Jack B. Healan, Jr.
Facsimile: (904) 277-5984

2758048 v03

with copies to (which will not constitute notice):

Stutsman, Thames & Markey, P.A.
50 North Laura Street, Suite 1600
Jacksonville, FL 32202
Attention: Richard R. Thames
Facsimile: (904) 358-4001

with copies to (which will not constitute notice):

Foley & Lardner LLP
One Independent Drive, Suite 1300
Jacksonville, Florida 32202
Attention: Gardner F. Davis or Emerson M. Lotzia
Facsimile: (904) 359-8700

If to any Cooper Seller:

c/o Nicola, Gudbranson & Cooper, LLC
Landmark Towers/Republic Building
25 West Prospect Avenue, Suite 1400
Cleveland, OH 44115-1048
Attention: Richard A. Cooper
Facsimile: (216) 621-3999

with copies to (which will not constitute notice):

Cooper Ridge & Safi
Baywater Square Building
136 E. Bay Street, Suite 301
Jacksonville, Florida 32202
Attention: George E. Ridge
Facsimile: 904.353.7550

or to such other address as the party in question may have furnished to the other parties by written notice given in accordance with this Section 14.13.

14.14   Counterparts.

This Agreement may be executed in counterparts, each of which will be an original as regards any party whose name appears thereon and all of which together will constitute one and the same instrument. This Agreement or any counterpart may be executed via facsimile or other electronic transmission, and any such executed facsimile or other electronic copy shall be treated as an original. This Agreement will become binding when one or more counterparts hereof, individually or taken together, bear the signatures of all parties reflected hereon as signatories.

14.15   Costs and Expenses.

Except as otherwise expressly set forth in this Agreement, all expenses of the negotiation and preparation of this Agreement and related to the transactions contemplated hereby, including legal

2758048 v03

counsel, accounting, brokerage and investment advisor fees and disbursements, shall be borne by the respective party incurring such expense, whether or not the transactions contemplated hereby are consummated. Purchaser shall pay the premium cost of its owner's title insurance policies. Purchaser shall pay the cost of the Survey, environmental, engineering, and other professional studies undertaken by Purchaser with respect to the Real Property.

14.16  Escrow Agent Provisions.

(a)  The Parties hereto covenant and agree that in performing any of its duties under this Agreement, Escrow Agent shall not be liable for any loss, costs or damage which it may incur as a result of serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence. Accordingly, Escrow Agent shall not incur any liability with respect to (i) any action taken or omitted to be taken in good faith upon advice of its counsel given with respect to any questions relating to its duties and responsibilities, or (ii) any action taken or omitted to be taken in reliance upon any document, including any written notice of instruction provided for in this Agreement, including the truth and accuracy of any information contained therein, which Escrow Agent shall in good faith believe to be genuine, to have been signed or presented by a proper person or persons.

(b)  Sellers and Purchaser hereby agree to indemnify and hold harmless Escrow Agent against any and all losses, claims, damages, liabilities and expenses, including without limitation, reasonable costs of investigation and attorneys' fees and disbursements which may be imposed upon or incurred by Escrow Agent in connection with its serving as Escrow Agent hereunder, except for any loss, costs or damage arising out of its willful default or gross negligence.

(c)  In the event of a dispute between any of the parties hereto sufficient in the sole discretion of Escrow Agent to justify its doing so, Escrow Agent shall be entitled to tender unto the Bankruptcy Court all money or property in its hands held under the terms of this Agreement, together with such legal pleading as it deems appropriate, and thereupon be discharged.

14.17  Option to Purchase Stock of Company after Purchased Assets are Purchased.

The Company's Plan shall provide that Purchaser may, upon Purchaser's election at any time before Closing, elect to acquire the stock of the reorganized Company. The Confirmation Order shall provide that, if Purchaser exercises such election, then:

(i)  Any and all zoning variances, licenses and permits, authorizations, approvals, development agreements, and Liquor Licenses shall be transferred to the reorganized Company, except as otherwise directed by Purchaser;

(ii)  All Encumbrances affecting the Company shall be discharged and extinguished in full;

(iii)  All shares, stock, equity interests, and other interest in the Company shall be discharged and extinguished;

(iv)  New shares in the reorganized Company will be issued exclusively to Purchaser as Purchaser directs;

(v)  A liquidating trustee will be appointed, and such liquidating trustee: (a) shall succeed to and be bound by all of rights and obligations of the Company under the terms of this Agreement; (b) shall perform all of the Company's obligations under this Agreement; and

2758048 v03

(c) shall administer the Company's Plan and perform the duties and obligations of the Bankruptcy Estate under the Company's Plan; and

The reorganized Company shall have no duties or obligations arising in, under, or in connection with: (a) the Bankruptcy Case or the Bankruptcy Estate; (b) the Plan; or (c) this Agreement.

**[Signature Pages Follow]**

2758048 v03

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement as of the date first above written.

Signed, sealed and delivered
in the presence of:

**AMELIA ISLAND COMPANY**

By _____

Name: _Jack B. Healan, Jr._

Title: _President_

Printed Name of Witness

_Tana H. Williams_
Printed Name of Witness

_Kim Seyda_
Printed Name of Witness

**Seller**

2758048 v03

*[Signature Page to Asset Purchase Agreement]*

Signed, sealed and delivered
in the presence of:

*Jana H. Williams*
Jana H. Williams
Printed Name of Witness

Printed Name of Witness

**AMELIA ISLAND MANAGEMENT, INC.**

By _____
Name: Jack B. Healan, Jr.
Title: President

**Seller**

2758048 v03

JACK_1783362.3

*[Signature Page to Asset Purchase Agreement]*

Signed, sealed and delivered
in the presence of:

**AMELIA REALTY, INC.**

_____
_____
Printed Name of Witness

By _____
Name: _Jack B. Healan, Jr._____
Title: _President / Treasurer____

_____

**Seller**

_____
Printed Name of Witness

2758048 v03

*[Signature Page to Asset Purchase Agreement]*

Signed, sealed and delivered
in the presence of:

*Charlotte Winstead Jones*

CHARLOTTE WINSTEAD-JONES
Printed Name of Witness

*Susan M. Timko*

SUSAN M. TIMKO
Printed Name of Witness

**R&D COOPER, LTD.**

By _____
Name: RICHARD A. COOPER
Title: MANAGING MEMBER

**Seller**

Signed, sealed and delivered
in the presence of:

_Charlotte Winstead-Jones_
CHARLOTTE WINSTEAD-JONES
Printed Name of Witness

_Susan M. Timko_
SUSAN M. TIMKO
Printed Name of Witness

_Charlotte Winstead-Jones_
CHARLOTTE WINSTEAD-JONES
Printed Name of Witness

_Susan M. Timko_
SUSAN M. TIMKO
Printed Name of Witness

**COOPER TRUSTS**

**RICHARD A. COOPER,** as Trustee under two
separate trust agreements, each dated 12/31/85,
and each known as "Trust Agreement of
Richard L. Cooper

_R.A. Cooper_

**ROBERT N. GUDBRANSON,** as Trustee under
two separate trust agreements, each dated
12/31/85 and each known as "Trust Agreement
of Richard L. Cooper"

_Robert N. Gudbranson, Trustee_

**Seller**

*[Signature Page to Asset Purchase Agreement]*

Signed, sealed and delivered
in the presence of:

*Bonnie Herring*

Printed Name of Witness

*Mark Rafise*

Printed Name of Witness

**NOBLE HOSPITALITY FUND
ACQUISITIONS, LLC**

By _____

Name: Rodney S. William

Title: Chief Investment Officer

**Purchaser**

*[Signature Page to Asset Purchase Agreement]*

Signed, sealed and delivered
in the presence of:

_Dana H. Williams_

Jana H. Williams
Printed Name of Witness

_____

_____
Printed Name of Witness

**JACK B. HEALAN, JR., joining for the sole purpose of the commitments on the CSA, as defined herein**

_____